# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Roderick Sharpe, | ) | Case No. 03-04644-BGC-13 |
| | ) | |
| Debtor. | ) | |
| | | |
| Roderick D. Sharpe and | ) | |
| Linda Sharpe, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | A.P. No. 04-00250 |
| | ) | |
| Wells Fargo Home Mortgage; | ) | |
| and GE Mortgage Services, LLC; | ) | |
| fka GE Capital Mortgages Services, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION
### Of Findings of Fact and Conclusions of Law

The defendant foreclosed the plaintiffs' mortgage on August 30, 2004. The plaintiffs sued for breach of contract, wrongful foreclosure, conversion, trespass, violation of the automatic stay, estoppel, fraud, unjust enrichment, and breach of fiduciary duty. A trial was held on October 11, 2007.[1]

## I. BACKGROUND

### A. The Parties' Mortgage Contract

The plaintiffs executed a note with Southern Atlantic Financial Services, Inc. on May 15, 1998, for a loan of $51,300. Pla. Ex. 41. In exchange, they gave Southern a security interest in their home at 2617 Avenue H, Birmingham, Alabama. Pla. Ex. 42.

---

[1] At a pretrial conference on September 12, 2007, the Court and the parties discussed the defendants' relationships to one another. For several reasons, most relating to the issues discussed at the end of this opinion, the Court and the parties decided that the trial scheduled for October 11, 2007, would proceed against Wells Fargo only. Therefore, unless noted, any reference to "the defendant" means "Wells Fargo."

Southern Atlantic transferred its interest in the property and the note to GE Capital Mortgage Services, Inc (later known as GE Mortgage Services, LLC) on June 3, 1998. Pla. Ex. 41. On September 30, 2000, Wells Fargo Home Mortgage started servicing this loan for GE. <u>Affidavit of Dixie Teagle</u> attached to <u>First Amendment to Motion to Dismiss Defendant GE Mortgage Services</u>, filed December 18, 2007. Proceeding No. 152. Wells Fargo acquired the loan from GE on December 1, 2004. <u>Id</u>.

## B. The Plaintiffs' Bankruptcies[2]

Since entering into the mortgage contract with the defendant's predecessor, the plaintiffs have filed three bankruptcy cases in this Court.

### 1. Case No. 01-04442-BGC-13

Mr. Sharpe filed case number 01-04442 on June 22, 2001. Proceeding No. 1.[3] At that time, the plaintiffs were severely in default on their mortgage to GE. According to the proposed Chapter 13 plan Mr. Sharpe filed with his petition, the plaintiffs were in arrears for $4,800. Proceeding No. 1.[4] GE filed claim number 5 on August 21, 2001, for $5,908.30, representing the plaintiffs' prepetition mortgage arrears on this loan.

After this case was filed, the plaintiffs again became delinquent on their mortgage payments. In response, Wells Fargo filed its first <u>Motion for Relief from Automatic Stay</u> on February 25, 2002, seeking permission to foreclose its mortgage. Proceeding No. 19. That motion was resolved when the parties entered into an agreement regarding the plaintiffs' future mortgage payments. That agreement was incorporated into an order entered by this Court on April 12, 2002. Proceeding No. 25. That order allowed the defendant relief from the stay (after certain notice to the plaintiffs) if the plaintiffs failed to make any future mortgage payment beginning with the April 2002 payment.

---

[2] Rule 201 of the Federal Rules of Evidence authorizes a court to take judicial notice of its own records. See this Court's discussion in <u>In re Steeley</u>, 243 B.R. 421, 427 n.10 (Bankr. N.D. Ala. 1999).

[3] This case was filed before the Court implemented its current electronic case filing and management system; therefore, all proceedings are contained in the Court's official paper file and are not available electronically.

[4] According to the same document, the plaintiffs had a second mortgage arrearage debt on the property, this one to CitiFinancial for $1,000. See Claims 4 and 5 filed in Case No. 01-04442.

2

GE filed claim number 8 on May 20, 2002, for $2,578.75, representing the postpetition arrears accumulated during this case.[5] The plaintiffs did not contest that claim. The case was dismissed on July 9, 2002, and closed on August 16, 2002.

## 2. Case No. 02-07768-BGC-13

Mr. and Mrs. Sharpe filed case number 02-07768 on October 2, 2002, at 11:44 a.m. Proceeding No. 1.[6] According to the Statement of Financial Affairs they filed on October 9, 2002, a foreclosure sale was scheduled by GE for October 2, 2002.

According to the proposed Chapter 13 plan they filed on October 11, 2002, the plaintiffs were $8,600 in arrears on their mortgage to GE.[7]

This case was converted from Chapter 13 to Chapter 7 on April 4, 2003. Proceeding No. 20.

The plaintiffs again failed to make all of their postpetition mortgage payments. On May 6, 2003, Wells Fargo filed its second Motion for Relief from Automatic Stay, again seeking to foreclose. Proceeding No. 27. On June 5, 2003, this Court entered an order granting the defendant's motion for relief, with the consent of the plaintiffs.

Wells Fargo filed claim number 2 on January 2, 2003, for $9,336.[8]

The plaintiffs' Chapter 7 discharge was granted on October 6, 2003, and the case was closed that day.

## 3. Case No. 03-04644-BGC-13 (The Current Case)

The current case was filed by Mr. Sharpe on May 28, 2003, during the pendency of the 2002 Chapter 7 case.[9] Proceeding No. 1. Consequently it was filed before the

---

[5] CitiFinancial filed claim number 4 on July 24, 2001, for $1,000.

[6] This case was also filed before the Court implemented its current electronic case filing and management system; therefore, all of its proceedings are contained in the Court's official paper file and are not available electronically.

[7] Again, the plaintiffs listed a second mortgage arrearage debt to CitiFinancial, this one for $6,302.

[8] CitiFinancial filed claim number 1 on October 25, 2002, for $4,661.

[9] This case was also filed before the Court implemented its current electronic case filing and management system; however, that system was instituted during this case. As such, proceeding numbers 1 through 24 are contained in the Court's official paper file. The remainder are in the electronic system.

3

Court entered its June 5, 2003, <u>consent</u> order granting the defendant relief from the stay in the Chapter 7 case.

The effect of the May 28, 2003 filing was of course, at least as to Mr. Sharpe, to nullify the Court's June 5, 2003, order. That result is quite significant, for at that time, the plaintiffs were again severely in default on their mortgage. According to the proposed Chapter 13 plan filed with the petition, the plaintiffs were in arrears for $9,500. Proceeding No. 1. <u>They were contractually due for their September 2001 mortgage payment</u>. T. 26-27.[10]

After filing this case, the plaintiffs became more delinquent on their mortgage payments. On August 28, 2003, the defendant filed its third <u>Motion for Relief from Stay and Motion for Relief from Co-Debtor Stay</u> again seeking permission to foreclose its mortgage. Proceeding No. 10. That motion was resolved when <u>the parties entered into an agreement</u> regarding the plaintiffs' future mortgage payments. That agreement was incorporated into an order entered by this Court on November 19, 2003. Proceeding No. 21. The pertinent parts of that order are:

1.  The Debtors shall resume making the regular monthly mortgage payment unto the Creditor, presently in the amount of **$531.95**, beginning **OCTOBER 20, 2003**.

2.  The Creditor shall file a post-petition arrearage claim for the mortgage payments, contractual fees and costs including the associated bankruptcy attorney fees and costs. Said claim appears to be as follows:

    | | |
    |---|---|
    | 2 payment of $531.95 each for August and September 2003 | $1,063.90 |
    | 4 late charges of $23.85 each for June - September, 2003 | $   95.40 |
    | Bankruptcy Attorney fees and costs RE Motion for Relief | $  575.00 |
    | Partial Payment in Suspense: | [$   483.00] |
    | Total post-petition arrearage through October 19, 2003 | $ 1,251.30 |

3.  The automatic stay of Section 362(a) is hereby MODIFIED to provide future relief unto the Creditor as follows: <u>should the Debtors default under the terms of this order, or the terms of the mortgage contract, by the failure to make a payment which is received by the Creditor within thirty (30) days from the date that it becomes due beginning on or before OCTOBER 20, 2003, then the automatic stay of Section 362 terminates as to the Creditor without further notice or order</u>. The waiver of any default occurring under this order shall not constitute a waiver as toward any subsequent default occurring under this order.

<u>Order on Motion for Relief from Automatic Stay</u> entered November 19, 2003, Proceeding No. 21 (emphasis added).

---

[10] CitiFinancial filed claim number 1 on June 11, 2003. The plaintiffs' objected to that claim on June 22, 2004. Proceeding No. 27. This Court sustained that objection with an order entered July 29, 2004. Proceeding No. 33.

Contending that the plaintiffs did not make all payments after entering into the above agreement, and therefore that the stay lifted, in July 2004 the defendant began foreclosure proceedings against the plaintiffs. Def. Ex. 8 at 296604; Pla. Ex. 11. That process ended with a foreclosure sale on August 30, 2004. Pla. Ex. 10. All of the causes of actions alleged by the plaintiffs in the pending adversary proceeding emanate from the defendant's actions leading up to and including that foreclosure.

## 4. Summary of the Plaintiffs' Bankruptcies

Mr. Sharpe filed his first Chapter 13 case on June 22, 2001. At that time, the plaintiffs admitted to being in arrears on their mortgage with GE for at least $4,800. The plaintiffs then failed to make all of their postpetition mortgage payments. With the agreement of the plaintiffs, the Court entered its first order granting GE relief from the stay.

The plaintiffs filed a joint Chapter 13 case on October 2, 2002. At that time, the plaintiffs admitted to being in arrears on their mortgage with GE for at least $8,600. The plaintiffs converted the case to Chapter 7 on April 4, 2003. Again, the plaintiffs failed to make all of their postpetition mortgage payments.

Before the Chapter 7 case was completed, Mr. Sharpe filed the current Chapter 13 on May 28, 2003. Shortly thereafter, this Court entered its second order granting the defendant relief from the stay.

When Mr. Sharpe filed his third case, the plaintiffs admitted to being in arrears on their mortgage with GE for at least $9,500. The plaintiffs again failed to make all of their postpetition mortgage payments. On November 19, 2003, the Court entered its third order granting GE relief from the stay. It is this November 19, 2003, order that is at the heart of all of the matters addressed by this opinion.

## II. CONTENTIONS

### A. The Plaintiffs' Contentions

The plaintiffs contend they made all of the mortgage payments required by the November 19, 2003, order. As such, they conclude the stay did not lift and therefore the foreclosure was wrongful and in violation of the stay. In the alternative, the plaintiffs contend that even if they did not make all of their post-November 19, 2003, payments, the defendants failed to give the notices required by statute and by the parties' mortgage.

5

The plaintiffs argue that without those notices, the foreclosure is void and that they are entitled to damages.[11]  Based on that argument, the plaintiffs conclude that the foreclosure was wrongful and gave rise to numerous causes of actions.  Those include: breach of contract; wrongful foreclosure; conversion; trespass; violation of the automatic stay; estoppel; fraud; unjust enrichment; and breach of fiduciary duty.

## B.  The Defendant's Contentions

The defendant contends the plaintiffs did not make all of the mortgage payments due under the November 19, 2003, order.  Based on that contention, the defendant argues that the stay lifted pursuant to the order, which then allowed the defendant to exercise its state law remedy of foreclosure.  The defendant concludes that with relief from the stay, it could not be in violation of the stay.

In regard to notice, the defendant contends that it gave all notice required.  It argues that even if actual notice was not given, constructive notice should be imposed on the plaintiffs.  The defendant concludes that because all notice was given, it cannot be liable on any of the alleged causes of action.

## III.  PROCEDURAL HISTORY
## OF THE PENDING ADVERSARY PROCEEDING[12]

The plaintiffs filed their original complaint on December 30, 2004.  That complaint included causes of action for breach of contract, wrongful foreclosure, conversion, trespass, and violation of the automatic stay. Wells Fargo filed an Answer to the original complaint on March 4, 2005.  Proceeding No. 5.

The Court scheduled a trial for July 21, 2005.  On July 6, 2005, Wells Fargo filed a Motion for Summary Judgment. Proceeding No. 18.  The Court entered an order scheduling oral arguments for August 9, 2005, and cancelling the trial set for July 21, 2005. Proceeding No. 19. Before the hearing, the plaintiffs filed a Response to Defendant Wells Fargo's Motion for Summary Judgment. Proceeding No. 23.  Oral arguments were held on August 9, 2005.  Appearing were Mr. Loder for the plaintiffs and Mr. Thomas Tutten for the defendant.  The matter was submitted on the arguments of counsel and the pleadings.

---

[11] On October 9, 2007, the defendant filed a Motion to Sever the trial into liability and damages segments. Proceeding No. 137.  The plaintiffs opposed that motion.  Proceeding No. 139.  On October 10, 2007, the Court granted the motion.  Proceeding No. 140.  Because the Court finds that the defendant has liability, a hearing on damages will be scheduled.

[12] The Court takes judicial notice of its own records.  See note 2 above.

On September 30, 2005, nine months after the plaintiffs filed their original complaint, and seven months after the defendant filed an answer, the plaintiffs filed a Demand for Jury Trial.  Proceeding No. 26.

On October 4, 2005, the defendant filed a Motion to Strike Plaintiffs' Demand for Trial by Jury.  Proceeding No. 27.  On November 18, 2005, the Court entered an order denying the plaintiffs' demand for a jury, finding the plaintiffs' demand was not timely.  Proceeding No. 30.  As explained in its comments on the record, the Court denied the jury demand based on Rule 38 of the Federal Rules of Civil Procedure, (applicable to this adversary proceeding through Rule 9015 of the Federal Rules of Bankruptcy Procedure).  That rule provides that a demand for a jury trial must be made either at the commencement of the case or within 10 days after service of the answer to the complaint.  The complaint was filed on December 30, 2004, and the defendant filed an answer on March 4, 2005.  The plaintiffs first made a demand for a jury trial on September 30, 2005.

On January 3, 2006, the Court entered an Order (Proceeding No. 32) granting the defendant's Motion for Summary Judgment.  Proceeding No. 18.

On January 13, 2006, the plaintiffs filed a Motion to Reconsider (Proceeding No. 34) and a Notice of Appeal.[13]   Proceeding No. 35.  The Court scheduled a hearing for February 8, 2006.

On January 25, 2006, the defendant filed a Response to Motion to Reconsider (Proceeding No. 42).  On February 7, 2006, the plaintiffs filed a Supplement to Motion to Reconsider.  Proceeding No. 44.

The February 8 hearing was held.  Appearing were Mr. Loder for the plaintiffs and Mr. Stephen Porterfield for the defendant.

On May 23, 2006, the Court entered an Order reversing the January 3, 2006, Order that granted the defendant's Motion for Summary Judgment.  Proceeding No. 19.

A status conference was held on June 14, 2006, and a hearing was held on July 26, 2006.  The matter was set for trial for December 7, 2006.

On August 23, 2006, the plaintiffs filed their First Amended Adversarial Complaint for Wrongful Foreclosure, Breach of Contract, Conversion, Trespass & Violation of Automatic Stay, Estoppel, Fraud, Unjust Enrichment & Breach of Fiduciary Duty. Proceeding No. 59.  The plaintiffs included a jury demand with this amended complaint.  Substantively, the complaint included the five counts from the original

_____

[13] The plaintiffs withdrew the Notice of Appeal (Proceeding No. 35) on October 28, 2006. Proceeding No. 80.

complaint and added four new counts.  As listed in the amended complaint, those nine counts were:

    (1)      Count One - Breach of Contract;
    (2)      Count Two - Wrongful Foreclosure;
    (3)      Count Three - Conversion;
    (4)      Count Four - Trespass;
    (5)      Count Five - Violation of Automatic Stay
    (6)      Count Six - Estoppel
    (7)      Count Seven - Fraud
    (8)      Count Eight - Unjust Enrichment
    (9)      Count Nine - Breach of Fiduciary Duty

On August 30, 2006, the defendant filed a <u>Motion to Dismiss First Amended Adversarial Complaint</u>. Proceeding No. 60.  The Court scheduled a hearing for September 27, 2006. The September 27 hearing was held.  Appearing were Mr. Loder for the plaintiffs and Ms. Robin Beardsley and Mr. Porterfield for the defendant.

On October 5, 2006, the Court entered an <u>Order</u> denying the <u>Motion to Dismiss First Amended Adversarial Complaint</u> and setting the December 7 trial. Proceeding No. 64.

On October 9, 2006, the plaintiffs filed <u>The Plaintiffs' Motion for Summary Judgment Against Defendant's Wells Fargo and GE Mortgage on Counts One (Breach of Contract), Two (Wrongful Foreclosure), Three (Conversion) & Four (Trespass)</u>. Proceeding No.  66.

On October 17, 2006, the plaintiffs filed an <u>Application for Entry of Default; Motion for Default Judgment</u>. Proceeding No. 70.  The Court scheduled a hearing for November 8, 2006.  On October 18, 2006, the defendant filed an <u>Answer to Complaint</u>. Proceeding No. 72.

On October 25, 2006, the defendant filed a <u>Response to Plaintiffs' Motion for Summary Judgment</u>. Proceeding No. 77.  On October 28, 2006, the Plaintiffs filed a <u>Plaintiffs' Response to Defendant's Response to Plaintiffs' Motion for Summary Judgment</u>. Proceeding No. 79.

The November 8 hearing was held.  Appearing were the plaintiffs, Mr. Loder, Mr. Porterfield, Ms. Beardsley, and Mr. Mark Cline, a representative of the defendant.  The matter was submitted on the arguments of counsel and the pleadings.  The trial scheduled for December 7, 2006, was cancelled.

On February 8, 2007, the Court entered a <u>Memorandum Opinion</u> and <u>Order</u> denying <u>The Plaintiff's Motion for Summary Judgment Against Defendant's Wells Fargo and GE Mortgage on Counts One (Breach of Contract), Two (Wrongful Foreclosure),</u>

Three (Conversion) & Four (Trespass). Proceeding No. 89 (reported at <u>Sharpe v. Wells Fargo, et al. (In re Sharpe)</u>, A.P. No. 04-00250, 2007 WL 473764 (Bankr. N.D. Ala. February 8, 2007). The Court scheduled a status conference for March 7, 2007.

On February 9, 2007, the plaintiffs filed a <u>Motion for Findings of Fact and Conclusion of Law</u>. Proceeding No. 90 (docketed by the plaintiffs as a <u>Motion to Reconsider</u>). The Court scheduled a hearing for March 7, 2007, but continued the hearing to March 8, 2007.

On March 1, 2007, the defendant filed a <u>Brief in Support of Motion to Strike Plaintiffs' Jury Demand</u>. Proceeding No. 94 (docketed by the defendant as a <u>Motion to Strike Plaintiffs' Jury Demand (Brief in Support of)</u>, but titled <u>Brief in Support of Motion to Strike Plaintiffs' Jury Demand</u>).

On March 6, 2007, the plaintiffs filed a <u>Plaintiffs' Response to Defendant Wells Fargo's Motion to Strike Jury Demand</u>. Proceeding No. 95. The plaintiffs also filed a <u>Motion to Certify Summary Judgment Decision as Final Order</u>. Proceeding No. 96 (docketed by the plaintiffs as a <u>Motion for Leave to Appeal</u>).

The March 8 hearing was held. Appearing were Mr. Loder and Mr. Porterfield.

On June 27, 2007, the Court entered an order addressing the plaintiffs' <u>Motion for Findings of Fact and Conclusions of Law</u> filed February 9, 2007, the defendant's <u>Motion to Strike Jury Demand</u> filed on March 1, 2007, and the plaintiffs' <u>Motion to Certify Summary Judgment Decision as Final Order</u> filed on March 6, 2007. Proceeding No. 96 (reported as <u>Sharpe v. Wells Fargo, et al. (In re Sharpe)</u>, A.P. No. 04-00250, 2007 WL 1876368 (Bankr. N.D. Ala. June 27, 2007)).

In regard to the plaintiffs' <u>Motion for Findings of Fact and Conclusions of Law</u> the Court attempted to clarify its denial of the plaintiffs' original <u>Motion for Summary Judgment</u> by making what findings of fact and conclusions of law it could, given that the denial of the original motion was because there were genuine issues of material fact.

In regard to the defendant's <u>Motion to Strike Jury Demand</u>, the Court found the five counts taken from the original complaint could not revive the waived right to a jury trial. In addition, the Court found that the four counts added by the amended complaint did not raise any new issues, were all equitable remedies, and were triable by the Court, not a jury.

In regard to the <u>Motion to Certify Summary Judgment Decision as Final Order</u>, the Court found that a denial of a motion for summary judgment was an interlocutory order and that the Court was prohibited from making that order a final order by way of

Rule 54(b).  The plaintiffs' remedy in that regard was to file a motion for leave to appeal the interlocutory order; however, they did not.[14]

After the Court's ruling on the above matters, the defendant filed the pending Motion to Dismiss Defendant GE Mortgage Services on November 21, 2007. Proceeding No. 147.  The plaintiffs filed their Response in Opposition to Motion to Dismiss Defendant GE Mortgage Services: Motion for Scheduling Conference on Jury Trial of Defendant GE on November 23, 2007. Proceeding No. 148.  The defendant filed its First Amendment to Motion to Dismiss Defendant GE Mortgage Services filed on December 18, 2007.  Proceeding No. 152.

## IV.  CURRENT MATTERS

The current matters are:

1.	The plaintiffs' First Amended Adversarial Complaint for Wrongful Foreclosure, Breach of Contract, Conversion, Trespass & Violation of Automatic Stay, Estoppel, Fraud, Unjust Enrichment & Breach of

---

[14] In its June 27, 2007, opinion, the Court discussed the "Motion for Leave to Appeal."  It wrote:

> This motion was docketed by the plaintiffs as a Motion for Leave to Appeal (Proceeding No. 96); however, the motion was clearly a Motion to Certify Summary Judgment Decision as Final Order pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the rule on which a motion to certify an order as final must be based. That is very important. As the Court discusses in the latter parts of this opinion, if the plaintiffs wanted to appeal the denial of their motion for summary judgment, their remedy was to file a real motion for leave to appeal, not just to docket one as a motion for leave to appeal. The filed motion, that is the motion to certify the order denying the motion for summary judgment as a final order, is not the proper vehicle. The reason is, a motion for summary is an interlocutory order. A court may not convert an interlocutory order into a final order by way of Rule 54. But, as explained later, this issue is academic. Even if this Court were inclined to treat the filed motion as a motion for leave to appeal, because the motion was filed on March 6, 2007, more than ten days after the Court's order denying the motion for summary judgment, it was not timely. Therefore, even if it were a motion for leave to appeal, it would be due to be denied. See Rules 8001, 8002, and 8003, of the Federal Rules of Bankruptcy Procedure.

Sharpe v. Wells Fargo, et al. (In re Sharpe), A.P. No. 04-00250, 2007 WL 1876368, at *5 n.4 (Bankr. N.D. Ala. June 27, 2007).

<u>Fiduciary Duty</u>, filed August 23, 2006. Proceeding No. 59.[15] Substantively, the complaint included the five counts from the original complaint and added four new counts. As listed in the amended complaint, those were:

(1)     Count One - Breach of Contract;
(2)     Count Two - Wrongful Foreclosure;
(3)     Count Three - Conversion;
(4)     Count Four - Trespass;
(5)     Count Five - Violation of Automatic Stay
(6)     Count Six - Estoppel
(7)     Count Seven - Fraud
(8)     Count Eight - Unjust Enrichment
(9)     Count Nine - Breach of Fiduciary Duty;

2.     The defendant's request to call the plaintiffs' former attorney as a rebuttal witness. Proceeding Nos. 143 and 144. The issue is whether the plaintiffs' waived their attorney client privilege with their former attorney;

3.     The defendant's <u>Motion to Dismiss Defendant GE Mortgage Services</u> filed November 21, 2007. Proceeding No. 147.

4.     The plaintiffs' <u>Response in Opposition to Motion to Dismiss Defendant GE Mortgage Services: Motion for Scheduling Conference on Jury Trial of Defendant GE</u> filed November 23, 2007. Proceeding No. 148.

5.     The defendant's <u>First Amendment to Motion to Dismiss Defendant GE Mortgage Services</u> filed December 18, 2007. Proceeding No. 152.[16]

A trial was held on all issues on October 11, 2007. Lee Loder appeared for the plaintiffs. Stephen Porterfield and Robin Beardsley appeared for the defendant Wells Fargo Home Mortgage.

_____

[15]Proceeding numbers refer to the pending adversary proceeding unless otherwise qualified.

[16] Current matters numbers 3, 4, and 5 are related and are discussed together later.

11

# V.  ADDITIONAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW[17]

The remainder of this opinion is divided into three parts.  Part One discusses the relief from stay.  Part Two discusses notice under the mortgage.   Part Three discusses the specific matters pending before the Court.

## A.  PART ONE – RELIEF FROM THE AUTOMATIC STAY

The defendant contends: (1) the plaintiffs did not make all payments required by this Court's November 19, 2003, order; and (2) of the payments made, each was less than the full amount due.  Based on those contentions, the defendant concludes that it was granted relief from stay by the November 19 order and was free to begin foreclosure.

The plaintiffs contend: (1) they made all payments; and (2) the amount of each payment was sufficient.  They conclude that the stay did not lift, and therefore the defendant's foreclosure violated the stay.

The first issue is: Did the plaintiffs make all of their payments?  The second issue is: Were the payment amounts sufficient?

### 1.  Did the Plaintiffs Make all of their Payments?

The plaintiffs' calculation that they made all of their post-November 19 order payments is based on five contentions.  Those are: (1) their June 2003 payment (the first mortgage payment due after the current case was filed in May 2003) was placed in their plan as arrears; (2) a July 2003 payment satisfied their July 2003 obligation; (3) an August 2003 payment satisfied their August 2003 obligation; (4) a September 2003 payment satisfied their September 2003 obligation; and (5) when their August 2003 and September 2003 obligations were placed in the pending Chapter 13 case pursuant to the November 19 order, they were three months (June, August, and September, the months allowed as postpetition arrears) ahead.

These contention are very important.  They are the basis for the argument that if credit is given for June, August, and September, even if the plaintiffs did not make all of the post-November 19 order payments, they remained current on their mortgage payments and therefore the stay did not lift pursuant to the November 19 order.  Essentially, the plaintiffs argue that payments made before that order should be credited to some of the months after that order.

---

[17] The Court made findings of fact and conclusions of law in its June 27, 2007, order.  It adopts those findings and conclusions for the current matters.  See <u>Sharpe v. Wells Fargo, et al. (In re Sharpe)</u>, A.P. No. 04-00250, 2007 WL 1876368 (Bankr. N.D. Ala. June 27, 2007).

There were 13 postpetition months between the time the current case was filed and the defendant's foreclosure. Each is discussion below.

### a. June 2003 – The First Postpetition Month

The plaintiffs' first postpetition payment was due in June 2003. The plaintiffs admit that the June payment was not made, but believed that the obligation would be paid as arrears through the pending case. T. 64-69.[18] There is, however, no record that the plaintiffs asked for the June 2003 payment to be added as arrears, or any record that it was added. To the contrary, the confirmation order this Court entered on October 30, 2003, reads, "The debtor's mortgage debt to Wells Fargo shall be paid directly to the mortgagee beginning <u>June, 2003</u>." <u>Confirmation Order</u> entered October 30, 2003. Proceeding No. 20 (emphasis added). That order was never amended to allow the June obligation to be paid as postpetition arrears.[19] Consequently, because the June payment was not made and was not included as postpetition arrears, at this point, the plaintiffs were in arrears on their mortgage payment by one month.

### b. July 2003 – The Second Postpetition Month

The plaintiffs' second postpetition payment was due in July 2003. According to Mrs. Sharpe's testimony, the plaintiffs made their <u>first</u> postpetition mortgage payment

---

[18] At trial Mr. Loder commented:

> Well, we don't dispute – what I'm saying is, Judge, we are not going to dispute that Ms. Sharpe had an obligation to pay post-petition payments. She didn't pay the June payment. She testified that there is no record of a June payment. He asked her why didn't she pay it. She told him she didn't pay it because she understood that the June – her lawyer told her that the June payment would be folded into the post-petition plan.

Transcript at 170. This situation precipitated the defendant's request to call the plaintiffs former counsel as a witness.

[19] The Court entered its November 19 order less than a month later. That order allowed the plaintiffs to include their August 2003 and September 2003 payments in their confirmed plan as postpetition arrears. The only mention of the June 2003 payment in the November 19 order is in regard to a late fee charge associated with that payment. And as the discussion below demonstrates, that late fee was all that was left of the June 2003 obligation when the November 19 order was entered because the plaintiffs' July 2003 payment had already been credited to their June 2003 obligation. Similarly, the plaintiffs July 2003 obligation had also been satisfied by the time the November 19 order was entered. That is why the November 19 order listed only the August 2003 and September 2003 obligations to be added as postpetition arrears. Those were the only two months pending at the time the parties entered into their agreement that relief from stay would be granted if the plaintiffs did not make a future mortgage payment beginning with the October 2003 payment.

13

with check number 1856 for $480.00, dated July 12, 2003. T. 45-46; Pla. Ex 46. That payment matches the payment posted by the defendant on July 22, 2003, and is the payment the defendant applied to the plaintiffs' June 2003 obligation. Def. Ex. 7; T12; T17; T26-27; T184-185; Consequently, at this point, the plaintiffs were still in postpetition arrears by one month. That month was July 2003.

### c. August 2003 – The Third Postpetition Month

The plaintiffs' third postpetition payment was due in August 2003. According to Mrs. Sharpe's testimony, the plaintiffs made their second postpetition mortgage payment with check number 1874 for $480.00 in August 2003. Pla. Ex 48.; T. 47-48. The date of the check was not supplied, but this payment matches the payment posted by the defendant on August 19, 2003. That payment had been placed in "suspense" by the defendant but was taken from suspense on November 7, 2003, and applied to the July 2003 obligation. T. 189; Def. Ex. 7. Therefore, at this point the plaintiffs were still in postpetition arrears by one month. That month was August 2003.

### d. September 2003 – The Fourth Postpetition Month

The plaintiffs' fourth postpetition payment was due in September 2003. It was near this time that the parties entered into their agreement that became the basis for the Court's November 19, 2003, order. As quoted above, that order allowed the plaintiffs to place their August 2003, obligation (for which the plaintiffs were then in arrears) and their September 2003 obligation, in their existing Chapter 13 plan as postpetition arrears. In exchange, the plaintiffs were required to begin making direct payments to the defendant with the payment due on October 20, 2003.

When the Court entered its November 19 order allowing these two months to be included as postpetition arrears, the plaintiffs became current on their postpetition obligations. The one month arrears for August 2003, and the current month obligation for September 2003, were both satisfied. This finding is confirmed by the parties' agreement and the Court's November 19, 2003, order.[20]

_____

[20] Mrs. Sharpe testified that it was the plaintiffs' understanding that because they had made an August payment, that when the August 2003 obligation was placed in their case, they were then one month ahead. That belief was based partly on the plaintiffs' misunderstanding that the June 2003 payment was added as postpetition arrears. The evidence discussed above clearly demonstrates that not only did they not have a credit in August 2003, they were in arrears by one month. So, when the confirmed plan was modified to include August 2003, they became current. When September 2003 was added, they remained current.

The plaintiffs did make a third postpetition mortgage payment at the end of September. That payment is discussed below under the heading "Fifth Payment Due." That discussion explains that the plaintiffs were given credit for that payment. The Court mentions that payment now because that payment is part of the evidence the plaintiffs assert as support for their

14

### e.  October 2003 and November 2003 –
### The Fifth and Sixth Postpetition Months

The plaintiffs' fifth and sixth postpetition payments were due in October 2003 and November 2003.  These payments must be considered together because of the way they were applied by the defendant.[21]

### i.  The Fifth Payment Due

According to Mrs. Sharpe's testimony, the plaintiffs made their third postpetition payment, (the first payment affected by the November order) with check number 1904 for $480.00, dated September 22, 2003.  T. 48, Pla. Ex. 49.  That payment matches the payment posted by the defendant on October 2, 2003.  T. 186; Def. Ex. 7.  The defendant placed those funds in suspense.  The defendant took those funds out of suspense on January 6, 2004, and credited them to the plaintiffs' November 2003 obligation. T. 191, 197.

### ii.  The Sixth Payment Due

According to Mrs. Sharpe's testimony, the plaintiffs made their fourth postpetition payment with check number 1939 for $480.00 in November 2003.  T. 52; Pla. Ex. 52. That check is not dated but an accompanying exhibit shows that it was paid by the

_____

contention that they had a credit going into the post-November mortgage payment period.  As the discussion that follows will explain, the Court finds that the September payment did not create any credit for the plaintiffs as that payment was made late in September (the 22nd) and was then necessary to satisfy a future month.  It was posted by the defendant on October 2, 2003, and eventually applied to the plaintiffs' November 2003 obligation.  The plaintiffs' October obligation was satisfied by another payment.  Admittedly, the way the defendant applied payments is confusing. That confusion is cleared somewhat with the parties' agreement that lead to the Court's November 19 order.  If the plaintiffs were current through September 2003, why did they agree for the August 2003 and September 2003 payments to be placed as arrears into the pending case?  The November 19 order on its face contradicts the plaintiffs' position, and other evidence supports that order.  Defendant's Exhibit 7 lists a check received by the defendant on July 22, 2003 and applied to the June payment.  Another check was received on August 19, 2003, and applied to the July 2003 mortgage payment.  There are no entries reflecting payments applied to August 2003 and September 2003, supporting the order's representation that the August and September obligations would be paid through the 13 plan. The testimony at trial also agrees.  See T. 122, T. 169, and T. 170.  Defendant's Exhibit 7 also supports the testimony that because of the Court's November 19 order, no payments were ever credited to the August 2003 and September 2003 obligations. T. 188.

[21] See In re Jones, Case No. 03-16518, 2007 WL 2480494 (Bankr. E.D. La. Aug 29, 2007) where the Court discusses Wells Fargo's willingness to change its procedures, at least in that district.

15

plaintiffs' bank on December 4, 2003. Pla. Exs. 52 & 53. That payment matches the payment posted by the defendant on December 3, 2003, and credited to the plaintiffs <u>October 2003</u> obligation. T. 211; Def. Ex. 7.[22]

At this point then, the plaintiffs remained current on their postpetition, and post-November order, obligations. They had made, or have been given credit for, payments due for June 2003, July 2003, August 2003, September 2003, October 2003, and November 2003.

### f. December 2003 – The Seventh Postpetition Month

The plaintiffs' seventh postpetition payment was due in December 2003. According to Mrs. Sharpe's testimony, the plaintiffs made their <u>fifth</u> postpetition payment with check number 804 for $480.00, dated December 24, 2003. T. 53; Pla. Ex. 54. That payment matches the payment posted by the defendant on December 30, 2003, and applied to the plaintiffs' December 2003 obligation. T. 191, 211. Def. Ex. 7. Again, at this point, the plaintiffs remained current on their postpetition, and post-November order obligations.

### g. January 2004 – The Eighth Postpetition Month

The plaintiffs' eighth postpetition payment was due in January 2004. According to Mrs. Sharpe's testimony, the plaintiffs made their <u>sixth</u> postpetition payment with check number 1969 for $480.00. T. 54; Pla. Ex. 55. That check was dated "1/04." That payment matches the payment received by the defendant on January 30, 2004. Def. Ex. 7; T.192. Those funds were placed in suspense. T. 192. According to the testimony of the defendant's representative, and confirmed by Defendant's Exhibit 7, those funds were never applied as a payment for the plaintiffs. It was suggested that these funds were applied toward an attorney fee, T. 192-93. For purposes of this Court's analysis of whether the automatic stay lifted, the plaintiff's must be given credit for these funds. Therefore, the Court will apply those funds to the plaintiffs' January 2004 obligation. Consequently, at this point the plaintiffs remained current on their postpetition and post-November order obligations.

---

[22] The documentary evidence of what payments the plaintiffs contend they made and what payments the defendant contends it received, posted and credited, matches exactly – <u>except for one payment</u>. The plaintiffs contend that at a hearing in September Mrs. Sharpe gave a check to representative of the defendant. That check would have been the plaintiffs' fourth postpetition payment. No other evidence about that payment was offered and the Court does not give any weight to what was offered. First, there is no documentary evidence except for a note Mrs. Sharpe's wrote that was not contemporaneous with the exchange. Second, the defendant does not show that it received the check, and no credit for such a payment was given. And third, counsel for the plaintiffs explained that the testimony was not offered to prove that a check was delivered but was offered to prove Mrs. Sharpe's recollection. T. 51.

16

### h.  February 2004 – The Ninth Postpetition Month

The plaintiffs' ninth postpetition payment was due in February 2004.  Up to this point they were current (given that this Court gave them credit for a payment made in January which the defendant did not credit.)  But it was at this point that the plaintiffs became in arrears on their postpetition, and post-November order, obligations. According to Mrs. Sharpe's testimony, and the defendant's supporting documents and its representative's testimony, the plaintiffs did not make a payment in February 2004. According to Mrs. Sharpe's testimony, the most immediate payment is the one discussed above, that is the payment made with check number 1969 dated January 2004. T. 54; Pla. Ex. 55.  That is the payment this Court believes should have been applied to the January 2004 obligation.  And as discussed below, according to Mrs. Sharpe's testimony, the next payment made, after the January payment, was one sent to the defendant in March 2004.  T. 55; Pla. Ex. 56. Therefore, no payment was made in February 2004, and no payment was credited, at least at this point, to the February 2004 obligation.  Consequently, for purposes of this Court's analysis, at this point, the plaintiffs were one month in arrears.  They were therefore in default of their postpetition, and post-November order, obligations.

### i.  March 2004 – The Tenth Postpetition Month

The plaintiffs' tenth postpetition payment was due in March 2004.   According to Mrs. Sharpe's testimony, the plaintiffs made their seventh postpetition payment with a Western Union "Payment via Quick Collect" for $480.00, negotiated in March 2004.[23]  T. 54; Pla. Ex. 56.  Mrs. Sharpe could not testify to the exact payment date. T. 55.  She did testify that it was sent in March. T. 55.  That payment matches a payment received by the defendant on April 2, 2004, T. 193; Def. Ex. 7, which the defendant applied to the plaintiffs' January 2004 obligation.

 For purposes of this Court's analysis then, the payment made in March 2004 should have been applied to the plaintiffs' February 2004 obligation.  Consequently, at this point, the plaintiffs were, after March 2004, one month in arrears.  That month was March 2004.  They therefore continued to be in default of their postpetition obligations and this Court's November 19, 2003, order.

### j.  April 2004 – The Eleventh Postpetition Month

The plaintiffs' eleventh postpetition payment was due in April 2004.  According to Mrs. Sharpe's testimony, the plaintiffs made their eighth postpetition payment with check

---

[23] The number of payments due and the number of payments made are matching up at this point.  Ten post petition payments have come due.  The plaintiffs have made seven; two have been placed in the debtor's Chapter 13 case (August and September 2003); one (February 2004) has not been made, for a total of ten.

17

number 2006 for $485.00.  T. 57.  That check was dated "4/04." T. 57 The defendant refused that payment because it was less than the amount due.  The defendant returned the check to the plaintiffs without crediting the plaintiff's account.  Pla. Ex. 59.  Like the situation with the plaintiff's sixth postpetition payment, for purposes of this Court's analysis of whether the automatic stay lifted, the plaintiffs should be given credit for these funds.  For purposes of this Court's analysis then, this payment should be applied to the plaintiffs' March 2004 obligation.[24]  Therefore, at this point, the plaintiffs were still one month is arrears.  That month is April 2004.  They were therefore still in default of their postpetition, and post-November order, obligations.

### k.  May 2004 – The Twelfth Postpetition Month

The plaintiffs' twelfth postpetition payment was due in May 2004.  According to Mrs. Sharpe's testimony, the plaintiffs made their <u>ninth</u> postpetition payment with check number 2014 for $485.00, dated May 26, 2004.  T. 61-62; Pla. Ex. 61.  This payment matches the payment received by the defendant on June 2, 2004.  T. 193; Def. Ex. 7.  The defendant posted that payment and applied it to the plaintiffs' February 2004 obligation.  T. 193; Def. Ex. 7.  For purposes of this Court's analysis, that payment should have been applied to the plaintiffs' April 2004 obligation.  Therefore, at this point, that is the end of May and the beginning of June, the plaintiffs were still one month is arrears That month was now May 2004.  They were therefore still in default of their postpetition, and post-November order, obligations.

### l.  June 2004 – The Thirteenth Postpetition Month

The plaintiffs' thirteenth postpetition payment was due in June 2004.  According to the defendant's collections log for the plaintiffs' loan, on June 11, 2004, the defendant recognized, based on the plaintiffs' at least one month default, that the relief from stay provision of the November 19, 2003, order was activated, and the defendant had relief to foreclose the loan.[25]

According to Mrs. Sharpe's testimony, the plaintiffs made their <u>tenth</u> and final postpetition payment with check number 2024 for $485.00, dated June 27, 2004.  T. 58-59; Pla. Ex. 62.  Apparently based on the defendant's decision that the stay had already lifted, it returned this check also.  Pla. Ex. 59.  The plaintiffs were not given credit for this

---

[24] The Court is not ruling on the issue of whether the defendant could refuse a payment for less than the amount due.  And, the Court is certainly not ruling that making a payment for less than the amount due does not violate the November 19 order.  The Court rules just that later in this opinion.  At this point, the Court is attempting to account for all payments.

[25] Because the defendant did not give the plaintiffs credit for the January 2004 payment, the defendant believed at this point that the plaintiffs were two months in arrears.

18

payment and therefore, at this point they would have been two months in arrears. Those months were May 2004 and June 2004.[26]

Mrs. Sharp testified that she did not have any other records of any other postpetition payments made to the defendant.  T. 63.

### m.  Conclusion to the Number of Payments Made

Based on the above, the Court finds that at the point the defendant decided to recognize its right under the November 19, 2003, order to foreclose, the plaintiffs were in default of the Court's November 19, 2003, order because they had not made all payments due under that order.

### 2.  The Amount of Payments Made

Prior to the November 19, 2003, order, the monthly amount of each of the plaintiffs' mortgage payments was $476.95.  The plaintiffs chose to make payments of $480.00  That amount was increased by the November order to $531.95.  Pla. Ex. 29. According to the evidence, each payment made by the plaintiffs after the effective date of the November order, that is beginning with the October 2003 payment, was either $480.00 or $485.00, not $531.95, as required by the order.  Therefore, the Court finds that regardless of the number of payments made, with each insufficient payment, the plaintiffs were in default of the Court's November 19, 2003, order.

### 3.  Conclusions to Relief from the Automatic Stay

The plaintiffs were in default of the Court's November 19, 2003, order because they had not made all payments, and the amounts of the payments were not sufficient. Therefore, the stay had lifted, and the defendant had relief from the stay to proceed with its state law rights.

### B. PART TWO – THE DEFENDANT'S FORECLOSURE NOTICE

The second major part of this opinion concerns the notice the plaintiffs received regarding the defendant's foreclosure .  Both statutory and contractual notice were required.  Statutory notice was required by section 35-10-13 of the Code of Alabama 1975.  Contractual notice was required by paragraphs 14 and 21 of the parties' mortgage.  The issue then is: Did the defendant give the required notice?  In deciding whether all notice was given, the Court must look at how notice was given.  Did the defendant give actual notice, or did the plaintiffs have constructive notice?  Both

---

[26] Again, because the defendant did not give the plaintiffs credit for the January 2004 payment, at this point the defendant believed the plaintiffs were three months in arrears.

19

methods of notice (actual and constructive) are discussed below in regard to both types of notice (statutory and contractual).

## 1. Statutory Notice – Section 35-10-13

Section 35-10-13 of the Code of Alabama 1975 provides the minimum notice publication standards for foreclosure by power of sale for mortgages executed after December 31, 1988.  That section reads:

> Notice of said sale shall be given in the county where said land is located.
>
> Notice of all sales under this article shall be given by publication once a week for three successive weeks in a newspaper published in the county or counties in which such land is located. If there is land under the mortgage in more than one county the publication is to be made in all counties where the land is located. The notice of sale must give the time, place and terms of said sale, together with a description of the property.
>
> If no newspaper is published in the county where the lands are located, the notice shall be placed in a newspaper published in an adjoining county. The notice shall be published in said adjoining county for three successive weeks.

Code of Ala. 1975, § 35-10-13.

The "Mortgage Foreclosure Sale," introduced as Defendant's Exhibit 16, recites publication dates in the "Alabama Messenger" for July 24, 2004, July 27, 2004, and August 7, 2004.  This notice satisfied the requirements of section 35-10-13.  The plaintiffs did not challenge this notice.

Consequently, the Court finds that the defendant gave actual notice that satisfied the statutory notice required by section 35-10-13.  Because actual notice was given, the Court need not consider whether constructive notice of this statutory requirement was given.  This concludes any consideration of statutory notice.  What remains is for the Court to determine whether the contractual notice required by paragraphs 14 and 21 were given.

## 2. Contractual

The parties' mortgage contract includes two pertinent notice provisions.  One is paragraph 14, entitled "Notices."  That paragraph describes how notice should be given, such as by first class mail.  Another is paragraph 21, entitled "Acceleration; Remedies." That paragraph describes the substantive provisions of a notice of acceleration if there has been a default.  Again, the issue is, was actual notice given, and if not, did the plaintiffs have constructive notice.

20

### a. Paragraph 14

Paragraph 14 of the parties' mortgage reads:

> 14. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail, unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender.... Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

<u>Mortgage</u> at 4.  Pla. Ex. 42.

The address listed by the debtor in his bankruptcy petition is 2617 Avenue H, Birmingham, Alabama 35218.  The address listed in the parties' mortgage is the same. The address listed in the notices sent to the plaintiffs by the defendant is the same. And finally, the address of the property subject to the pending motions is the same.  The plaintiffs did not contest this notice.[27]

The Court finds that the defendant <u>gave actual notice</u> that satisfied the paragraph 14 requirements. Because actual notice was given, the Court need not consider whether constructive notice of this contractual requirement was given.  What remains is for the Court to determine whether the defendant gave actual notice of the paragraph 21 requirements or whether the plaintiffs had constructive of those.

### b. Paragraph 21

Whether the defendant gave actual notice of the paragraph 21 requirements, and if not, whether the plaintiffs had constructive notice, is a far more difficult question than those above.

Paragraph 21 of the parties' mortgage reads:

> 21.  Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument.... The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) the failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by the Security

---

[27] Of course, the Court recognizes that the plaintiffs contest the sufficiency of the notices.

Instrument and sale of the property. The notice shall further inform Borrower of the right to reinstate after acceleration and sale. If the default is not cured, on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by the Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorney's fees and cost of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of notice to Borrower in the manner provided in paragraph 14. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in Shelby County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

Mortgage at 4. Pla. Ex. 42.

Summarized from the above, the paragraph 21 notice provisions required the defendant to:

(1)    specify the default;

(2)    specify the action required to cure the default;

(3)    specify a date, not less than 30 days from the date the notice is given by which the default must be cured;

(4)    advise that the failure to cure the default on or before the date specified in the notice may result in acceleration of the debt and sale of the property; and

(5)    inform of the right to reinstate after acceleration and sale.

In simple terms, these provisions required the defendant to give the plaintiffs: (1) notice of the default; (2) a specific time to cure that default; and (3) its intent to accelerate its mortgage if the default was not cured.

22

To determine whether the defendant satisfied these requirements, the Court begins with the defendant's July 6, 2004, letter to the plaintiffs.[28]  That letter reads:

> July 6, 2004
>
> Roderick L. Sharpe
> Linda D. Sharpe
> 2617 Avenue H
> Birmingham, Alabama 35218
>
> RE:  NOTICE OF ACCELERATION OF PROMISSORY
>       NOTE AND MORTGAGE -
>       2617 AVENUE H BIRMINGHAM, ALABAMA 35218
>
> We hereby acknowledge that you have previously filed for protection under the Bankruptcy Code.  Accordingly, we are not attempting to impose personal liability against you to collect the debt that has been discharged under bankruptcy. The purpose of this letter is to notify you of the present intent of our client, GE Mortgage Services, LLC f/k/a GE Capital Mortgage Services, Inc., to initiate foreclosure proceedings solely against the above referenced real property used to secure your mortgage loan.
>
> YOU ARE HEREBY NOTIFIED that, pursuant to the terms of the Promissory Note and Mortgage dated the 15th day of May, 1998, to Southern Atlantic Financial Services, Inc., said mortgage having subsequently been transferred and assigned to G E Capital Mortgage Services, Inc. and by virtue of default in the terms of said Note and Mortgage, GE Mortgage Services, LLC f/k/a GE Capital Mortgage Services, Inc. hereby accelerates to maturity the entire remaining unpaid balance of the debt, including attorney's fees, accrued interest, and other lawful charges, and the amount due and payable as of this date is $68,532.94.  This payoff amount may change on a daily basis.  If you wish to pay off your mortgage, please call our office to obtain the updated figure. We are at this time commencing foreclosure under the terms of the Mortgage.

---

[28] This letter is the only specific evidence before the Court on the issue of whether the defendant gave the plaintiffs both notice of the mortgage default and notice of acceleration and its related requirements.  See Note 29 below.

23

We will assume this debt to be valid unless it is disputed within thirty days after you receive this letter.  If you do dispute this debt or any portion thereof, we will obtain and mail you a verification of the debt or a copy of any judgment if you send us a written request within this thirty-day period. Also, upon written request within this thirty-day period, we will provide you with the name and address of the original creditor, if different from the current creditor.  This letter is an attempt to collect a debt, and any information obtained will be used for that purpose.

FOR:  GE Mortgage Services, LLC f/k/a GE Capital Mortgage Services, Inc.

Defendant's Exhibit 14; Plaintiffs' Exhibit 29.[29]

───────────────────────

[29] The tone of this letter implies that another letter was sent before it.  At trial, Mr. Loder asked the defendant's representative:

Q.  And in the Plaintiff's Exhibit, would you turn to Exhibit No. 45, which is an excerpt of Mark Kline's.  I am going to represent to you it is an excerpt of a corporate deposition.  Then if you turn to page 77.

THE COURT: Page 77 of Exhibit 45?
MR. LODER: Of Exhibit 45, that's correct.
THE COURT: Okay.

Q.  I want you to read through page 77 and 78 and 79.  If you would read those real quickly for me, I want to ask you –
(Pause)

A.  Okay.

Q.  I just want to confirm now that it is still Wells Fargo's position that Wells Fargo was relying on a demand letter sent by GE to provide the Sharpes with the default notice information regarding the June 2004 default?

A.  That would be correct.

Q.  Okay.  And I want to make sure we are clear that, other than the letter that GE sent in 2000, the letter that Mark Kline identified that GE sent in 2000, which was described as a demand letter, I believe, to your knowledge there hasn't been another demand letter that has been sent to the Sharpes?

A.  No, there has not.

24

There are two parts to paragraph 21's notice provisions. They are: (1) notice regarding default; and (2) notice regarding acceleration. Within each part, the Court must determine whether the defendant gave actual notice or whether the plaintiffs had constructive notice.

### i. Actual Notice of the Paragraph 21 Requirements

### (1) Notice Regarding Default

Did the defendant give the plaintiffs actual notice of the default? There is no evidence that the defendant gave the plaintiffs actual notice of the default. The above letter did not give that notice. No other notice was offered at trial.[30] Therefore, the Court finds that the defendant did not give the plaintiffs actual notice of default.

### (2) Notice Regarding Acceleration

Did the defendant give the plaintiffs actual notice of acceleration and its related mortgage provisions? According to the parties' contract, the defendant was required to give the plaintiffs notice of acceleration, and related actions, before it could begin the foreclosure process.

The defendant's July 6, 2004, letter read:

> [The defendant] hereby accelerates to maturity the entire remaining unpaid balance of the debt, including attorney's fees, accrued interest, and other lawful charges, and the amount due and payable as of this date is $68,532.94. This

---

Transcript at 9-10. See also Transcript at 22-24, 59, 77, 175-177, 179-180, 200.

A portion of Mr. Kline's deposition was introduced as Plaintiff's Exhibit 45 and Defendant's Exhibit 23. That portion discussed the demand letter sent on July 20, 2000, and referred to it on page 30 of 51 in Defendant's Exhibit 8, the defendant's log of all activity involving the plaintiff's loan. As far as the Court can determine, a copy of that letter was not introduced in this proceeding. It was not included on either of the parties' exhibit list, and was not reported in the transcript that it was introduced and admitted at trial. On the other hand, at trial the plaintiffs' attorney stated, "we are willing to concede in 2000 that they were aware they were behind and that they had been declared in default in 2000. We don't concede that satisfies the June '04 matter, but we are willing to concede that they knew that then." T. 180. Even so, the Court cannot accept that a demand letter sent four years before acceleration could satisfy a requirement that notice of default be given before acceleration. However, because the Court finds, as discussed below, that the plaintiffs had constructive notice of their default, it need not address this difficult question here.

[30] See Notes 28 and 29 above.

payoff amount may change on a daily basis.  If you wish to
pay off your mortgage, please call our office to obtain the
updated figure.  We are at this time commencing foreclosure
under the terms of the Mortgage.

We will assume this debt to be valid unless it is disputed
within thirty days after you receive this letter.  If you do
dispute this debt or any portion thereof, we will obtain and
mail you a verification of the debt or a copy of any judgment if
you send us a written request within this thirty-day period.
Also, upon written request within this thirty-day period, we will
provide you with the name and address of the original
creditor, if different from the current creditor.  This letter is an
attempt to collect a debt, and any information obtained will be
used for that purpose.

Defendant's Exhibit 14; Plaintiffs' Exhibit 29 (parenthetical added).

As discussed above, the defendant was required to specify the action required to
cure the default; specify a date, not less than 30 days from the date the notice is given
by which the default must be cured; advise that the failure to cure the default on or
before the date specified in the notice may result in acceleration of the debt and sale of
the property; and inform of the right to reinstate after acceleration and sale. Did that
letter give <u>actual</u> notice of these elements?  Each is discussed below.

### (a)  Did the defendant specify
### the action required to cure the default?

If actual notice of this requirement were given, it is only that the plaintiffs were
advised that the "action" to cure was payment of the debt in full.  The Court finds that
this is not actual notice.

### (b) Did the defendant specify a date,
### not less than 30 days from the date the notice is given
### by which the default must be cured?

The notice did not specify a date by which the default should be cured.  First, the
July 6, 2004, letter did not give the plaintiffs an opportunity to cure the default.  It is a
notice that acceleration had already occurred.  But even if the plaintiffs could have cured
the default at this time, the letter did not give the plaintiffs a date for that to be done. The
only dates mentioned are ones that are dependant on the date the plaintiffs received the
letter.  Those dates are not specific.  The Court finds that this is not actual notice.

26

**(c)  Did the defendant advise that the failure to cure the default
on or before the date specified in the notice
may result in acceleration of the debt and sale of the property?**

The letter states, the defendant, "hereby **accelerates** to maturity the entire
remaining unpaid balance of the debt....  We are at this time commencing **foreclosure**
under the terms of the Mortgage."  Id. (emphasis added).  This is not notice that a failure
to cure may, "result in acceleration."  The letter states that the debt has already been
accelerated.  Similarly, it advised the plaintiffs that the foreclosure had begun, not that it
was possible.  The Court finds that this is not actual notice.

**(d)  Did the defendant inform the plaintiffs
of the right to reinstate after acceleration and sale?**

The defendant's July 6, 2004, letter to the plaintiffs told the plaintiffs to call the
defendant's attorney if they wished, "to pay off... [their] mortgage...."  Pla. Ex. 20
(parenthetical added).  A July 19, 2004, letter sent to the plaintiffs told them to contact
the defendant's attorney if they wished, "to avoid losing..." the property.  Pla. Ex. 14.  A
"Demand for Possession" letter sent to the plaintiffs on August 30, 2003, after the
foreclosure advised the plaintiffs about their right of redemption. Pla. Ex. 9.  The Court
finds that none of these contacts with the plaintiffs were actual notice of the plaintiffs'
right to reinstate after acceleration and sale.

**(3) Conclusions to Actual Notice
of the Paragraph 21 Requirements**

This Court could not find an Alabama case on point.  One from the Court of
Appeals for the Fifth Circuit discussing Texas law is instructive.  Writing for the Court,
District Judge Frank A. Kaufman, sitting by designation, explained:

> Texas law requires that a maker of a promissory note be afforded notice of
> intent to accelerate and an opportunity to cure the default. Any notice of
> acceleration is ineffective unless preceded by a proper notice of intent to
> accelerate. Ogden v. Gibraltar Sav. Ass'n, 640 S.W.2d 232, 234
> (Tex.1982). The two types of notice constitute separate rights of the
> borrower, and each is obligatory.
>
> Notice of intent to accelerate is necessary in order to provide the debtor an
> opportunity to cure his default prior to harsh consequences of acceleration
> and foreclosure. Proper notice that the debt has been accelerated, in the
> absence of a contrary agreement or waiver, cuts off the debtor's right to
> cure his default  and gives notice that the entire debt is due and payable.

Id. Appellant never received a notice of intent and was not given the opportunity to cure his default prior to the letter of May 23, 1985. A "demand for payment of the overdue installment [must] be made prior to exercising the option to accelerate." Allen Sales & Servicenter, Inc. v. Ryan, 525 S.W.2d 863, 866 (Tex.1975).

Id. at 775.

Based on the evidence in the instant proceeding, the Court finds that the defendant did not give actual notice of the Paragraph 21 requirements.[31]  What remains is for the Court to determine whether the plaintiffs had constructive notice of those requirements.

## ii.  Constructive Notice of Paragraph 21

The defendant argues that even if it did not give actual notice, the plaintiffs had constructive notice of default and acceleration.  Again, there are two parts.  Those are: (1) notice regarding default; and (2) notice regarding acceleration.  A general discussion of the application of constructive notice to mortgage provisions precedes those two parts.

## (1) Application of Constructive Notice
## to Mortgage Provisions

The leading case in Alabama on the application of constructive notice to mortgage provisions is Redman v. Federal Home Mortgage Corp., 765 So.2d 630 (Ala.1999), rehearing denied.[32]

In summary, the facts of Redman were these.  The Redmans purchased a home in 1995 and gave SouthTrust Corporation a mortgage to secure a loan to buy the house. Mrs. Redman sued for divorce later that year.  Mr. Redman moved from their home and another individual moved in with Mrs. Redman.  Mrs. Redman assumed the responsibility of the monthly mortgage payments, but when there was a default, SouthTrust contacted Mr. Redman.  In 1996, SouthTrust wrote both Mr. and Mrs. Redman at the home address to advise them that if payments were not made, it would

---

[31] As stated in note 29, the Court recognizes that the defendant contends that a July 20, 2000, demand letter to the plaintiffs satisfied its requirement to give the plaintiffs notice of their default and notice of their right to cure that default.  Again, there is no substantive evidence of that letter, and the Court has not considered it.  In addition, as stated in note 29, the Court cannot imagine that a letter sent four years earlier would satisfy a current requirement.

[32] "The property rights of a debtor in a bankruptcy estate are defined by state law."  In re Smith, 85 F.3d 1555, 1558 (11th Cir. 1996).

28

exercise its right of foreclosure. Mr. Redman asked SouthTrust to delay foreclosure pending the divorce action. After some delay, SouthTrust sent notices of default to the Redmans at the home address. In 1997, SouthTrust mailed a notice of foreclosure to the Redmans at the same address. That notice was published in accordance with state law. SouthTrust purchased the property at foreclosure and transferred the property to now co-defendant, Federal Home Loan Mortgage Corporation. Federal filed a complaint for ejectment. Mrs. Redman filed a counterclaim alleging wrongful foreclosure, fraud, and breach of contract. The trial court entered summary judgment for the defendants.

In deciding the case, the Alabama Supreme Court discussed the notice provisions of section 35-10-13 and paragraphs 14 and 21 of those parties' mortgage.[33] In doing so, the Court specifically ruled on the question of whether the lender satisfied those provisions, and in particular, the Court considered whether the borrowers had constructive notice of the paragraph 21 requirements.

Writing for the Court in Redman, Justice Ralph D. Cook explained the Court's position on constructive notice. He stated:

> our inquiry here is whether Mrs. Redman and Burns, as reasonable persons, had notice of facts sufficient to cause them to make further inquiry as to the status of Mrs. Redman's mortgage account with SouthTrust. We conclude that they did. It is clear from the record that the defendants closed their eyes to avoid "discovery" of the truth that was reasonably apparent: that the Mortgage was seriously in arrears and that SouthTrust was ready to legally foreclose on the property in Vincent.

Id. at 635.

The plaintiffs contend that Redman does not apply because it is either distinguishable from the instant situation, or that the constructive notice portion of the decision is dictum. In its order entered June 27, 2007, this Court held that Redman applies, is not distinguishable, and its applicable parts were not dictum. Sharpe v. Wells Fargo, et al. (In re Sharpe), A.P. No. 04-00250, 2007 WL 1876368, at *13-*17 (Bankr. N.D. Ala. June 27, 2007). The Court again finds that Redman applies and relies on its June 27, 2007, opinion as support for that conclusion.

### (2) Application of Constructive Notice

Again, each paragraph 21 provision is discussed below, this time in regard to constructive notice. And like the discussion above, this one has the same two parts. Those are: (a) notice regarding default; and (b) notice regarding acceleration.

---

[33] Paragraphs 14 and 21 of the mortgage in Redman are identical to the ones in this proceeding.

**(a) Notice Regarding Default**

Did the plaintiffs have constructive notice of their default?

As discussed above, the plaintiffs are not unsophisticated debtors. Between them they have had three bankruptcy cases before this Court. They were in default in their mortgage payments before each case was filed. They continued to default on their mortgage during each case. The defendant filed a motion for relief from stay in each of those cases. In each case, the defendant was granted relief from the stay with limited conditions. The plaintiffs agreed to future relief orders in two cases and agreed to unqualified relief in one case.[34]

When the current case was filed, the plaintiffs were in default for $9,500. This Court's November 19 order allowed them to add $1,251.30 to that amount to be paid as postpetition arrears. That order also instructed them to make regular payments to the defendant beginning with the October 2003 payment. At best, the plaintiffs' situation was critical. Any hint of the slightest problem should have prompted them to take action. And as the evidence demonstrates, there was much more than a hint.

First, the plaintiffs received the July 6, 2004, letter. While deficient in some ways, it clearly told the plaintiffs that the defendant believed that the plaintiffs were in default. Second, The plaintiffs received a follow-up letter from the defendant on July 19, 2004, which read, "The mortgage loan with... [the defendant] is currently in default." Pla. Ex. 14.[35] Third, the plaintiffs' former attorney had notice that the defendant considered the plaintiffs in default. Even if the plaintiffs did not understand the importance of that consideration, their attorney did. And fourth, Mrs. Sharp testified:

> Q.      You mentioned that in July of '04 you called a Wells Fargo number that you were given to call and that, when you were transferred, either you hung up or they hung up; you lost the call, I take it, when they transferred you?
>
> A.      They hung up.
>
> Q.      Did you call back?
>
> A.      Several times.

---

[34] The unqualified relief was of course the one entered in the Chapter 7 case shortly after Mr. Sharpe filed the current case.

[35] The Court did not consider this letter in deciding that the defendant did not give actual notice of the default because the letter was written after the defendant gave the plaintiffs notice that their debt had been accelerated.

30

Q.   Did you ever talk to anybody at loss mitigation?

A.   After the ones on the exhibits, no, sir.

Q.   Well, did you ask – when you called back, did you ask them how much would I have to pay to stop the foreclosure?

A.   I asked what do I need to do or what had I done, the reason they were sending me this letter.

Transcript at 127.

She testified later:

Q.   When the foreclosure proceedings were begun or you started getting letters and you knew that someone was telling you your house was going to be foreclosed on, at that point in time you knew that you had not made every payment to Wells Fargo that was owed; didn't you?

A.   Yes.

Transcript at 149.

Like the parties in Redman, if these plaintiffs had acted responsibly, they would not have ignored their situation.  They had a history of defaulting on payments and knew the consequences.  The defendant sent them notices that they were in default.  Their attorney knew about that situation and had to know the consequences.  Like the Court in Redman, this Court must find that for the plaintiffs, "[t]o argue ignorance of the status of the Mortgage... was to close... [their] eyes in an effort to avoid discovering the truth."  Id. at 635 (parenthetical added).  Therefore, the Court finds that the plaintiffs had constructive notice of their most recent default.  What remains is for the Court to determine whether the plaintiffs had constructive notice of the acceleration provisions of paragraph 21.

### (b)  Notice Regarding Acceleration

Did the plaintiffs have constructive notice of matters relating to acceleration?  Like the actual notice issue discussed above, this question has four parts.

### (i)  Did the plaintiffs have constructive notice of the action required to cure the default?

Notwithstanding that paragraph 21 required the defendant, before acceleration, to specify the action required to cure the default, it appears that the defendant gave that

31

information to the plaintiffs' attorney <u>after acceleration</u> and three days before the foreclosure sale. A letter dated August 27, 2004, addressed to the plaintiffs' counsel read:

> Re:    Our Client: Wells Fargo Home Mortgage
> Loan No. 0022060412
> Property Address: 2617 Avenue H, Birmingham, AL 35218

> Dear Ms. Greenway:

> As you are aware this firm represents Wells Fargo Home Mortgage ("Wells Fargo") related to its interest in the above-referenced property. Pursuant to your fax dated August 10, 2004 to Ginny Rutledge and communication from the debtors alleging that they are current in their bankruptcy payments, please find the a copy of the Court Order entered November 19, 2003 regarding Motion for Relief from the Bankruptcy Stay.

> As you will see from the Bankruptcy Order, the automatic stay terminates without further notice regarding Wells Fargo in the event the debtor fails to make a payment within 30 days from the date that it becomes due. As you will see from the payment history below, Wells Fargo has not received the monthly payments since the Order was signed. These payments are more than 30 days overdue, resulting in this loan still being due for the March 2004 payment forward. Therefore, pursuant to the Order, the automatic stay is lifted.

> <u>Payment History After the Entry of the Order</u>

| Date Payment Made | Post Payment Applied to |
|---|---|
| 12/3/03 | 10/20/2003 |
| 1/6/03 | 11/20/2003 |
| 2/11/04 | 12/20/2003 |
| 4/02/04 | 1/20/2004 |
| 6/02/04 | 2/20/2004 |

> Since relief is valid, Wells Fargo has instructed us to go forward with the foreclosure sale on Monday, August 30, 2004. If you would like to discuss this further, please do not hesitate to call me.

Pla. Ex. 12.

Is the above constructive notice? This Court does not believe that it is. The answer to the specific question then is, no.

32

**(ii)  Did the plaintiffs have constructive notice of a specific date**
**not less than 30 days from the date notice was given**
**by which the default must be cured?**

The Court cannot imagine a situation where a debtor would have constructive notice of a <u>specific date</u> a creditor was required to provide where that creditor was the only entity who could provide it but did not.  The answer then is, no.

**(iii)  Did the plaintiffs have constructive notice**
**that the failure to cure the default**
**on or before the date specified in the notice**
**may result in acceleration of the debt and sale of the property?**

Again, the Court cannot imagine a situation where a debtor would have constructive notice of a <u>specific date</u> a creditor was required to provide where that creditor was the only entity who could provide it but did not.  The answer then is, no.

**(iv)  Did the plaintiffs have constructive notice**
**of the right to reinstate after acceleration and sale?**

As discussed above, the defendant sent the plaintiffs a letter dated July 19, 2007, regarding their default and the impending foreclosure.  That letter read:

RE:    Foreclosure on Property Located at 2617 Avenue H, Birmingham, Alabama 35218

We represent GE Mortgage Services, LLC f/k/a GE Capital Mortgage Services, Inc..  The mortgage loan with them is currently in default.  Due to the default in the terms of the note and mortgage, we have been instructed to foreclose on the above-described property.

Enclosed is a copy of the Mortgage Foreclosure Sale publication notice to be published in the Alabama Messenger.  The foreclosure sale is scheduled for August 16, 2004.  If you wish to avoid losing the subject property, you must contact us; otherwise, the foreclosure sale will take place as set forth in the publication notice, and we will take legal action to obtain possession of the subject property.

This communication is from a debt collector.

For any information regarding this matter, please call (205) 930-5169.

Defendant's Exhibit 15.  In a broad sense, this letter may be some kind of constructive notice, but the Court finds that it is not sufficient.  The answer then is, no.

### (3) Conclusion to Constructive Notice

The Court finds that the plaintiffs <u>had constructive notice of their default</u>.  But, the Court finds that the plaintiffs <u>did not have constructive notice of any of the provisions relating to acceleration</u>.  Like the situation described above in <u>FDIC v. Massinggill</u>, because of the mortgagee's failure to give the mortgagor notice of an <u>intent</u> to accelerate, the mortgagors did not have an opportunity to cure the default (regardless of whether they had constructive notice of it.)  Without an opportunity to cure the default, the acceleration would not be effective.

### 3.  Conclusion to Notice

The plaintiffs had actual notice of the statutory requirements of section 35-10-13. They had actual notice of the paragraph 14 part of their contractual provisions.  They had constructive notice of their default.  They did not have actual or constructive notice of the paragraph 21 provisions relating to acceleration.  What liability then, if any, does this create for the defendant?

### C.  PART THREE – THE SPECIFIC PENDING MATTERS

The third major part of this opinion discusses the specific pending matters.  Those are:

1. The plaintiffs' <u>First Amended Adversarial Complaint for Wrongful Foreclosure, Breach of Contract, Conversion, Trespass & Violation of Automatic Stay, Estoppel, Fraud, Unjust Enrichment & Breach of Fiduciary Duty</u>, filed August 23, 2006. Proceeding No. 59.

2. The defendant's request to call the plaintiffs' former attorney as a rebuttal witness.  Proceeding Nos. 143 and 144.  The issue is whether the plaintiffs' waived their attorney client privilege with their former attorney.

3. The defendant's <u>Motion to Dismiss Defendant GE Mortgage Services</u> filed November 21, 2007, Proceeding No. 147, which includes related matters of the plaintiffs' <u>Response in Opposition to Motion to Dismiss Defendant GE Mortgage Services: Motion for Scheduling Conference on Jury Trial of Defendant GE</u> filed November 23, 2007, Proceeding No. 148, and the defendant's <u>First Amendment to Motion to Dismiss Defendant GE Mortgage Services</u> filed December 18, 2007, Proceeding No. 152.

### 1.  The Plaintiffs' <u>First Amended Adversarial Complaint</u>

Each of the nine counts of the plaintiffs' amended complaint is discussed below, but first, the plaintiffs' general allegations, other than jurisdiction, and their request for damages, are reproduced.

34

### a. General Allegations

The plaintiffs' general allegations are:

2.      The subject property is situated in Jefferson County, Alabama and is
        located at 2617 Avenue H, Birmingham, AL 35218 and is described as Lot
        5, Block 26-H, according to the Survey of the First Addition to Ensley, as
        recorded in Map Book 4, Page 8, in the office of the judge of probate of
        Jefferson County, Alabama.

3.      The defendant Wells Fargo Bank is a business organization organized
        and/or operating under the laws of the State of Alabama. The defendant
        GE Mortgage Services, LLC fka GE Capital Mortgage Services, Inc. is a
        subsidiary and/or agent of Wells Fargo Home Mortgage and otherwise a
        business entity qualified to do business in the State of Alabama.

First Amended Adversarial Complaint for Wrongful Foreclosure, Breach of Contract,
Conversion, Trespass & Violation of Automatic Stay, Estoppel, Fraud, Unjust
Enrichment & Breach of Fiduciary Duty at 1-2. Proceeding No. 59.

### b. Request for Damages

The plaintiffs request the same damages after each count.  Each request reads:

WHEREFORE, the Plaintiffs pray that this Court will enter an Order
declaring that the Plaintiffs are entitled to relief, ordering defendant to pay
the Plaintiffs' costs and attorney's fees, entering a finding, order or
declaration that the Plaintiffs have good title in and to the property,
awarding plaintiffs punitive and compensatory damages in the amount of
One Million Dollars ($1,000,000.00) and ordering such other relief that the
Plaintiffs are entitled to.

First Amended Adversarial Complaint at 3 and passim. Proceeding No. 59.[36]

### c. The Plaintiffs' Nine Counts

The plaintiffs' nine counts are:

(1)     Count One - Breach of Contract;

---

[36] As noted above, the defendant filed a Motion to Sever the trial into liability and
damages segments. Proceeding No. 137.  The plaintiffs opposed that motion.  Proceeding No.
139.  On October 10, 2007, the Court granted the motion.  Proceeding No. 140.  Because the
Court finds that the defendant has liability, a hearing on damages will be scheduled.

(2)    Count Two - Wrongful Foreclosure;
(3)    Count Three - Conversion;
(4)    Count Four - Trespass;
(5)    Count Five - Violation of Automatic Stay;
(6)    Count Six - Estoppel;
(7)    Count Seven - Fraud;
(8)    Count Eight - Unjust Enrichment;
(9)    Count Nine - Breach of Fiduciary Duty.

### i.  Count One - Breach of Contract

The substance of the plaintiffs' breach of contract count reads:

7.    This action is brought pursuant to Code of Alabama, 1975 §35-4-150, et. seq.

8.    On or about the 15th day of May, 1998, Southern Atlantic Financial Services executed a mortgage and note to the Plaintiffs, a copy of which mortgage and note are attached and incorporated herein. The defendant later acquired said mortgage.

9.    In 2003, the defendant began foreclosure proceedings.  The plaintiffs sought and received Chapter 13 relief.

10.    On or about, November 19, 2003, the Bankruptcy Court approved a post petition claim for mortgage arrearage covering all mortgage payments through September 2003, thereby folding said claims into the underlying bankruptcy plan ("the plan").

11.    The Court ordered the plaintiffs to make current mortgage payments outside of the plan and directly to the defendant beginning on October 20, 2003. The Court granted future relief from stay if the plaintiffs defaulted.

12.    The plaintiffs have made said payments according to terms of order and according to terms of mortgage governing post petition relationship.

13.    On or about August 30, 2004, the defendants foreclosed on said mortgage. Prior to said foreclosure, the defendant failed to give borrower notice as required by paragraph 21 of the plaintiffs' mortgage.

14.    The defendant's foreclosure was in violation of the plaintiffs' mortgage instrument and the plaintiffs were otherwise denied the opportunity to cure the alleged breach.

36

<u>First Amended Adversarial Complaint</u> at 2-3, Proceeding No. 59.[37]

This is a state law question. The elements of breach of contract in Alabama are:

(1)     a valid contract binding the parties;

(2)     the plaintiffs' performance under the contract;

(3)     the defendant's nonperformance; and

(4)     resulting damages.

<u>Reynolds Metals Co. v. Hill</u>, 825 So.2d 100, 105-06 (Ala. 2002) (citing <u>State Farm Fire & Cas. Co. v. Slade</u>, 747 So.2d 293, 303 (Ala.1999).

### (1)  Discussion

No one disputes that the parties have a valid binding contract. While the plaintiffs dispute that they were in default, this Court has found that they were. Therefore they failed to perform under the contract. Does that mean that the defendant did not have to perform? The answer is, no.

The parties contract provided, "Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument...." <u>Mortgage</u> at 4, ¶ 21. Clearly, the contract provided for the contingency of a default by the plaintiffs. It described what the defendant's duty was if that contingency arose. That duty, which the Court considers as the defendant's performance under the contract, was to give certain notice pursuant to paragraph 21 of the mortgage. This Court has found that the defendant did not give that notice. Therefore, the defendant did not perform under the contract and was in breach of that contract.

### (2)  Conclusion to Count One – Breach of Contract

Based on the above, the Court finds in favor of the plaintiffs and against the defendant on the count of breach of contract.

### ii.  Count Two - Wrongful Foreclosure

The substance of the plaintiffs' wrongful foreclosure count reads:

16.     The defendant foreclosed on plaintiffs although plaintiffs were
        current with their payments pursuant to this Court's order.  Prior to

---

[37] At each count, the plaintiffs incorporate all proceeding paragraphs.

foreclosure, the defendant failed to give borrower notice as required by paragraph 21 of the plaintiffs' mortgage.

17.    The defendant otherwise failed to follow tenets of Code of Alabama, 1975 §35-4-150, et. seq.[38]

<u>First Amended Adversarial Complaint</u> at 4, Proceeding No. 59.

This is a state law question.

## (1)  Discussion

Factually, the plaintiffs allege:

> On or about August 30, 2004, the defendants foreclosed on said mortgage.  Prior to said foreclosure, the defendant failed to give borrower notice as required by paragraph 21 of the plaintiffs' mortgage.
>
> The defendant's foreclosure was in violation of the plaintiffs' mortgage instrument and the plaintiffs were otherwise denied the opportunity to cure the alleged breach.

<u>Id</u>. at 3.

The Court presumes that the plaintiffs' contention is that the defendant wrongfully foreclosed the mortgage because the defendant either did not give the plaintiffs proper notice, or because the plaintiffs were not given an opportunity to cure the default they contend did not exist.  During the proceedings leading up to trial and at trial, the plaintiffs

---

[38] Section 35-4-150 reads:

> Any person claiming title to land directly or remotely from the grantee in a deed, mortgage or other conveyance containing an erroneous description, may maintain a civil action in a circuit court for the reformation of such deed, mortgage or other conveyance and shall be entitled to relief in all cases in which the grantee in the deed, mortgage or other conveyance containing an erroneous description would be entitled to relief.

Code of Ala. 1975 §35-4-150.

The Court cannot find how this section is applicable.  There are no issues in this case relating to a mortgage, "containing an erroneous description...."  Similarly, the Court cannot know what sections the plaintiffs intended to rely on in citing "<u>et seq.</u>"

38

also argued that the foreclosure was not valid because the price the defendant paid for the property was, according to the plaintiffs' calculations, fifty percent of the value of the property. The plaintiffs characterized that difference as one that, was, "grossly inadequate and shocks the conscience...." Transcript at 229.

As it turns out, the later argument is more in line with the concept of wrongful foreclosure than are the plaintiffs' formal arguments. A brief discussion of wrongful foreclosure in Alabama explains.[39]

### (a) Wrongful Foreclosure in Alabama Law

When this Court began its research of wrongful foreclosure, it expected to find, like it did for the plaintiffs' other plead causes of action, reported cases discussing specific <u>elements</u>, including what facts must be proven to satisfy those elements. This Court did not find what it was looking for. What it did find was that while there is a long-recognized cause of action in Alabama for "wrongful foreclosure," it is an open-ended equitable action rising from the trust relationship between a mortgagor and a mortgagee.

The accepted definition of a wrongful foreclosure cause of action in Alabama is, "A mortgagor has a wrongful foreclosure action whenever a mortgagee uses the power of sale given under a mortgage for a purpose other than to secure the debt owed by the mortgagor." <u>Reeves Cedarhurst Development Corp. v. First American Federal Sav. and Loan Ass'n</u>, 607 So.2d 180, 182 (Ala. 1992), citing <u>Johnson v. Shirley</u>, 539 So.2d 165, 168 (Ala.1989); <u>Paint Rock Properties v. Shewmake</u>, 393 So.2d 982, 984 (Ala.1981).

This cause of action is an equitable one typically brought against a mortgagee who goes outside the boundaries of a mortgage to foreclose for reasons not allowed by the mortgage. Writing for the Supreme Court of Alabama in <u>Paint Rock Properties v. Shewmake</u>, 393 So.2d 982 (Ala. 1981), Justice T. Eric Embry explained:

> Generally the purpose for which the power of sale is given being to afford an additional and more speedy remedy for the recovery of the debt, the mortgagor is by the contract bound to exercise necessary promptness in fulfilling it and cannot complain of a legitimate exercise of the power. If in any case it is attempted <u>to pervert the power</u> from its legitimate purpose and to use it for the purpose of oppressing the debtor or of enabling the creditor to acquire the property himself, a court of equity will enjoin a sale or will set it aside if made. <u>Wittmeier v. Tidwell</u>, 147 Ala. 354, 40 So. 963, and authorities there cited. Or, as was said in the case of <u>Castleman v. Knight</u>, 215 Ala. 429, 110 So. 911: 'If he uses the power to sell, which he

---

[39] In researching all of the plaintiffs' counts, the Court discovered that wrongful foreclosure, estoppel, unjust enrichment, and breach of fiduciary duty are related. While they are not siblings, they are at least first cousins. This is important in discussing the latter counts.

39

gets for that purpose, for another purpose, <u>from any ill motive</u>, to effect means and <u>purposes of his own</u>, or to serve the <u>purposes of other individuals</u>, the court considers that to be what it calls a fraud in the exercise of the power, because <u>it is using the power for a purpose foreign to the legitimate purposes for which it was intended</u>.'

<u>Id</u>. at 983-84 (emphasis added).

Writing for the Court in <u>Johnson v. Shirley</u>, 539 So.2d 165, 168 (Ala.1989), Justice Sam A. Beatty gave good examples of when the cause of action would arise.  In <u>Johnson</u>, the plaintiff alleged a conspiracy.  When addressing the specific elements of conspiracy, Justice Beatty wrote, "The third alternative would also be satisfied: the evidence indicates that the defendants did something that was unlawful, oppressive, or immoral, i.e., <u>that they interfered with the divorce judgment; by unlawful, oppressive, or immoral means, i.e., a wrongful foreclosure</u>."  <u>Id</u>. at 169 (emphasis added).

### (b) "Elements" of Wrongful Foreclosure

Based on the above, the "elements" this Court will consider to determine whether the plaintiffs have an action for wrongful foreclosure are: (1) the actions of the mortgagee were either outside the boundaries of the foreclosure or taken for some purpose other than to secure the debt owed by the mortgagor; (2) the actions of the mortgagee were for some ulterior motive; (3) the power of sale was perverted or used for the mortgagee's or someone else's purpose; or (4) the mortgagee had an ill motive.[40]

### (c) Application of the "Elements" of Wrongful Foreclosure

The Court finds, with the one exception discussed below relating to the price the mortgagee paid for the property, the plaintiffs do not have a wrongful foreclosure action against the defendant.  Under Alabama law, if an action by a mortgagee was <u>for the purpose of securing the debt owed by the mortgagor</u>, while it may be wrong for other reasons, it cannot, unless some other malady exists, be wrongful foreclosure.  In this proceeding, there is no evidence: (1) that the mortgagee's actions were for any purpose but to secure the plaintiffs' debt; (2) the actions of the mortgagee were for some ulterior motive; (3) the power of sale was perverted or used to for the mortgagee's or someone else's purpose; or (4) the mortgagee had an ill motive.

Writing for the Court in <u>Garst v. Johnson</u>, 37 So.2d 183 (Ala. 1948),  Justice Thomas Seay Lawson explains:

_____

[40] The Court does not suggest that all, or some combination, of these "elements" must be satisfied, but considers them guidelines, as have the Alabama courts that have considered wrongful foreclosure.

40

The legitimate purpose for which a power of sale is given in a mortgage is to secure repayment of the mortgage indebtedness. If this power is perverted from its legitimate purpose and is used for the oppression of the debtor or to enable the creditor to acquire the property for himself, or other illegitimate purpose, a court of equity will enjoin the sale or set it aside after it is made. Talley v. Webster, 222 Ala. 188, 131 So. 555, and cases cited.

Id. at 294-95.

In reaching the above conclusions on wrongful foreclosure, this Court is mindful of the plaintiffs' independent allegations of fraud, breach of fiduciary duty, estoppel, and unjust enrichment, all of which are related to wrongful foreclosure.  Those relationships are important.  They are all based on the "trust" relationship that arises between a mortgagee and a mortgagor when a foreclosure occurs.  That relationship is discussed next in regard to wrongful foreclosure, but it also applies in those other situations.

### (d)  Trust in a Foreclosure Relationship

One of the earlier Alabama cases reported on the trust relationship between a mortgagor and a mortgagee is Hayden v. Smith, 113 So. 293 (Ala. 1927).  In Hayden the Supreme Court of Alabama recognized:

But it must be observed that high authorities have held that, "while it is not imperative that he [the mortgagee] should choose that paper which will in fact give the utmost possible publicity to the notice, yet he must act in good faith and exercise reasonable care, and it will be ground for vacating the sale if he caused the notice to be printed in an obscure newspaper of very small circulation." 27 Cyc. 1473, citing Webber v. Curtiss, 104 Ill. 309; Stevenson v. Hano, 148 Mass. 616, 20 N.E. 200; Briggs v. Briggs, 135 Mass. 306; Wake v. Hart, 12 How.Prac. (N.Y.) 444. See, also, Montague v. Dawes, 14 Allen (Mass.) 369, 373.

Id. at 295 (parenthetical in original).

This "good faith" requirement was recognized by the Court in Appelbaum v. First Nat. Bank, 179 So. 373 (Ala. 1938) in regard to the "trust" relationship that arises between a mortgagee and a mortgagor.  Relying on Hayden, Chief Justice John Crawford Anderson wrote for the Court, "In executing the power [of sale], the mortgagee 'becomes the trustee of the debtor, and is bound to act bona fide, and to adopt all reasonable modes of proceeding, in order to render the sale most beneficial to the debtor.'" Id. at 375 (citing Hayden v. Smith, 216 Ala. 428, 113 So. 293, 295 (Ala. 1927); Kelly v. Carmichael, 217 Ala. 534, 117 So. 67 (Ala. 1928); De Moville v. Merchants & Farmers Bank of Greene County et al., 233 Ala. 204, 170 So. 756 (Ala. 1936)).  He added, "and... [the rule in Hayden] is specially applicable where the mortgagee becomes the purchaser at the sale."  Id. (parenthetical added).

41

This position was affirmed in <u>Ames v. Pardue</u>, 389 So.2d 927 (Ala. 1980).  The per curiam opinion there includes:

> A power of sale is more than a mere clause in a legal contract and equity regards a mortgagee holding a power of sale as a <u>quasi trustee</u> with a duty of fairness and good faith to the mortgagor in its execution. <u>Bank of New Brockton v. Dunnavant</u>, 204 Ala. 636, 87 So. 105 (1920). To void the foreclosure sale, the mortgagor must show that the trust imposed on the mortgagee has been abused and that he has been injured by the sale. <u>Rudisill v. Buckner</u>, 244 Ala. 653, 656, 15 So.2d 333 (1943).

<u>Id</u>. at 931 (emphasis added).[41]  See also <u>Muller v. Seeds</u>, 975 So.2d 914 (Ala. 2007).

As <u>Ames</u> suggests, the relationship is limited.  It does not include all of the duties typically associated with a trust.  The Court in <u>Brabham v. American Nat. Bank of Union Springs</u>, 689 So.2d 82 (Ala.Civ.App. 1996) commented on <u>Ames</u> and similar cases. Judge Sharon G. Yates stated:

> A review of these cases leads us to conclude that the duty a mortgagee owes a mortgagor in a foreclosure proceeding is one of good faith and fairness, not a general fiduciary duty. The description of a mortgagee as, "in a sense, a trustee," <u>J.H. Morris, Inc.</u>, supra, or as a "quasi-trustee," <u>Ames</u>, supra, should not be taken to mean that a mortgagee owes a mortgagor all the same duties that a trustee owes a trust beneficiary.

<u>Id</u>. at 88.

---

[41] See the opinion in <u>Mt. Carmel Estates, Inc. v. Regions Bank</u>, 853 So.2d 160 (Ala. 2002), which reads:

In <u>Wood River Development</u> this Court stated:

"When a mortgagee forecloses a mortgage pursuant to a power, the mortgagee becomes a trustee of the debtor/mortgagor, and is bound to act in good faith and adopt all reasonable modes of proceeding in order to render the sale most beneficial to the mortgagor. <u>First National Bank of Opp</u> [v. Wise, 235 Ala. 124, 177 So. 636 (1937) ]. This duty is imposed upon the mortgagee foreclosing under a power of sale, because the mortgagee is selling the property, and his interest is diametrically opposed to the interest of the mortgagor, especially if he is the purchaser of the property at the foreclosure sale. In such a case, the mortgagee is in a better position to hinder the sale and render it self-serving. The reasons for imposing such a duty are not present at a judicial foreclosure sale, because there the court, not the mortgagee, is selling the property."

<u>Id</u>. at 165.

At least one Alabama federal court agrees. Citing <u>Brabham</u>, the Court in <u>Atkins v. GE Capital Mortg. Services, Inc.</u>, 993 F.Supp. 1406 (M.D. Ala.1998), wrote:

> The Parties present an accurate discussion of fiduciary law in Alabama in their pleadings on summary judgment (See Def's Mem. Supp. at 26-29; Pls.' Resp. at 73-87.) Generally the relationship of a lender to a borrower does not impose a fiduciary duty on the lender. <u>K & C Development Corp. v. AmSouth Bank, N.A.</u>, 597 So.2d 671 (Ala.1992). This general rule also applies to the relationship between a mortgagee and mortgagor. <u>Brabham v. American Nat. Bank of Union Springs</u>, 689 So.2d 82 (Ala.Civ.App.1996); see also <u>Nettles v. First Nat. Bank of Birmingham</u>, 388 So.2d 916 (Ala.1980) (holding no fiduciary duty existed between mortgagee and mortgagor despite mortgagee's active role in attempting to improve mortgage company's financial position).

<u>Id</u>. at 1418.

### (e) The One Exception

The specific <u>fiduciary</u> relationship of the defendant to the plaintiffs is discussed below; however, there remains the <u>one exception</u> this Court referred to above, that is, does a wrongful foreclosure action lie because of the amount the mortgagee paid for the property at foreclosure? That exception is discussed in several Alabama cases. It is directly related to the trust relationship that arises between a mortgagee and a mortgagor.

One of the earlier cases is <u>First Nat. Bank v. Wise</u>, 177 So. 636 (Ala. 1937). The opinion in <u>Wise</u> includes:

> The general rule in respect to the sale of real property under the power of sale in a mortgage is that:
>
> " 'Where the price realized at the sale is so inadequate as to shock the conscience, it may itself raise a presumption of fraud, trickery, unfairness, or culpable mismanagement, and therefore be sufficient ground for setting the sale aside.' 27 Cyc. 1508.
>
> <u>"And, although mere inadequacy of price is not sufficient to that end, it is 'always a circumstance to be considered in connection with other grounds of objection to the sale, and will be sufficient to justify setting the sale aside, when coupled with any other circumstances showing unfairness, misconduct, fraud, or even stupid management, resulting in the sacrifice of the property.'</u> *** The remedial action of courts in such cases is grounded upon the duty of the mortgagee, as stated by Shaw, C.J., in <u>Howard v. Ames</u>, 3 Metc. (Mass.) [308] 311: 'In executing such power, he becomes

43

the trustee of the debtor, and is bound to act bona fide, and to adopt all reasonable modes of proceeding, in order to render the sale most beneficial to the debtor.' " Hayden v. Smith, 216 Ala. 428, 113 So. 293, 295; HunterBenn & Co. Company v. Bassett Lumber Co., 224 Ala. 215, 139 So. 348. See, also, Dewberry v. Bank of Standing Rock, 227 Ala. 484, 150 So. 463; Note, 69 A.L.R. 1194.

Id. at 638 (emphasis added).

One of the cases cited above, Brabham v. American Nat. Bank of Union Springs, 689 So.2d 82 (Ala.Civ.App. 1996), a leading cases on this issue, agrees. After looking at Ames and other cases, Judge Yates stated:

Ames, supra, is part of a line of cases that discuss the application of the good faith standard to the mortgagee's power of sale. In particular, those cases address whether the purchase price at the foreclosure sale is so inadequate as to constitute bad faith and whether the manner in which the mortgagee sold the property was appropriate (e. g., whether the property was sold en masse or by parcel or tract). See Dozier v. Farrior, 187 Ala. 181, 65 So. 364 (1914); Bank of New Brockton v. Dunnavant, 204 Ala. 636, 87 So. 105 (1920); Hayden v. Smith, 216 Ala. 428, 113 So. 293 (1927); Kelly v. Carmichael, 217 Ala. 534, 117 So. 67 (1928); First National Bank v. Wise, 235 Ala. 124, 177 So. 636 (1937); J.H. Morris, Inc. v. Indian Hills, Inc., 282 Ala. 443, 212 So.2d 831 (1968). A review of these cases leads us to conclude that the duty a mortgagee owes a mortgagor in a foreclosure proceeding is one of good faith and fairness, not a general fiduciary duty. The description of a mortgagee as, "in a sense, a trustee," J.H. Morris, Inc., supra, or as a "quasi-trustee," Ames, supra, should not be taken to mean that a mortgagee owes a mortgagor all the same duties that a trustee owes a trust beneficiary. We also note that Wood River, supra, deals with a judicial sale, not a foreclosure sale.

Id. at 88

Based on these cases, the Court finds that there is a possibility that the defendant has some liability under this limited area of wrongful foreclosure. However, the record is not sufficient to decide that issue now. Because the Court decided to hold a separate hearing on damages, if the defendant had any liability, the parties did not offer sufficient evidence of the value of the property or what was paid for it.[42] But,

---

[42] The following exchange occurred at the trial:

Q.          And as of 2004, the tax assessed value of your house was sixty-one thousand, nine hundred dollars; is that correct?

because the issue is related to damages, the parties may present evidence on this issue at the hearing to be held on damages.

### (2) Conclusion to Count Two – Wrongful Foreclosure

The Court finds that under the accepted definition of wrongful foreclosure in Alabama, with one limited exception, the plaintiffs did not prove that the defendant committed a wrongful foreclosure. The limited exception, which the Court will decide after hearing the evidence on damages, is whether the price paid by the mortgagee for the property so shocks the conscience that it raises a presumption of fraud, trickery, unfairness, or culpable mismanagement that could be considered wrongful foreclosure.[43]

Based on the above, the Court finds in favor of the defendant and against the plaintiffs on the count of wrongful foreclosure, with the limited exception described above.

------------------------

MR. PORTERFIELD: Objection, Your Honor. These questions now can only be going to damages. They can't possibly be related to liability.

MR. LODER: Well, we have got a breach of fiduciary claim that we made regarding whether the sale of the home at the amount was unreasonable, whether it was a breach of their duty to actually sell the home for only thirty-three thousand, five hundred. So to some degree I, at least, wanted to put in some evidence on what we understood the value of the home to be at that time, at the time that they sold it. That is the only way – that is a legal –

THE COURT: Okay. I am going to allow it for that purpose.

MR. LODER: And it speaks for itself. I am not going to belabor that point.

Transcript at 102.

[43] So there will be no mistake, the Court finds that the defendant's failure to give proper notice, in and of itself, is not wrongful foreclosure. Historically in Alabama, the failure to give such notice may be grounds for setting aside a mortgage foreclosure, but this Court does not believe that improper notice alone can constitute "wrongful foreclosure." In Appelbaum v. First Nat. Bank, 179 So. 373 (Ala. 1938) the grantee of the mortgagor sought to set aside a foreclosure in order to exercise the equity right of redemption. The Supreme Court of Alabama reversed the lower court and vacated a foreclosure in part because notice was inadequate. The Court's decision may have been based on wrongful foreclosure as it cited Hayden v. Smith, 113 So. 293 (Ala. 1927); however, in citing Hayden the Court recognized, in addition to inadequate notice, that, "the bid was less than the mortgage debt, and greatly disproportionate to the value of the property-approximately one-third of its minimum value...." Id. at 376 (emphasis added).

45

### iii. Count Three - Conversion

The substance of the plaintiffs' conversion count reads:

19.     The defendant wrongfully exerted control over the plaintiffs' property which was inconsistent with and destructive of the plaintiff's title to and right of possession to said real and personal property.

First Amended Adversarial Complaint at 5, Proceeding No. 59.

This is a state law question.  The elements of conversion in Alabama are:

(1) wrongful taking;

(2) illegal assumption of ownership;

(3) illegal use or misuse; or,

(4) wrongful detention.

Strickland v. Kafko Mfg., Inc., 512 So.2d 714, 716 (Ala. 1987).

### (1)  Discussion

The plaintiffs' position, "is that fundamentally that's a constructive eviction and that, if this court finds that the foreclosure was not correct, then they will have a claim for conversion.  They testified that they left a few items at the house.  Those items are not accounted for right now." Transcript at 230 (emphasis added).[44]

_____

[44] An action for constructive eviction in Alabama is the same as an action for a violation of the covenant of quiet enjoyment.  The opinion in Bowdoin Square, L.L.C. v. Winn-Dixie Montgomery, Inc., 873 So.2d 1091 (Ala. 2003) includes:

Specifically, Alabama does not recognize constructive eviction and breach of quiet enjoyment as separate claims. Oliver v. Bush, 125 Ala. 534, 27 So. 923, 924 (1900) (an action for constructive eviction is, in substance and effect, the same as one for a breach of the covenant of quiet enjoyment); see also David C. Skinner, Alabama Residential, Commercial & Mineral Lease Law § 7-7(h) (cum.supp.1999). Rather, Alabama follows the common-law concept that a tenant has a covenant to quiet enjoyment of the premises. Id. Therefore, in Alabama, an action for constructive eviction must be framed as a violation of the covenant of quiet enjoyment. Steele v. McRaney, 855 So.2d 1114, 1121 (Ala. Civ. App.2003) (stating that a party may be responsible for a breach of the covenant of quiet enjoyment by constructively evicting the plaintiff); see also Southern Sec. Servs., Inc. v. Esneault, 435 So.2d 1309, 1312 (Ala. Civ.

46

The plaintiffs' complaint does not identify what property was converted. Legally, it cannot be the real property. The law in Alabama has for sometime been, "An action for conversion will not lie for the taking of real property...." Garrett v. Valley Sand and Gravel, Inc., 800 So.2d 600, 601 (Ala. Civ. App. 2000). See also Bynum v. Gay, 49 So. 757 (1909); Hatfield v. Spears, 380 So.2d 262 (Ala.1980); and Faith, Hope and Love, Inc. v. First Alabama Bank, 496 So.2d 708, 711 (Ala.1986).

The only evidence regarding personal property was Mrs. Sharpe's testimony:

Q.    Were you able to take everything with you when you left?
A.    No, sir.
Q.    Do you know what happened to the things that you left behind?
A.    No, sir.
Q.    Are they still there, to your knowledge?
A.    No, sir.
Q.    Okay.

Transcript at 103.

Based on this evidence, the Court finds that the plaintiffs did not meet their burden of proof as to conversion. Even if the first three elements of conversion were satisfied, there was no evidence that the fourth was satisfied, that is proof that the property was wrongfully detained. The only evidence on the point was that to Mrs. Sharpe's knowledge the items they allegedly left in the house were no longer in the house.

### (2)  Conclusion to Count Three – Conversion

Based on the above, the Court finds in favor of the defendant and against the plaintiffs on the count of conversion.

### iv.  Count Four - Trespass

The substance of the plaintiffs' trespass count reads:

21.    The defendant invaded the plaintiffs [sic] property right against the plaintiffs' will."

_____

App.1983) (landlord's interference with the tenant's right to quiet enjoyment may constitute a constructive eviction); Skinner, § 7-7(h). As a result, Winn-Dixie's claim of constructive eviction is, in effect, part of its claim of the breach of the covenant of quiet enjoyment. Therefore, Winn-Dixie did not waive this issue.

Id. at 1104. This Court cannot find that the plaintiffs plead either, and the Court has not considered either constructive eviction or violation of quiet enjoyment in this proceeding.

47

First Amended Adversarial Complaint at 5, Proceeding No. 59.

This is a state law question. The elements of indirect trespass in Alabama are:[45]

1.     an invasion affecting an interest in the exclusive possession of his property;[46]

2.     an intentional doing of the act which results in the invasion;

3.     reasonable foreseeability that the act done could result in an invasion of plaintiff's possessory interest; and,

4.     substantial damages to the res."

AmSouth Bank, N.A. v. City of Mobile, 500 So.2d 1072 (Ala. 1986); W.T. Ratliff Co. v. Henley, 405 So.2d 141 (Ala.1981); Borland v. Sanders Lead Co., 369 So.2d 523 (Ala.1979).

### (1)  Discussion

The specific issue is: Can an improperly accelerated mortgage which lead to foreclosure constitute trespass by a mortgagee who failed to properly accelerate the mortgage? Admittedly, the acceleration issues this proceeding presents are complicated. In the context of trespass, they are even more complicated.

Two trespass questions are present. One is: Which party to the mortgage has the right of possession of the property upon default by the mortgagor? Another is: What constitutes an "invasion" on the property under the elements of indirect trespass?

### (a)  Right to Possession

A determination of which party has a right to possession upon default will determine whether the plaintiffs have a trespass cause of action. The law in Alabama, as described by Chief Justice Sonny Hornsby in Avery v. Geneva County, 567 So.2d 282, 289 (Ala. 1990), is:

---

[45] The plaintiffs do not contend that the defendant directly trespassed on the property, and there is no evidence that it did. In this regard, the Court has considered only the issue of indirect trespass.

[46] The first element of indirect trespass has also been described as, "enters land in the possession of the other, or causes a thing or a third person to do so...."  Born v. Exxon Corp., 388 So.2d 933 (Ala. 1980).

48

Alabama's law on trespass is "plain that the gist of any trespass action is the interference with a right to possession of the property. Absent such right of possession, there can be no action based on trespass." Dollar v. McKinney, 272 Ala. 667, 133 So.2d 673 (1961); Sutton's Music Co. v. Top Music Co., 377 So.2d 1092 (Ala.Civ.App.1979).

Id. at 289 (emphasis added).[47] Therefore, if upon default, the defendant had a right to possess the property, there could be no trespass action, regardless of the notice of acceleration. If the plaintiffs had a right to maintain possession after default, they may have a trespass action, if other elements are satisfied.

The short explanation of mortgage interests from Trauner v. Lowrey, 369 So.2d 531 (Ala.1979) is helpful in understanding the law of trespass in Alabama as it relates to mortgages. The opinion there reads in part:

Alabama classifies itself as a "title" state with regard to mortgages. Execution of a mortgage passes legal title to the mortgagee. Lloyd's of London v. Fidelity Securities Corporation, 39 Ala.App. 596, 105 So.2d 728 (1958); Moorer v. Tensaw Land & Timber Co., 246 Ala. 223, 20 So.2d 105 (1944); Jones v. Butler, 286 Ala. 69, 237 So.2d 460 (1970). The mortgagor is left with an equity of redemption, but upon payment of the debt, legal title revests in the mortgagor. § 35-10-26, Code 1975. The equity of redemption may be conveyed by the mortgagor, and his grantee secures only an equity of redemption. McDuffie v. Faulk, 214 Ala. 221, 107 So. 61 (1926). The payment of a mortgage debt by the purchaser of the equity of redemption invests such purchaser with the legal title. Denman v. Payne, 152 Ala. 342, 44 So. 635 (1907). The equity of redemption in either case, however, is extinguished by a valid foreclosure sale, and the mortgagor or his vendee is left only with the statutory right of redemption. § 6-5-230, Code 1975; McDuffie, Supra.

Id. at 534.

Under these rules, the mortgagee holds legal title to the subject property. Unless the mortgage is satisfied, the mortgagor holds only a statutory right of redemption. If the mortgage is satisfied, legal title passes back to the mortgagor. Federal Deposit Ins. Corp. v. Morrison, 747 F.2d 610 (11th Cir. 1984); Biggers v. Ingersoll, 184 So. 478 (Ala. 1938).

Researching possession in the context of a mortgage is complicated under Alabama law because of references in older cases to mortgages where the collateral

---

[47] Avery involved the release of a significant amount of water onto the plaintiff's property.

49

was personal property not real property. Historically chattel mortgages were common and possession upon default in those situations involved a right to possess the personal property.[48] There is however one case that appears to have established the same general rule for both types of property. The opinion in Harmon v. Dothan Nat. Bank, 64 So. 621 (Ala. 1914) includes:

> Under the theory of mortgages prevailing in this state, nothing can be clearer than the proposition that after default the legal title of the mortgagee is perfect. Indeed, foreclosure adds nothing to the legal title, and its only office and value is to cut off the equity of redemption. The mortgagee's legal title carries, of course, the right of possession, and, in the case of chattels, possession taken by the mortgagee after default leaves in the mortgagor no interest except an equity of redemption-which is cognizable and enforceable only in a court of equity.

Id. at 622.[49]

The above is clarified in Moorer v. Tensaw Land & Timber Co, 20 So.2d 105 (Ala. 1944). The opinion there includes:

> A mortgage effective at law passes the legal title to the mortgagee, who is entitled to the immediate possession of the land even before default, unless it is provided in it (or by separate instrument) that the possession shall remain in the mortgagor. Woodward v. Parsons, 59 Ala. 625; Trannon v. Towles, 200 Ala. 82, 75 So. 458; Cowart v. Aaron, 220 Ala. 35, 123 So. 229; Wilson v. Federal Land Bank, 230 Ala. 75, 159 So. 493; Mallory v. Agee, 226 Ala. 596, 147 So. 881, 88 A.L.R. 1107.

Id. at 227.

Contrary to the plaintiffs' position, it is this possessory right that is in question under a trespass theory, not the actual property right. The Court in Mallory v. Agee, 147 So. 881, 882 (Ala. 1932), explained, "It matters not whether the status was created before or after default. While a mortgagor, after default, is said to be a tenant of the mortgagee by sufferance (Buchmann v. Callahan, 222 Ala. 240, 131 So. 799), such status relates to his possessory right and not to the character of his property right." Id.

---

[48] See Dunlap v. Steele, 80 Ala. 424 (1885).

[49] The above indicates that the statement, "and, in the case of chattels..." is a reference to a situation in addition to the propositions that in real estate mortgages, " after default the legal title of the mortgage is perfect...," and, " [t]he mortgagee's legal title carries, of course, the right of possession...."

50

This Court could not find an Alabama case on point.  The Mississippi case of Haggart v. Wilczinski, 143 F. 22 (5th Cir. 1906) decided by the Court of Appeals for the Fifth Circuit is close.  Writing for the Court, Circuit Judge David Shelby explained:

> In Mississippi, the mortgagor is the owner of the legal title to the land until a valid foreclosure of the mortgage. This is true against everybody, but subject to this exception: After breach of the condition of the mortgage, the mortgagee may maintain ejectment against the mortgagor to recover the mortgaged land as a means of enforcing the security. Buckley v. Daley, 45 Miss. 338; Freeman v. Cunningham, 57 Miss. 67. **It follows, we think, that where a mortgagee obtains possession by suit, or under an irregular, or voidable, or void, foreclosure, after breach of the condition of the mortgage, he has the right to hold possession until his mortgage is paid**. The mortgagor cannot deprive him of possession without first paying the debt. Bryan v. Brasius, 162 U.S. 415, 16 Sup.Ct. 803, 40 L.Ed. 1022; Helm v. Yerger, 61 Miss. 44, 51; Buckley v. Daley, supra. We have no reason to doubt that this doctrine prevails in Mississippi, although it may be that the mortgagee under such circumstances, if sued, in ejectment by the mortgagor, would have to resort to a court of equity to preserve his possession till his mortgage was paid. Bonner v. Lessley, 61 Miss. 392. This rule, that the mortgagee cannot be deprived of possession by the mortgagor till the debt is paid, is applied in cases where the debt secured by the mortgage is barred by the statute of limitations. Bryan v. Brasius (Ariz.) 31 Pac. 519; Id., 162 U.S. 415, 16 Sup.Ct. 803, 40 L.Ed. 1022. This may be true generally on the theory that the statute operates alone on the remedy, not extinguishing the debt nor the lien (Angell on Limitations (6th Ed.) Sec. 73), but we must keep in mind that in Mississippi the completion of the period of limitation defeats and extinguishes 'the right as well as the remedy.' Code Miss. 1892, Sec. 2755.

Id. at 26 (emphasis added).

The law in Alabama appears to be the same.[50]  Upon the plaintiffs' default, the defendant had a right to possession of the property.  Because it had a right to possession, it could not be guilty of trespass, whether direct or indirect.

### (b)  Invasion of the Property

The second question the Court must answer is: What constitutes an "invasion" on the property under the elements of indirect trespass?  As the elements listed above

---

[50] If this is not the law in Alabama, it is for the Supreme Court of Alabama to define, not this Court.

51

demonstrate, before an action for indirect trespass arises, there must be an entry on, or invasion of, the property. While historically an actual physical entry was required, everyone knows now that an indirect trespass may occur, such as with the discharge of pollutants.[51] That distinction has however not been an easy one to define, and in describing it, one court called the history of it as, "tortured." See Cloud v. Olin Corp., 552 F.Supp. 528 (N.D. Ala.1982). This Court will not recreate that here, but will rely on the conclusion reached by the Cloud court that nonetheless, the four elements listed above are required to prove an indirect trespass.

The critical element is of course, was there an indirect invasion. The question is: How indirect may the action be?[52] In this regard, the opinion in Russell Corp. v. Sullivan, 790 So.2d 940 (Ala. 2001) is very instructive.

In Russell, the Russell Corporation was alleged to have discharged chemicals into a wastewater treatment facility which in turn discharged the treated water into Lake Martin, a manmade lake outside of Alexander City, Alabama, of which the court attributed ownership to Alabama Power Company. Some of the plaintiffs owned property adjacent to the lake. They alleged trespass, among other actions. A jury returned a verdict of $155,000 in compensatory damages and $52,000,000 in punitive damages. The Supreme Court of Alabama reversed and awarded judgment for Russell and others. The Supreme Court's reversal was based in part on the limits of "indirect" trespass.

Writing for the Court, Chief Justice Perry Hooper explained:

In Rushing v. Hooper-McDonald, Inc., 293 Ala. 56, 300 So.2d 94 (1974), this Court held that an indirect trespass occurs where the trespasser releases a "foreign polluting matter" beyond the boundaries of his property, knowing to a "substantial certainty" that it will invade the property. In comparing direct trespass and indirect trespass, this Court, in Borland v. Sanders Lead Co., 369 So.2d 523 (Ala.1979), stated that a plaintiff need not show actual damage to prove direct trespass. However, the plaintiff must prove four elements to show an indirect trespass: "1) an invasion affecting an interest in the exclusive possession of his property; 2) an intentional doing of the act which results in the invasion; 3) reasonable foreseeability that the act done could result in an invasion of plaintiff's

---

[51] The Supreme Court of Alabama ruled in a case of first impression in Rushing v. Hooper-McDonald, Inc., 300 So.2d 94 (1974), that trespass need not be direct on another's realty where pollution is discharged. See Cloud v. Olin Corp., 552 F.Supp. 528 (N.D. Ala.1982).

[52] In this proceeding, the plaintiffs' trespass allegation is only that the defendant invaded their property right. The plaintiffs do not even allege that the defendant invaded the property or allowed or caused someone else to invade the property.

possessory interest; and 4) substantial damage[ ] to the res." 369 So.2d at
529. In order to prove an indirect trespass, the plaintiffs here must show
that "some substance has entered upon the land itself, affecting its nature
and character, and causing substantial actual damage to the res." 369
So.2d at 530. (Initial emphasis added.)

Id. at 947-48 (footnote omitted).

     The plaintiffs here allege that the defendant, "invaded... [their] property right...."
This allegation does not appear to fit the standards set down in the above cases.  If such
an "invasion" is an indirect trespass under Alabama law, that is a determination that the
Supreme Court of Alabama must make.  It is not an extension this Court is willing to
make based on its research or the facts of this case.

### (2)  Conclusion to Count Four – Trespass

     Based on the above, the Court finds in favor of the defendant and against the
plaintiffs on the count of trespass.

### v. Count Five - Violation of Automatic Stay

     The substance of the plaintiffs' violation of the automatic stay count reads:

    23.    The defendant foreclosed in violation of the automatic stay.

First Amended Adversarial Complaint  at 6, Proceeding No. 59.

     This is a federal law question.  The elements of the automatic stay are:

    1.     A petition filed under section 301, 302, or 303 of this title...
        operates as a stay....

    2.     On request of a party in interest and after notice and a
        hearing, the court shall grant relief from the stay by
        terminating, annulling, modifying, or conditioning such stay
        for cause, including the lack of adequate protection of an
        interest in property of such party in interest.

11 U.S.C. § 362 (a) and (d).  A violation could occur if action is taken without relief from
the stay.

**(1) Discussion**

This Court exercised its authority to condition the stay when it entered its November 19, 2003.[53]  As quoted above, that order read in part:

1.  The Debtors shall resume making the regular monthly mortgage payment unto the Creditor, presently in the amount of **$531.95**, beginning **OCTOBER 20, 2003**.

2.  The Creditor shall file a post-petition arrearage claim for the mortgage payments, contractual fees and costs including the associated bankruptcy attorney fees and costs.  Said claim appears to be as follows:

    | | |
    |---|---|
    | 2 payment of $531.95 each for August and September 2003 | $1,063.90 |
    | 4 late charges of $23.85 each for June - September, 2003 | $    95.40 |
    | Bankruptcy Attorney fees and costs RE Motion for Relief | $  575.00 |
    | Partial Payment in Suspense: | [$   483.00] |
    | Total post-petition arrearage through October 19, 2003 | $ 1,251.30 |

3.  The automatic stay of Section 362(a) is hereby MODIFIED to provide future relief unto the Creditor as follows: <u>should the Debtors default under the terms of this order, or the terms of the mortgage contract, by the failure to make a payment which is received by the Creditor within thirty (30) days from the date that it becomes due beginning on or before OCTOBER 20, 2003, then the automatic stay of Section 362 terminates as to the Creditor without further notice or order</u>. The waiver of any default occurring under this order shall not constitute a waiver as toward any subsequent default occurring under this order.

<u>Order on Motion for Relief from Automatic Stay</u> entered November 19, 2003. Proceeding No. 21 in the main case (emphasis added).  This consent order embodied the agreement between the parties.[54]

---

[53] Section 362 of the Bankruptcy Code gives the Court the authority to enter an order conditioning the stay for the future if the Court finds that relief from the stay should not be granted outright.  Such orders can take many forms, but the most frequently used are those commonly referred to as "drop dead" orders.  This Court prefers the term "future relief" order. Others use terms such as "doomsday," "strict compliance" or "prospective."  Whatever they are called, the effect is the same.  The orders condition the stay in such a way that if the debtor fails to make a future payment, the stay will be granted without further notice or order from the court. One court described these orders as the "linchpin in the bankruptcy process." <u>In re Derringer</u>, 375 B.R. 903, 912 n.44 (10th Cir. BAP 2007).  See also <u>Matter of Mendoza</u>, 111 F.3d 1264, 1270 (5th Cir. 1997) where the Court commented, "bankruptcy courts should be afforded the latitude to fashion remedies they consider appropriate under the circumstances, including "drop dead" orders, as long as the bankruptcy court follows the Bankruptcy Code's statutory mandate."

[54] The Court is bound to enforce a consent or agreed upon order strictly according to its terms.  The opinion in <u>Strouse v. J. Kinson Cook, Inc.</u>, 634 F.2d 883, 885 (5th Cir. (Unit B)

54

The issue then is: Did the stay lift by operation of this order? As explained below, it did, for two reasons. The stay lifted when the plaintiffs failed to make all of their payments. The stay lifted when the plaintiffs failed to make payments for the full amount due.

### (a) The Stay Lifted when the Plaintiffs Failed to Make All Payments

In accordance with the expressed terms of the consent order, if the plaintiffs did not make their mortgage payments in accordance with the order, the stay lifted. This Court has found that the plaintiffs did not make all of the payments required by the November 19 order. Therefore, the stay lifted. When the stay lifted, the defendant was entitled to pursue its state law remedy of foreclosure. Consequently, the defendant was not in violation of the stay.

### (b) The Stay Lifted when the Plaintiffs Failed to Make Full Payments

In addition, the November 19 order required the plaintiffs to make monthly mortgage payments of $531.95 for each month beginning with October 2003. As discussed above, this Court found that each of the plaintiffs' payments under the order was less than $531.95; therefore, the plaintiffs were, with each payment, also in default of the November 19 order. Therefore, after each such payment, the stay lifted.[55]

_____

1981) includes:

> Although a consent decree is a judgment, it is to be construed for enforcement purposes as a contract. United States v. ITT Continental Baking Co., 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148, 162 (1975). Under the rules of construction applicable to consent agreements, the contract of consent, as the law between the parties, must be enforced as written. Id. at 236, 95 S.Ct. at 934, 43 L.Ed.2d at 161. Any command alleged to exist therein must be found "within its four corners." United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256, 263 (1971). Unless the language is ambiguous, there can be no departure from the "four corners" rule. United States v. ITT Continental Baking Co., 420 U.S. at 238, 95 S.Ct. at 935, 43 L.Ed.2d at 162.

Id.

[55] The Court recognizes that the plaintiffs argue that the defendant waived its right to foreclose when it accepted payments after default. That issue is discussed below under Count Six – Estoppel.

Case 04-00250-BGC    Doc 160    Filed 05/29/08    Entered 05/29/08 10:38:15    Desc Main
Document    Page 55 of 77

## (2) Conclusion to Count Five – Violation of the Automatic Stay

Based on the above, the Court finds in favor of the defendant and against the plaintiffs on the count of violation of the automatic stay.

### vi. Count Six - Estoppel

The substance of the plaintiffs' estoppel count reads:

25.     The defendant's asserts that the plaintiff's were in default as of November 2003 and that relief had been granted as of November 2003.

26.     The defendant encouraged the plaintiffs to continue making payments in spite of its position that the stay had lifted and that the plaintiff's were in default. The plaintiff's relied on the defendant's representations and continued to make payments through August, 2004 with the understanding that their regular payments would prevent a foreclosure. The defendant accepted and applied payments on October, 2003, November 2003, December 2003, January 2004,  2004 and March 2004 as evidenced by the attached affidavit (See Exhibit C, Wells Fargo affidavit).

27.     In spite of the plaintiff regular mortgage payments, the defendant foreclosed on August 30, 2004. As such, the defendant should be estopped from asserting that the plaintiffs were in default as of the date of the foreclosure.

First Amended Adversarial Complaint at 6-7, Proceeding No. 59.

The plaintiffs do not identify the type of estoppel the Court should apply.  There are many.[56]  Based on the complaint, the Court presumes it is one of the two most frequently raised.  Those are "judicial estoppel" and "equitable estoppel."  If the plaintiffs are arguing "equitable estoppel," that is a state law question.  If they are arguing "judicial estoppel," in the context of this proceeding, that is a federal law question.   State law is discussed first.

### (1) Alabama Law

The elements of estoppel in Alabama are:

1.      that the party to be estopped had knowledge of the facts;

---

[56] See this Court's opinion in In re Gilmore, 221 B.R. 864 (Bankr. N.D. Ala. 1998).

2.      that the party to be estopped intended that his conduct be acted upon, or that the party asserting estoppel had a right to believe that the conduct was so intended;

3.      that the party asserting estoppel was ignorant of the true facts;

4.      that the party asserting estoppel relied on the other's conduct; and

5.      that the party asserting estoppel was injured as a result of his reliance.

Reeves Cedarhurst Development Corp. v. First American Federal Sav. and Loan Assoc., 607 So.2d 180, 183 (Ala. 1992).[57]

The plaintiffs contend that the defendant accepted payments from the plaintiffs after the defendant contended that the plaintiffs were in default. They argue that when the defendant accepted those payments, it waived its right to contend that the plaintiffs were in default. The plaintiffs conclude that the defendant should be estopped from taking that position now. That is not the law in Alabama.

The law in Alabama is, and has been for over 100 years, that a creditor does not waive the right to act on a future default by accepting payment of a past default. In Parker v. Olliver, 18 So. 40 (Ala. 1895) the Supreme Court of Alabama recognized:

> Having the absolute right to declare the note due upon any such delinquency, his failure to exercise it in one instance did not preclude its exercise in a subsequent instance. The first delinquency passed without such election; the right was as fully secured to him by the terms of the contract as to a succeeding delinquency as it had been with reference to the first. And the fact that he had elected not to declare the debt due upon the first delinquency gave no assurance whatever that a subsequent right of election would be exercised in the same way. And it cannot be said that his election at one time not to declare the maturity of the debt induced the respondents to again allow the taxes to become delinquent, when they knew then, as well as in respect of the first delinquency, that, nothwithstanding his pretermission at that time, he had the unqualified right to make the contrary election. If they acted upon a different assumption, it was gratuitous,-mere speculation upon which of two courses equally open to him he would adopt; and this action could in no sense be said to have been induced by him.

---

[57] The Court recognizes that most, if not all, forms of estoppel are equitable. The elements of estoppel as discussed here appear to be ones representing one of the purest "equitable" forms of the doctrine.

57

Id. at 42.

In considering an equitable estoppel argument against a foreclosure similar to the one before this Court, the Court in Auto-Plaza, Inc. v. Central Bank of Alabama, N.A., 394 So.2d 6 (Ala.1980), recognized:

> On the other hand, the mere making of late payments by the debtor and their acceptance by the creditor does not alter, as a matter of law, the express terms of either the acceleration or the nonwaiver of acceleration clauses of the security agreement. Putman Realty & Auction, Inc. v. Bailes, 371 So.2d 658 (Ala.1979).

Id. at 9.[58]

Similarly, the mortgagor in Reeves Cedarhurst, cited above, also raised estoppel as a cause of action against its mortgagee and argued that the mortgagee "waived its right to object to... [the mortgagor's] default... and should be estopped...." Id. Based on the facts there, the Supreme Court of Alabama rejected the argument. The result should be the same here.

If this is a state law question, the law in Alabama is that the defendant did not waive its right to rely on a future default by accepting payments from the plaintiffs while contending that the plaintiffs were in default.

In addition, if this is a state law question, this Court need not consider any element of estoppel other than number 3 above. As discussed, this Court found that the plaintiffs had constructive knowledge of their default. As to element 3, the plaintiffs were not ignorant of the true facts. The plaintiffs were not unsophisticated debtors. The facts establish that they ignored the true facts that they were in default.[59] They cannot rely on estoppel to defend those actions. As the Court in Auto-Plaza recognized:

Draughon v. General Finance Credit Corp., 362 So.2d 880, at p. 884 (Ala.1978), states:

---

[58] This Court has recognized that a mortgagee can waive its rights by accepting payments after foreclosure. See In re Parks, 93 B.R. 361 (Bankr. N.D. Ala. 1995). But that is not the situation here.

[59] See the discussion above about the plaintiffs' prior bankruptcy cases, the number of relief from stay actions from those cases, the plaintiffs' ongoing failure to make current mortgage payments, and the plaintiffs' success in stopping the defendant from foreclosing on the property until August 30, 2004, many years after they first defaulted on the loan.

58

"Because the doctrine of estoppel is for the protection of innocent persons, it is essential that the party claiming the benefit of estoppel does not predicate his claim on his own dereliction of duty or wrongful conduct.

"Where a party seeks an equitable remedy, such as equitable estoppel, the party's conduct must reflect the maxim of 'clean hands,' for any unconscientious conduct arising out of the subject matter of the suit will bar their action. Anders v. Sandlin, 191 Ala. 158, 67 So. 684 (1914).

Id. at 9.

## (2)  Federal Law

Notwithstanding the above, the Court finds, based on the plaintiffs' complaint, that the plaintiffs have raised a federal question of judicial estoppel.  Factually, the question rises in the context of the Court's November 19 order.

The Court of Appeals for the Eleventh Circuit has defined judicial estoppel many times.  This Court discussed those definitions in its opinion in In re Steeley, 243 B.R. 421 (Bankr. N.D. Ala. 1999).  This Court wrote:

Judicial estoppel is a general rule, "directed against those who would attempt to manipulate the court system through the calculated assertion of divergent sworn positions in judicial proceedings." Chrysler Credit Corp. v. Rebhan, 842 F.2d 1257, 1261 (11th Cir.1988), quoting, Johnson Service Co. v. Transamerica Insurance Co., 485 F.2d 164, 174 (5th Cir.1973). "The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings." American Nat'l Bank of Jacksonville v. F.D.I.C., 710 F.2d 1528, 1536 (11th Cir.1983). And the doctrine may apply, as Chrysler Credit Corp. v. Rebhan demonstrates, even if there is no showing of a calculated intent to mislead.

Id. at 427, n.10.  That note also list specific examples of the application of judicial estoppel.

One simple definition, in this context, is, "'Estoppel is an equitable doctrine which prevents a party from raising a claim or taking a legal position when his conduct with regard to that claim is contrary to his position.' Matter of Garfinkle, 672 F.2d 1340, 1346-47 (11th Cir. 1982)." Matter of T & B General Contracting, Inc., 833 F.2d 1455, 1461 (11th Cir. 1987).

The plaintiffs argue that the defendant should be estopped from asserting that the plaintiffs were in default because the defendant continued to accept payments from the plaintiffs.  The Court disagrees.

The Court's November 19 order allowed the defendant relief from the stay if the plaintiffs did not make a future payment beginning with the October 2003 payment. That order is self-perpetuating. Each payment period, and each payment, stands on its own. The failure to make any one payment would trigger the future relief clause of the order. Each payment could be the default payment, and if one payment is missed, relief is granted. Factually, the plaintiffs remained one month behind on their payments beginning in February 2004. When each subsequent payment became due, they defaulted, not to mention that none of the payments made were for the full amount.

The defendant's position is that the plaintiffs were in default of the November 19 order. As the discussion above confirms, the plaintiffs were in default of the order beginning in February 2004. Based on the definitions above, the Court finds: (1) the defendant is not trying to manipulate the system; (2) the defendant is not making a mockery with inconsistent pleadings; (3) the defendant is not attempting to mislead the Court; (4) and the defendant is not taking a legal position that is contrary to its conduct.

### (3) Conclusion to Count Six – Estoppel

Based on the above, the Court finds in favor of the defendant and against the plaintiffs on the count of estoppel.

### vii. Count Seven - Fraud

The substance of the plaintiffs' fraud count reads:

29.     On August 30, 2004 the defendant held out to the public that the plaintiffs' [sic] were in default of their mortgage. The defendant concealed the fact that it continued to solicit, received and apply payments through August 2004. The defendant misrepresented the status of the plaintiffs' mortgage in order to secure as many pre-foreclosure payments as possible.

30.     When the plaintiffs called to check the status of their mortgage, the defendant concealed the fact that its position was that the plaintiffs' [sic] were in default as of November 2003 and it solicited, received and applied payments in spite of its intent to foreclose on the property.

31.     Although the plaintiff's post-relief from stay mortgage payments were more than their actual mortgage note and although the plaintiffs were paying for their own homeowner's insurance and taxes, the defendant concealed the fact that its position was that the post relief from petition payments were only "partial" payments. The defendant continued to solicit, receive and apply the "so-called" partial payments in spite of the fact that it intended to foreclose on the plaintiffs' property.

First Amended Adversarial Complaint at 7-8, Proceeding No. 59.

60

This is a state law question.  The elements of fraud in Alabama are:

(1)     that the defendant made a false representation to the plaintiff;

(2)     that the representation concerned a material fact;

(3)     that the plaintiff relied on the representation; and

(4)     that the plaintiff incurred damage as a proximate result of the reliance.

Reeves Cedarhurst Development Corp. v. First American Federal Sav. and Loan Ass'n, 607 So.2d 180, 182 (Ala. 1992).

## (1)  Discussion

In In re Bennitt, 348 B.R. 820 (Bankr. N.D. Ala. 2006) this Court discussed Alabama's fraud laws.  It wrote:

> What constitutes "fraud" in Alabama is the extensive subject of many statutes and judicial opinions. As the discussion below demonstrates, there are different types of fraud in Alabama law with varying degrees of intent.
>
> Section 6-5-101 of the Code of Alabama provides, "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud." Code of Ala.1975, § 6-5-101. Under section 6-5-101, a false representation, even if made by mistake or innocently, is actionable and entitles a plaintiff to compensatory damages. Hall Motor Co. v. Furman, 285 Ala. 499, 504, 234 So.2d 37, 41 (1970). Fraudulent intent, or an intent to deceive, is not essential to a recovery under that section. Standard Oil Co. v. Johnson, 276 Ala. 578, 581, 165 So.2d 361, 364 (1964). Neither is knowledge by the defendant of the falsity of his or her representations. First Nat'l Bank of Auburn v. Dowdell, 275 Ala. 622, 626, 157 So.2d 221, 225 (1963); Barrett v. Hanks, 275 Ala. 383, 385, 155 So.2d 339, 342 (1963).

Id. at 825-26.

There is no evidence that the defendant committed fraud.  Let's look at what the plaintiffs allege.

First the plaintiffs allege:

61

On August 30, 2004 the defendant held out to the public that the plaintiffs were in default of their mortgage. The defendant concealed the fact that it continued to solicit, received and apply payments through August 2004. The defendant misrepresented the status of the plaintiffs' mortgage in order to secure as many pre-foreclosure payments as possible."

If the defendant held out to the "public" that the plaintiffs were in default, they held out the same to the plaintiffs. How could this then be a false representation? The defendant sent its acceleration letter as early as July 6, 2004. Even if that letter was not sufficient to give certain required notices, clearly it put the plaintiffs on notice that the defendant intended to foreclose. And finally, according to Mrs. Sharpe's testimony, the plaintiffs made their tenth and final postpetition payment with check number 2024, for $485.00, dated June 27, 2004. The defendant returned that check. Simply put, the defendant neither continued to accept payments from the plaintiffs nor concealed its intentions.

Second, the plaintiffs allege:

When the plaintiffs called to check the status of their mortgage, the defendant concealed the fact that its position was that the plaintiffs were in default as of November 2003 and it solicited, received and applied payments in spite of its intent to foreclose on the property.

How could the defendant have concealed its position in November 2003 when this Court entered a **CONSENT** order on November 19, 2003, based on the parties' agreement that the plaintiffs were in default? The defendant's intent all along was to foreclose if the plaintiffs did not pay. That was never concealed.[60]

Third, the plaintiffs allege:

Although the plaintiff's post-relief from stay mortgage payments were more than their actual mortgage note and although the plaintiffs were paying for their own homeowner's insurance and taxes, the defendant concealed the fact that its position was that the post relief from petition payments were only "partial" payments. The defendant continued to solicit, receive and apply the "so-called" partial payments in spite of the fact that it intended to foreclose on the plaintiffs' property.

Do the plaintiffs contend that they did not know the amount of their mortgage payments? This Court's November 19 order set that amount. Again, this was a consent

_____

[60] As discussed above, the defendant filed a motion for relief from stay in each of the plaintiffs' three bankruptcy cases. The defendant's intent in each case was to get relief from the stay so it could foreclose on the plaintiffs.

62

order based on the agreement of the parties. The plaintiffs were represented by an attorney. How could the defendant mislead the plaintiffs into thinking that less than full payments were sufficient when the parties agreed that the payments would be more than the plaintiffs were paying? And again, it is clear that the defendant's intent was always to foreclose if the plaintiffs did not pay. There was nothing misleading about the defendant's actions. There is absolutely no evidence of fraud.[61]

### (2) Conclusion to Count Seven – Fraud

Based on the above, the Court finds in favor of the defendant and against the plaintiffs on the count of fraud.

### viii. Count Eight - Unjust Enrichment

The substance of the plaintiffs' unjust enrichment count reads:

33.     The defendant accepted payments in spite of its intent to foreclose. The defendant received payments it otherwise would not have received and the defendant's [sic] were made whole through the auction of said property.

First Amended Adversarial Complaint at 9, Proceeding No. 59.

This is a state law question,. The elements of unjust enrichment in Alabama are:

1.     The defendant holds money which, in equity and good conscience, belongs to the plaintiff; or

2.     Holds money which was improperly paid to defendant because of mistake or fraud.

Atlantic Nat. Trust, LLC v. McNamee, Case No. 1060423, 2007 WL 2898263 (Ala. Oct 05, 2007).

### (1) Discussion

The simple answer to the plaintiffs unjust enrichment allegations is this, "Recovery on a theory of unjust enrichment, however, is only available 'when as a matter of fact there is no legal contract.' See Regional Pacesetters, 165 Ga.App. 777, 300 S.E.2d 180, 185 (1983)." Camp Creek Hospitality Inns, Inc. v.. Sheraton Franchise Corp., 139 F.3d 1396, 1413 (11th Cir. 1998). The parties' mortgage is a legal contract. Therefore, there cannot be unjust enrichment. But even if there were, the plaintiffs would not be entitled to recover.

---

[61] The Court's discussion above about wrongful foreclosure is applicable here.

The plaintiffs allege, "The defendant received payments it otherwise would not have received...."  Are the plaintiffs saying that if they had known that the defendant intended to foreclose that they would not have made their payments?  First, it was clear that the defendant intended to foreclose if the plaintiffs did not pay.  Second, regardless of the defendant's intentions, the plaintiffs had a debt and that debt was supposed to have been paid.

Unjust enrichment depends on the facts.  Id.  The doctrine is one of equity that permits a court of equity to disallow enrichment at the expense of another when in good conscience it believes that it should do so.  Battles v. Atchison, 545 So.2d 814, 815 (Ala.Civ.App.1989).  This proceeding is not one of those situations.

The defendant never hid its intentions.  The plaintiffs have been involved in three bankruptcy cases.  In each case the defendant's intent was to obtain relief from the stay to foreclose on the mortgage.  During all of those cases and motions, the plaintiffs had a substantial debt to the defendant, and substantial arrears on that debt.  The plaintiffs were required to pay that debt.  If they had, the defendant would have received only what it was entitled to receive.  Nothing more.  But as it turned out, the defendant did not even receive that.

### (2)  Conclusion to Count Eight – Unjust Enrichment

Based on the above, the Court finds in favor of the defendant and against the plaintiffs on the count of unjust enrichment.

### ix.  Count Nine - Breach of Fiduciary Duty

The substance of the plaintiffs' breach of fiduciary duty count reads:

35.     The price the defendant received at the August 30, 2004 foreclosure sale was grossly inadequate.  The defendant, therefore, breached their duty to conduct a fair and reasonable sale.

First Amended Adversarial Complaint  at 9, Proceeding No. 59.

### (1) Discussion

This is a state law question, and the law in Alabama appears to be that there is no fiduciary duty between a mortgagee and a mortgagor.  As quoted above, District Court Judge Ira De ment wrote in Atkins v. GE Capital Mortg. Services, Inc., 993 F.Supp. 1406 (M.D. Ala.1998):

The Parties present an accurate discussion of fiduciary law in Alabama in their pleadings on summary judgment ( See Def's Mem. Supp. at 26-29;

64

Pls.' Resp. at 73-87.) **Generally the relationship of a lender to a borrower does not impose a fiduciary duty on the lender**. K & C Development Corp. v. AmSouth Bank, N.A., 597 So.2d 671 (Ala.1992). **This general rule also applies to the relationship between a mortgagee and mortgagor**. Brabham v. American Nat. Bank of Union Springs, 689 So.2d 82 (Ala.Civ.App.1996); see also Nettles v. First Nat. Bank of Birmingham, 388 So.2d 916 (Ala.1980) (**holding no fiduciary duty existed between mortgagee and mortgagor despite mortgagee's active role in attempting to improve mortgage company's financial position**).

Id. at 1418.[62]  If that is not the law in Alabama, it is for the Supreme Court of Alabama to correct, not this Court.[63]

However, the issue of whether the mortgagee sold the property for grossly less than the property was worth, is the same issue discussed above regarding wrongful foreclosure.  In that sense, this Court will determine whether the defendant has any liability after the parties present evidence of damages.

### (2) Conclusion to Count Nine – Breach of Fiduciary Duty

With the exception stated above, the Court finds in favor of the defendant and against the plaintiffs on the count of breach of fiduciary duty.

### x.  Conclusion to the Plaintiffs' Nine Counts

Based on the above, the Court finds judgment is due to be entered in favor of the plaintiffs and against the defendant on count one, breach of contract, but judgments are due to be entered in favor of the defendant and against the plaintiffs on counts two through nine, with the exceptions noted regarding wrongful foreclosure and breach of fiduciary duty.

---

[62] The Court in Brabham v. American Nat. Bank of Union Springs, 689 So.2d 82 (Ala.Civ.App. 1996) commented, "The gist of the Brabhams' argument is that the supreme court has tacitly recognized that a mortgagee owes a fiduciary duty to a mortgagor. We do not agree." Id. at 88. It concluded, "the duty a mortgagee owes a mortgagor in a foreclosure proceeding is one of good faith and fairness, not a general fiduciary duty."  Id.

[63] And, Alabama law does not imply a fiduciary duty in debtor-creditor relationships. Gulf States Steel, Inc. v. Lipton, 765 F.Supp. 696, 703 (N.D. Ala. 1990).

## 2. The Plaintiffs' Request for a Jury Trial Against GE, and the Defendant's
## Motion to Dismiss Defendant GE Mortgage Services

### a. Background

Wells Fargo was the only defendant in the plaintiffs' original complaint.  GE Mortgage Services, LLC, fka GE Capitol Mortgage Services, Inc., was added as a defendant by the plaintiffs when they filed their amended complaint.

According to one of the affidavits filed with the defendant's motion to dismiss GE:

1.      Prior to September 30, 2000, GE serviced certain mortgages for Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A.

2.      One of the mortgages that GE serviced for Wells Fargo was a mortgage in the name of Plaintiffs Roderick and Linda Sharpe, loan number 0022060412.

3.      On September 30, 2000, the servicing rights of the Plaintiffs' mortgage were transferred to Wells Fargo, and Wells Fargo became legally responsible for all matters with respect to said loan and mortgage.

4.      GE is no longer an active entity and has no license to service loans. However, full legal dissolution of the entity will not take place until all outstanding matters are resolved.

Affidavit of Dixie Teagle attached to First Amendment to Motion to Dismiss Defendant GE Mortgage Services. Proceeding No. 152.

In support of its motion to dismiss, the defendant, assumes all liability for any actions of GE and pledges to satisfy any judgment rendered against in this case, whether against Wells Fargo or GE.  Id.

The defendant wants GE dismissed to allow GE Mortgage Services, LLC to dissolve itself.  The plaintiffs want to keep GE in this proceeding to support a renewed request for a jury trial.

### b. The Plaintiffs' Request for a Jury Trial against GE

In its June 27, 2007, order, this Court held that the plaintiff was not entitled to a jury trial against Wells Fargo on any of the nine counts in its amended complaint. Sharpe v. Wells Fargo, et al. (In re Sharpe), A.P. No. 04-00250, 2007 WL 1876368, at *18-*27 (Bankr. N.D. Ala. June 27, 2007).  Those nine counts were divided into two

groups. The first group included the five counts from the plaintiffs' original complaint. The Court found that the plaintiffs were not entitled to a jury trial on those counts because those five counts were the same as the original counts for which the plaintiffs had waived their right to a jury trial. The second group included the four new counts added to the amended complaint. The Court held that there was also no right to a jury trial on those counts because each was equitable in nature and there is no right to a jury trial on equitable claims.

The plaintiffs' theory now is that even if they cannot try their matters against Wells Fargo before a jury, they should be allowed to do so against GE because they made a timely jury demand when they added GE to the complaint.

### i. The Four Counts added by the Amended Complaint

As stated above, in its June 27, 2007, memorandum opinion, this Court considered whether the plaintiff was entitled to a jury trial against Wells Fargo on any of the four counts added by the amended complaint. The Court granted the defendant's motion to strike jury demand as to each added count because each count was equitable in nature. This Court relied on the universally accepted rule that a right to a jury does not extend to claims which are equitable in nature. <u>CBS Broadcasting, Inc. v. EchoStar Communications</u>, 450 F.3d 505, 517, n.25 (11th Cir. 2006).

The Court's conclusion is the same with GE. The facts and allegations in the four amended counts are the same for GE as they are to Wells Fargo. Therefore, as to GE, the defendant's motion to strike jury demand on the four counts added by the amended complaint is due to be granted. It does not matter that a timely jury demand was made in the amended complaint at the same time GE was added. The plaintiffs are not entitled to a jury trial on any of the added counts because all of them are equitable in nature, regardless of who the defendant is.[64] See <u>Sharpe v. Wells Fargo, et al. (In re Sharpe)</u>, A.P. No. 04-00250, 2007 WL 1876368, at *23-*27 (Bankr. N.D. Ala. June 27, 2007).

### ii. The Five Original Counts

The remaining jury trial issue is whether the plaintiffs may revive the waived right to a jury trial on the original five counts simply by adding a new defendant where all else is identical to the original complaint?

As this Court discussed in its prior order, as a general rule, a right to a jury trial that was waived because a demand was not timely, cannot be revived with a second demand. Also, as a general rule, new causes of action pleaded in an amended complaint cannot support another jury demand if they are only new theories based on

---

[64] This issue was decided by the Court's June 27, 2007, order. That order was final as to that issue. No appeal was taken.

the same facts, rather than new issues. See <u>Sharpe v. Wells Fargo, et al. (In re Sharpe)</u>, A.P. No. 04-00250, 2007 WL 1876368,  at *19-*27 (Bankr. N.D. Ala. June 27, 2007).[65] The question now is: What is new in this amended complaint that could revive the waived right?

The basic facts in the amended complaint are the same as those in the original complaint.  There are no new issues, only new theories. The plaintiffs contend that the plaintiffs were not in default on their mortgage payments and that the defendant's action in foreclosing on the property was wrongful.  Every count in the original complaint and every count in the amended complaint is based on those theories.  In the amended complaint, the first five counts are the same as the five counts in the original complaint. Yes, there are variations such as the question of whether the defendant provided sufficient notice to satisfy the requirements of paragraph 21 of the mortgage, but the issue in every one is the same, that is did the defendant wrongfully foreclose.

The only substantive difference is of course that the plaintiffs added GE as a defendant.  Is that a change that could revive the plaintiffs' waived right to a jury trial? The answer is, no.

The same issue was raised in <u>Sunenblick v. Harrell</u>, 145 F.R.D. 314 ((S.D.N.Y.1993).  The Court there concluded:

> The issues raised in the proposed amended complaint involve the "same general area of dispute" as the original complaint and merely add an alternative legal theory upon which relief could be granted. As such, the amendment is insufficient to revive plaintiff's right to a jury trial. <u>Rosen v. Dick</u>, 639 F.2d at 94; <u>Lanza v. Drexel</u>, 479 F.2d at 1310.

> Similarly, the addition of the new defendants does not revive plaintiff's right to demand a jury trial. The parties plaintiff seeks to add are all related to the parties already named in this action and, indeed, have been participating in discovery. This mere addition of parties does not change the underlying claims or the nature of the relief desired and, therefore, does not revive plaintiff's right to a jury trial.

---

[65] As discussed in the June 27 opinion, the Court of Appeals for the Eleventh Circuit recognized in <u>In re Financial Federated Title & Trust, Inc.</u>, 309 F.3d 1325, 1331 (11th Cir. 2002) that an, "amended complaint did not revive any waived right to jury trial because it did not raise any new issues which carry a Seventh Amendment right to jury trial") (citing <u>Moore v. United States</u>, 196 F.2d 906, 908 (5th Cir.1952).  See this Court discussion of reviving a waived jury demand in its June 27, 2007, order entered in this proceeding at <u>Sharpe v. Wells Fargo, et al. (In re Sharpe)</u>, A.P. No. 04-00250, 2007 WL 1876368, at *19-*22 (Bankr. N.D. Ala. June 27, 2007).

68

Id. at 317.  See also Tuff-N-Rumble Management, Inc. v. Sugarhill Music Pub. Inc., 75 F.Supp.2d 242, 245 (S.D.N.Y. 1999).

Relying on Sunenblick, the court in Sea Carriers Corp. v. Empire Programs Inc., Case No. 04 Civ. 7395(RWS), 2007 WL 221521, *1 (S.D.N.Y. January 26, 2007) explained:

> The claims asserted in the amended complaint are identical to those of the original complaint, except that they refer to an additional party, Martin. Therefore, the Plaintiff waived its rights to a jury trial with respect to all issues in this action by failing to demand a jury trial within ten days of service of the answer to the original complaint. See Rule 38(b), Fed.R.Civ.P. The addition of parties does not change the underlying claims or the nature of the relief desired and, therefore, does not revive plaintiff's right to a jury trial. See, e.g., Tuff-N-Rumble Mgmt., Inc., 75 F.Supp.2d at 246 (quoting Sunenblick v. Harrell, 145 F.R.D. 314, 317 (S.D.N.Y.1993)).

Id. at *1.

The Court of Appeals for the Fifth Circuit agrees.  In Daniel International Corporation v. Fischbach & Moore, Inc., 916 F.2d 1061 (5th Cir.1990), then Chief Judge Thomas A. Clark commented:

> F & M also argues that the jury demand it made was sufficient under Rule 38(b). However, the only pleading on which a demand was endorsed merely added a party to its counterclaim. At most, this added only an additional right to recover against FIC, Daniel's surety. It did not plead any new issues of fact or raise a new issue of law. An amendment not introducing a new issue will not give rise to a right to demand for a jury trial. Guajardo v. Estelle, 580 F.2d 748, 753 (5th Cir.1978). The amendment must introduce a new issue and not merely add a new theory of recovery. Fredieu v. Rowan Companies, Inc., 738 F.2d 651, 653 (5th Cir.1984). All issues were joined when F & M filed its reply and counterclaim.

Id. at 1063-64.[66]

---

[66] It appears that the Second and Third Circuits agree that merely adding a new party does not revive a waived right to a jury trial. See State Mutual Life Assurance Company of America v. Arthur Andersen & Co., 581 F.2d 1045, 1049 (2d Cir.1978) and Pennsylvania ex rel. Feiling v. Sincavage, 439 F.2d 1133, 1134 (3d Cir. 1971);

This Court agrees. Based on the above, the Court finds that the plaintiffs' request for a jury trial against GE on the original five counts is also due to be denied.

### iii. Conclusion to the Plaintiffs' Right to a Jury Trial against GE

The plaintiffs' previously waived right to a jury trial on the original five counts was not revived by making an amended demand for a jury trial when GE was added to the complaint. Similarly, the plaintiffs are not entitled to a jury trial on any of the four equitable counts for the reasons expressed in the Court's June 27, 2007, order.

### c. The Defendant's Motion to Dismiss GE
### and the Plaintiffs' Allegations against GE

Should GE be dismissed? If the plaintiffs are not entitled to a jury trial, is there anything left to try anything against GE?

### i. Discussion

All of the evidence offered at the trial against Wells Fargo applies to GE. And based on that evidence, this Court cannot imagine additional evidence that could be offered against GE that was not offered against Wells Fargo. Each party offered all of its evidence regardless of whether it involved Wells Fargo or GE. And as it turns out, all of that evidence applies equally to GE and Wells Fargo. If ever necessary, this Court can determine whether GE has any liability separate from Wells Fargo. But for now, all that matters is that it is not necessary to have another trial.

But does that mean that GE should be dismissed? The Court does not believe that GE should be dismissed until all of the matters in this proceeding are resolved. In the affidavits supporting its motion to dismiss, Wells Fargo assumed all liability for all of GE's actions and pledged to satisfy any judgment rendered against Wells Fargo or GE. If a monetary judgment is entered in favor of the plaintiffs, and Wells Fargo satisfies that judgment, the Court will entertain another motion to dismiss GE.

### ii. Conclusion to the Motion to Dismiss GE

For the reason expressed above, the Court finds that the defendant's motions to dismiss GE are due to be denied. The Court will retain jurisdiction over GE until all matters are resolved.

### 3. Did the Plaintiffs Waive their Attorney-client Privilege
### as to their former Attorney?

The final matter before the Court is whether the plaintiffs' former counsel should testify. Mrs. Sharpe testified that her attorney told her that she did not need to make the

June 2003 payment because that payment would be added into the Chapter 13 plan. The defendant contends that in so testifying, Mrs. Sharpe waived her attorney client privilege. The plaintiffs contend that Mrs. Sharpe did not waive the privilege.

The Court need not answer this question. The Court has ruled in the defendant's favor on the payment issue. The defendant does not need to call the former attorney. Whether the privilege was waived is of no concern as the plaintiffs do not want the attorney to testify anyway.

Based on the above, the Court finds that this issue is moot.

## VI. CONCLUSIONS

Based on the above, the Court makes the following conclusions.

1. Judgment is due to be entered in favor of the plaintiffs and against the defendant on count one, breach of contract;

2. Judgments are due to be entered in favor of the defendant and against the plaintiffs on counts two through nine, with the exceptions that after the Court hears the evidence on damages, the Court will consider whether judgment should be entered for the plaintiff on count two as to wrongful foreclosure and count nine as to breach of fiduciary duty;

3. The plaintiffs are not entitled to a jury trial against GE on any count;

4. The defendant's motions to dismiss GE are due to be denied pending satisfaction of any judgment rendered against Wells Fargo;

5. The plaintiffs' former attorney need not testify in this proceeding as the issue of the waiver of attorney-client privilege is moot.

A separate order will be entered in conformity with this Memorandum Opinion.

Dated: May 29, 2008                    /s/Benjamin Cohen
                                        BENJAMIN COHEN
                                        United States Bankruptcy Judge

71

I.    **BACKGROUND**

    A.    **The Parties' Mortgage Contract**

    B.    **The Plaintiffs' Bankruptcies**

        1.    **Case No. 01-04442-BGC-13**

        2.    **Case No. 02-07768-BGC-13**

        3.    **Case No. 03-04644-BGC-13 (The Current Case)**

        4.    **Summary of the Plaintiffs' Bankruptcies**

II.   **CONTENTIONS**

    A.    **The Plaintiffs' Contentions**

    B.    **The Defendant's Contentions**

III.  **PROCEDURAL HISTORY OF THE PENDING ADVERSARY PROCEEDING**

IV.   **CURRENT MATTERS**

V.    **ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    A.    **PART ONE – RELIEF FROM THE AUTOMATIC STAY**

        1.    **Did the Plaintiffs Make all of their Payments?**

            a.    **June 2003 – The First Postpetition Month**

            b.    **July 2003 – The Second Postpetition Month**

            c.    **August 2003 – The Third Postpetition Month**

            d.    **September 2003 – The Fourth Postpetition Month**

            e.    **October 2003 and November 2003 –**
                **The Fifth and Sixth Postpetition Months**

                i.    **The Fifth Payment Due**

                ii.   **The Sixth Payment Due**

f.      December 2003 – The Seventh Postpetition Month

g.      January 2004 – The Eighth Postpetition Month

h.      February 2004 – The Ninth Postpetition Month

i.      March 2004 – The Tenth Postpetition Month

j.      April 2004 – The Eleventh Postpetition Month

k.      May 2004 – The Twelfth Postpetition Month

l.      June 2004 – The Thirteenth Postpetition Month

m.      Conclusion to the Number of Payments Made

2.      The Amount of Payments Made

3.      Conclusions to Relief from the Automatic Stay

B.      PART TWO – THE DEFENDANT'S FORECLOSURE NOTICE

1.      Statutory Notice – Section 35-10-13

2.      Contractual

a.      Paragraph 14

b.      Paragraph 21

i.      Actual Notice of the Paragraph 21 Requirements

(1)     Notice Regarding Default

(2)     Notice Regarding Acceleration

(a)     Did the defendant specify the action required to cure the default?

(b)     Did the defendant specify a date, not less than 30 days from the date the notice is given by which the default must be cured?

73

(c)     Did the defendant advise that the failure to cure the default on or before the date specified in the notice may result in acceleration of the debt and sale of the property?

(d)     Did the defendant inform the plaintiffs of the right to reinstate after acceleration and sale?

(3)     Conclusions to Actual Notice of the Paragraph 21 Requirements

ii.     Constructive Notice of Paragraph 21

(1)     Application of Constructive Notice to Mortgage Provisions

(2)     Application of Constructive Notice

(a)     Notice Regarding Default

(b)     Notice Regarding Acceleration

(i)     Did the plaintiffs have constructive notice of the action required to cure the default?

(ii)    Did the plaintiffs have constructive notice of a specific date not less than 30 days from the date notice was given by which the default must be cured?

(iii)   Did the plaintiffs have constructive notice that the failure to cure the default on or before the date specified in the notice may result in acceleration of the debt and sale of the property?

74

                      **(iv)    Did the plaintiffs have constructive notice of the right to reinstate after acceleration and sale?**

             **(3)    Conclusion to Constructive Notice**

     **3.    Conclusion to Notice**

**C.    PART THREE – THE SPECIFIC PENDING MATTERS**

     **1.    The Plaintiffs' <u>First Amended Adversarial Complaint</u>**

        **a.    General Allegations**

        **b.    Request for Damages**

        **c.    The Plaintiffs' Nine Counts**

           **i.    Count One - Breach of Contract**

              **(1)    Discussion**

              **(2)    Conclusion to Count One – Breach of Contract**

           **ii.    Count Two - Wrongful Foreclosure**

              **(1)    Discussion**

                  **(a)    Wrongful Foreclosure in Alabama Law**

                  **(b)    "Elements" of Wrongful Foreclosure**

                  **(c)    Application of the "Elements" of Wrongful Foreclosure**

                  **(d)    Trust in a Foreclosure Relationship**

                  **(e)    The One Exception**

              **(2)    Conclusion to Count Two – Wrongful Foreclosure**

iii.    **Count Three - Conversion**

        (1)    **Discussion**

        (2)    **Conclusion to Count Three – Conversion**

iv.    **Count Four - Trespass**

        (1)    **Discussion**

               (a)    **Right to Possession**

               (b)    **Invasion of the Property**

        (2)    **Conclusion to Count Four – Trespass**

v.    **Count Five - Violation of Automatic Stay**

        (1)    **Discussion**

               (a)    **The Stay Lifted when the Plaintiffs Failed to Make All Payments**

               (b)    **The Stay Lifted when the Plaintiffs Failed to Make Full Payments**

        (2)    **Conclusion to Count Five – Violation of the Automatic Stay**

vi.    **Count Six - Estoppel**

        (1)    **Alabama Law**

        (2)    **Federal Law**

        (3)    **Conclusion to Count Six – Estoppel**

vii.    **Count Seven - Fraud**

        (1)    **Discussion**

        (2)    **Conclusion to Count Seven – Fraud**

viii.    **Count Eight - Unjust Enrichment**

        (1)    **Discussion**

        (2)    **Conclusion to Count Eight – Unjust Enrichment**

ix.    **Count Nine - Breach of Fiduciary Duty**

        (1)    **Discussion**

        (2)    **Conclusion to Count Nine – Breach of Fiduciary Duty**

x.    **Conclusion to the Plaintiffs' Nine Counts**

2.    **The Plaintiffs' Request for a Jury Trial Against GE, and the Defendant's <u>Motion to Dismiss Defendant GE Mortgage Services</u>**

    a.    **Background**

    b.    **The Plaintiffs' Request for a Jury Trial against GE**

        i.    **The Four Counts added by the Amended Complaint**

        ii.    **The Five Original Counts**

        iii.    **Conclusion to the Plaintiffs' Right to a Jury Trial against GE**

    c.    **The Defendant's Motion to Dismiss GE and the Plaintiffs' Allegations against GE**

        i.    **Discussion**

        ii.    **Conclusion to the Motion to Dismiss GE**

3.    **Did the Plaintiffs Waive their Attorney-client Privilege as to their former Attorney?**

VI.    **CONCLUSIONS**