**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Roderick Sharpe, | ) | Case No. 03-04644-BGC-13 |
| | ) | |
| Debtor. | ) | |
| | | |
| Roderick D. Sharpe and | ) | |
| Linda Sharpe, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | A.P. No. 04-00250 |
| | ) | |
| Wells Fargo Home Mortgage; | ) | |
| and GE Mortgage Services, LLC; | ) | |
| fka GE Capital Mortgages Services, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

The matters addressed in this Memorandum Opinion are the third and final part of an almost eight-year dispute before this Court.[1] That dispute grew out of a loan note of $51,300 the plaintiffs executed with Southern Atlantic Financial Services, Inc. on May 15, 1998. Defendant's Exhibit 3. In exchange for that loan, the plaintiffs gave Southern a security interest in their home at 2617 Avenue H, Birmingham, Alabama. Defendant's Exhibit 2. Southern Atlantic transferred its interest in the property and the note to GE Capital Mortgage Services, Inc (later known as GE Mortgage Services, LLC) on June 3, 1998. Defendant's Exhibit 2. On September 30, 2000, Wells Fargo Home Mortgage, the defendant, started servicing this loan for GE. Affidavit of Dixie Teagle attached to

---

[1] This Memorandum Opinion constitutes findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable here pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. This Court has already entered lengthy opinions in the two prior parts of this dispute. See Sharpe V. Wells Fargo, et al. (In re Sharpe), Case No. 03-04644; A.P. Case No. 04-00250, 2007 WL 1876368, (Bankr. N.D. Ala. Jun 27, 2007) and Sharpe V. Wells Fargo, et al. (In re Sharpe), 391 B.R. 117 (Bankr. N.D. Ala. 2008). Portions of those opinions are included here, and the Court adopts both opinions in support of its findings of fact and conclusions of law here.

<u>First Amendment to Motion to Dismiss Defendant GE Mortgage Services</u>, filed December 18, 2007.  A.P. Docket No. 152. Wells Fargo acquired the loan from GE on December 1, 2004. <u>Id</u>.  When the plaintiffs did not make all of the required payments, the defendant attempted to collect.

The parties' dispute has three parts.  Those are:

Part One - The Foreclosure: This first part began with the plaintiffs' default on their mortgage during Mr. Sharpe's first bankruptcy case, case number 01-04442.  It ended when the defendant foreclosed the mortgage on August 30, 2004.

Part Two - The Plaintiffs' Complaint and the Defendant's Liability: This second part began when the plaintiffs filed the pending complaint, Adversary Proceeding No. 04-00250, against the defendant on December 30, 2004.  It ended on May 29, 2008, when this Court ruled on the majority of the liability issues raised by the complaint.

Part Three - Damages: This third part began with a trial on November 12-13, 2008, on the damages phase of the pending complaint.  It ends with entry of this memorandum opinion and accompanying order.

Each part is discussed below.

## I.  PART ONE - THE FORECLOSURE

As stated above, part one of the parties' dispute began with the plaintiffs' default on the above-described mortgage during Mr. Shape's first bankruptcy case, case number 01-04442.  Part one ended on August 30, 2004, when the defendant foreclosed the plaintiffs' mortgage.  Plaintiffs' Exhibit 6.  The pertinent events are summarized below.[2]

Mr. Sharpe filed his first, case number 01-04442, on June 22, 2001.  Docket No. 1, Case No. 01-04442.[3]  At that time, the plaintiffs were severely in default on their mortgage to GE.  According to the proposed Chapter 13 plan Mr. Sharpe filed with his

---

[2] Rule 201 of the Federal Rules of Evidence authorizes a court to take judicial notice of its own records.  See this Court's discussion in <u>In re Steeley</u>, 243 B.R. 421, 427 n.10 (Bankr. N.D. Ala. 1999).

[3] This case was filed before the Court implemented its current electronic case filing and management system; therefore, all proceedings are contained in the Court's official paper file and are not available electronically.

petition, the plaintiffs were in arrears for $4,800. Id.[4]  GE filed claim number 5 on August 21, 2001, for $5,908.30, representing the plaintiffs' prepetition mortgage arrears on this loan.

After filing case number 01-04442, the plaintiffs again became delinquent on their mortgage payments.  In response, Wells Fargo filed its first Motion for Relief from Automatic Stay on February 25, 2002, seeking permission to foreclose its mortgage.  Docket No. 19, Case No. 01-04442.  That motion was resolved when the parties entered into an agreement regarding the plaintiffs' future mortgage payments.  That agreement was incorporated into an order entered by this Court on April 12, 2002.  Docket No. 25, Case No. 01-04442. That order allowed the defendant relief from the stay (after certain notice to the plaintiffs) if the plaintiffs failed to make any future mortgage payment beginning with the April 2002 payment.

GE filed claim number 8 on May 20, 2002, for $2,578.75, representing the postpetition arrears accumulated during case number 01-04442. The plaintiffs did not contest that claim.  The case was dismissed on July 9, 2002, and closed on August 16, 2002.

Mr. and Mrs. Sharpe filed a second case, case number 02-07768 on October 2, 2002, at 11:44 a.m.  Docket No. 1, Case No. 02-07768.[5]  According to the Statement of Financial Affairs they filed on October 9, 2002, a foreclosure sale was scheduled by GE for October 2, 2002.

According to the proposed Chapter 13 plan they filed on October 11, 2002, the plaintiffs were $8,600 in arrears on their mortgage to GE.

This case was converted from Chapter 13 to Chapter 7 on April 4, 2003.  Docket No. 20, Case No. 02-07768.

The plaintiffs again failed to make all of their postpetition mortgage payments.  On May 6, 2003, Wells Fargo filed its second Motion for Relief from Automatic Stay, again seeking to foreclose.  Docket No. 27, Case No. 02-07768.  On June 5, 2003, this Court entered an order granting the defendant's motion for relief, with the consent of the plaintiffs.  Docket No. 31, Case No. 02-07768.

Wells Fargo filed claim number 2 on January 2, 2003, for $9,336.

---

[4] According to the same document, the plaintiffs had a second mortgage arrearage debt on the property to CitiFinancial for $1,000. See Claims 4 and 5 filed in Case No. 01-04442.

[5] This case was also filed before the Court implemented its current electronic case filing and management system; therefore, all of its proceedings are contained in the Court's official paper file and are not available electronically.

3

The plaintiffs' Chapter 7 discharge was granted on October 6, 2003, and the case was closed that day.[6]

Mr. Sharpe filed the current case, case number 03-04644, his third, on May 28, 2003, <u>during the pendency of the 2002 Chapter 7 case</u>.[7]  Docket No. 1, Case No. 03-04644.  Consequently, that case was filed before the Court entered its June 5, 2003, <u>consent</u> order granting the defendant relief from the stay in the Chapter 7 case.

The effect of the May 28, 2003, case filing was of course, at least as to Mr. Sharpe, to nullify the Court's June 5, 2003, order.  That result is quite significant, for at that time, the plaintiffs were again severely in default on their mortgage.  According to the proposed Chapter 13 plan filed with the petition, the plaintiffs were in arrears for $9,500.  Docket No. 1, Case No. 03-04644.  <u>They were contractually due for their September 2001 mortgage payment</u>. Transcript of hearing on October 11, 2007, at 25-26.

After the current case was filed, the plaintiffs became more delinquent on their mortgage payments.  On August 28, 2003, the defendant filed its third <u>Motion for Relief from Stay and Motion for Relief from Co-Debtor Stay</u> again seeking permission to foreclose its mortgage. Docket No. 10, Case No. 03-04644. That motion was resolved when the parties entered into <u>a third agreement</u> regarding the plaintiffs' future mortgage payments.  That agreement was incorporated into an order entered by this Court on November 19, 2003.  Docket No. 21, Case No. 03-04644.  Among other things, that order provided relief from the automatic stay to the defendant if the plaintiffs failed to make all future mortgage payments.  <u>Order on Motion for Relief from Automatic Stay</u> entered November 19, 2003, Docket No. 21, Case No. 03-04644

Contending that the plaintiffs did not make all payments required after the Court's order of November 19, 2003, and therefore that the stay lifted, the defendant began foreclosure proceedings against the plaintiffs in June 2004.  A foreclosure sale was held on August 30, 2004.  The defendant-mortgagee bid $33,500, the winning bid. Transcript at 285.  A foreclosure deed was recorded on September 13, 2004.  Plaintiffs' Exhibit 6.

---

[6] The debtors reaffirmed their debt to Citifinancial before the discharge was entered. This Court cannot find that the debtors reaffirmed their debt with the defendant.

[7] This case was also filed before the Court implemented its current electronic case filing and management system; however, that system was instituted during this case.  As such, proceeding numbers 1 through 24 are contained in the Court's official paper file.  The remainder are in the electronic system.

## II. PART TWO - THE PLAINTIFFS' COMPLAINT
## and the DEFENDANT'S LIABILITY

Part two of the parties' dispute began with the filing of the pending complaint on December 30, 2004, and ended on May 29, 2008, with this Court's ruling on certain liability issues raised by the complaint. See In re Sharpe, 391 B.R. 117 (Bankr. N.D. Ala. 2008). The pertinent events are summarized below.

Contending that the August 30, 2004, foreclosure was wrongful, the plaintiffs filed the pending complaint against the defendant on December 30, 2004. Docket No. 1.[8] The plaintiffs alleged breach of contract, wrongful foreclosure, conversion, trespass, violation of the automatic stay, estoppel, fraud, unjust enrichment, and breach of fiduciary duty.[9]

Wells Fargo filed an Answer to the original complaint on March 4, 2005. Docket No. 5. The Court scheduled a trial for July 21, 2005. On July 6, 2005, Wells Fargo filed a Motion for Summary Judgment. Docket No. 18. The Court entered an order that scheduled oral arguments for August 9, 2005, and cancelled the trial set for July 21, 2005. Docket No. 19. Before the hearing, the plaintiffs filed a Response to Defendant Wells Fargo's Motion for Summary Judgment. Docket No. 23. Oral arguments were held on August 9, 2005.

On September 30, 2005, nine months after the plaintiffs filed their original complaint, and seven months after the defendant filed an answer, the plaintiffs filed a Demand for Jury Trial. Docket No. 26.

On October 4, 2005, the defendant filed a Motion to Strike Plaintiffs' Demand for Trial by Jury. Docket No. 27. On November 18, 2005, the Court entered an order denying the plaintiffs' demand for a jury, finding the plaintiffs' demand was not timely. Docket No. 30.

On January 3, 2006, the Court entered an Order (Docket No. 32) granting the defendant's Motion for Summary Judgment. Docket No. 18.

On January 13, 2006, the plaintiffs filed a Motion to Reconsider, Docket No. 34, and a Notice of Appeal, Docket No. 35.[10] The Court scheduled a hearing for February 8, 2006.

---

[8] Docket numbers cited in the remainder of this opinion refer to the current adversary proceeding unless otherwise described.

[9] The Court takes judicial notice of its own records. See note 2.

[10] The plaintiffs withdrew the Notice of Appeal (Docket No. 35) on October 28, 2006. Docket No. 80.

5

On January 25, 2006, the defendant filed a Response to Motion to Reconsider. Docket No. 42. On February 7, 2006, the plaintiffs filed a Supplement to Motion to Reconsider. Docket No. 44.

The February 8 hearing was held. On May 23, 2006, the Court entered an Order reversing the January 3, 2006, Order that granted the defendant's Motion for Summary Judgment. Docket No. 19.

A status conference was held on June 14, 2006, a hearing was held on July 26, 2006, and the proceeding was set for trial for December 7, 2006.

On August 23, 2006, the plaintiffs filed their nine-count First Amended Adversarial Complaint for Wrongful Foreclosure, Breach of Contract, Conversion, Trespass & Violation of Automatic Stay, Estoppel, Fraud, Unjust Enrichment & Breach of Fiduciary Duty. Docket No. 59. The plaintiffs included another jury demand with this amended complaint.

On August 30, 2006, the defendant filed a Motion to Dismiss First Amended Adversarial Complaint. Docket No. 60. The Court scheduled a hearing for September 27, 2006. The September 27 hearing was held.

On October 5, 2006, the Court entered an Order denying the Motion to Dismiss First Amended Adversarial Complaint. Docket No. 64.

On October 9, 2006, the plaintiffs filed The Plaintiffs' Motion for Summary Judgment Against Defendant's Wells Fargo and GE Mortgage on Counts One (Breach of Contract), Two (Wrongful Foreclosure), Three (Conversion) & Four (Trespass). Docket No. 66.

On October 17, 2006, the plaintiffs filed an Application for Entry of Default; Motion for Default Judgment. Docket No. 70. The Court scheduled a hearing for November 8, 2006. On October 18, 2006, the defendant filed an Answer to Complaint. Docket No. 72.

On October 25, 2006, the defendant filed a Response to Plaintiffs' Motion for Summary Judgment. Docket No. 77. On October 28, 2006, the Plaintiffs filed a Plaintiffs' Response to Defendant's Response to Plaintiffs' Motion for Summary Judgment. Docket No. 79.

The November 8 hearing was held. The trial scheduled for December 7, 2006, was cancelled.

On February 8, 2007, the Court entered a Memorandum Opinion and Order denying The Plaintiffs' Motion for Summary Judgment Against Defendant's Wells Fargo and GE Mortgage on Counts One (Breach of Contract), Two (Wrongful Foreclosure),

6

Three (Conversion) & Four (Trespass). Docket No. 89 (reported at <u>Sharpe v. Wells Fargo, et al. (In re Sharpe)</u>, A.P. No. 04-00250, 2007 WL 473764 (Bankr. N.D. Ala. February 8, 2007). The Court scheduled a status conference for March 7, 2007.

On February 9, 2007, the plaintiffs filed a <u>Motion for Findings of Fact and Conclusion of Law</u>. Docket No. 90 (docketed by the plaintiffs as a <u>Motion to Reconsider</u>). The Court scheduled a hearing for March 7, 2007, but continued the hearing to March 8, 2007.

On March 1, 2007, the defendant filed a <u>Brief in Support of Motion to Strike Plaintiffs' Jury Demand</u>. Docket No. 94 (docketed by the defendant as a <u>Motion to Strike Plaintiffs' Jury Demand (Brief in Support of)</u>, but titled <u>Brief in Support of Motion to Strike Plaintiffs' Jury Demand</u>.

On March 6, 2007, the plaintiffs filed a <u>Plaintiffs' Response to Defendant Wells Fargo's Motion to Strike Jury Demand</u>. Docket No. 95. The plaintiffs also filed a <u>Motion to Certify Summary Judgment Decision as Final Order</u>. Docket No. 96 (docketed by the plaintiffs as a <u>Motion for Leave to Appeal</u>).

The March 8, 2007, hearing was held.

On June 27, 2007, the Court entered an order addressing the plaintiffs' <u>Motion for Findings of Fact and Conclusions of Law</u> filed February 9, 2007, the defendant's <u>Motion to Strike Jury Demand</u> filed on March 1, 2007, and the plaintiffs' <u>Motion to Certify Summary Judgment Decision as Final Order</u> filed on March 6, 2007. Docket No. 96 (reported as <u>Sharpe v. Wells Fargo, et al. (In re Sharpe)</u>, A.P. No. 04-00250, 2007 WL 1876368 (Bankr. N.D. Ala. June 27, 2007)).

In regard to the plaintiffs' <u>Motion for Findings of Fact and Conclusions of Law</u> the Court attempted to clarify its denial of the plaintiffs' original <u>Motion for Summary Judgment</u> by making what findings of fact and conclusions of law it could, given that the denial of the original motion was because there were genuine issues of material fact.

In regard to the defendant's <u>Motion to Strike Jury Demand</u>, the Court found the five counts taken from the original complaint could not revive the waived right to a jury trial. In addition, the Court found that the four counts added by the amended complaint did not raise any new issues, were all equitable remedies, and were triable by the Court, not a jury.

In regard to the <u>Motion to Certify Summary Judgment Decision as Final Order</u>, the Court found that a denial of a motion for summary judgment was an interlocutory order and that the Court was prohibited from making that order a final order by way of Rule 54(b). The plaintiffs' remedy in that regard was to file a motion for leave to appeal the interlocutory order; however, they did not.

7

After the Court's ruling on the above matters, the defendant filed a <u>Motion to Dismiss Defendant GE Mortgage Services</u> on November 21, 2007. Docket No. 147.[11] The plaintiffs filed their <u>Response in Opposition to Motion to Dismiss Defendant GE Mortgage Services: Motion for Scheduling Conference on Jury Trial of Defendant GE</u> on November 23, 2007. Docket No. 148. The defendant filed its <u>First Amendment to Motion to Dismiss Defendant GE Mortgage Services</u> filed on December 18, 2007. Docket No. 152.

On October 9, 2007, the defendant filed a <u>Motion to Sever</u> the trial into liability and damages segments. Docket No. 137. The plaintiffs opposed that motion. Docket No. 139. On October 10, 2007, the Court granted that motion. Docket No. 140.

A trial on liability was held on October 11, 2007. At trial, the plaintiffs contended that they made all of the mortgage payments required by the November 19, 2003, order. As such, they concluded the stay did not lift, and therefore the foreclosure was wrongful and in violation of the stay. In the alternative, the plaintiffs contended that even if they did not make all of their post-November 19, 2003, payments, the defendants failed to give adequate notice as required by statute and by the parties' mortgage.

The plaintiffs argued that without those notices, the foreclosure was void and that they are entitled to damages. Based on that argument, the plaintiffs concluded that the foreclosure was wrongful and gave rise to numerous causes of actions including: breach of contract; wrongful foreclosure; conversion; trespass; violation of the automatic stay; estoppel; fraud; unjust enrichment; and breach of fiduciary duty.

The plaintiffs also argued that the foreclosure was void and they were entitled to damages because the $33,500 amount paid by the defendant-mortgagee for the property so shocked the conscience that it could be considered a wrongful foreclosure or a breach of fiduciary duty.

The defendant contended the plaintiffs did not make all of the mortgage payments due under the November 19, 2003, order. Based on that contention, the defendant argued that the stay lifted pursuant to the order, which then allowed the defendant to exercise its state law remedy of foreclosure. The defendant concluded that with relief from the stay, it could not be in violation of the stay.

In regard to notice, the defendant contended that it gave all notice required. It argued that even if actual notice was not given, constructive notice should be imposed on the plaintiffs. The defendant concluded that because all notice was given, it could not be liable on any of the alleged causes of action.

---

[11] That motion is addressed below and is granted by the Order entered with this Memorandum Opinion.

The defendant denied that the price paid by the mortgagee for the property so shocked the conscience that it could be considered wrongful foreclosure or a breach of fiduciary duty.

The Court issued a ruling on these matters on May 29, 2008. See <u>Sharpe V. Wells Fargo, et al. (In re Sharpe)</u>, 391 B.R. 117 (Bankr. N.D. Ala. 2008). The Court's pertinent conclusions included:

1.  Judgment is due to be entered in favor of the plaintiffs and against the defendant on count one, breach of contract;

2.  Judgments are due to be entered in favor of the defendant and against the plaintiffs on counts two through nine, with the exceptions that after the Court hears the evidence on damages, the Court will consider whether judgment should be entered for the plaintiff on count two as to wrongful foreclosure and count nine as to breach of fiduciary duty [on the issue of whether the price paid by the mortgagee for the property so shocked the conscience that it could be considered wrongful foreclosure];

<u>Id</u>. (parenthetical added).

What remains now for the Court is to determine in this Part Three: (1) whether the defendant is liable under the theory that the price paid by the defendant-mortgagee for the property so shocked the conscience that it could be considered wrongful foreclosure or a breach of fiduciary duty, and if it is, what are the damages for that liability; and (2) what damages, if any, should be awarded to the plaintiffs for the defendant's breach of contract.

### III.  PART THREE - DAMAGES

As explained above, part three began with the damages phase of the trial held on November 12-13, 2008, and ends with entry of this Memorandum Opinion and accompanying Order.  There are two, <u>and only two</u>, issues.

 The first issue is: Is the defendant liable under the limited theory that the price paid by the mortgagee for the property so shocked the conscience that it could be considered wrongful foreclosure or a breach of fiduciary duty?

The second issue is: What damages, if any, should be awarded to the plaintiffs?

9

## A.  Issue One

**Is the defendant liable under the limited theory
that the price paid by the mortgagee for the property
so shocked the conscience that it could be considered
wrongful foreclosure or a breach of fiduciary duty?**

### 1.  Findings of Fact

The fair market value of the property at the time of the foreclosure is the key fact in deciding this issue.

The defendant contends that the fair market value of the property at the time of the foreclosure was the price bid at foreclosure, that is $33,500.  Transcript at 285.  The plaintiffs contend that the fair market value of the property was $65,000. Transcript at 79.[12]

The mortgage arrears at the time of the foreclosure were about $18,271.97. Transcript at 289.   The mortgage payoff at the time of foreclosure was about $68,346.92.  Transcript at 290.

### a.  The Plaintiffs' Evidence of the Market Value of the Property

As stated above, the plaintiffs contend that the fair market value of the property was $65,000.  Transcript at 79.  The plaintiffs called two witness to support their position.   They were Mr. Sharpe and Ms. Jamie Walls, a Wells Fargo representative.

### (1)  Mr. Sharpe's Testimony

Mr. Sharpe testified in support of the plaintiffs' contended fair market value.  His direct examination included:

Q.      During 2004, during the foreclosure, do you have an opinion of roughly the value of your house, what the value of your house was?
A.      Well, the last value, I was under assumption it was sixty-five thousand dollars.
Q.      Okay.  And that was based on what?
A.      Based on an actual appraisal.
Q.      Oh, and actual appraisal, okay.  So your opinion of the value of the property was sixty-five thousand dollars?

---

[12] Citations to Transcript pages are to the November 12-13, 2008, hearing unless described otherwise.

| | |
|---|---|
| A. | Right. |
| Q. | Did you also pay taxes on – do you know what the tax assessed value of the property was that you paid taxes for around that time, how much they said it was? |
| A. | No, but this says fifty-three, I believe, fifty-three thousand [referring to a tax assessor's value of the property]. |
| Q. | And does it have a land value also? |
| A. | Eleven thousand. |
| Q. | So that is about sixty-four, roughly. So you understood the value to be about sixty-five thousand? |
| A. | Right. |
| Q. | And you paid taxes – |
| A. | On that amount. |
| Q. | On property that the tax assessor felt was worth about sixty, sixty-three, sixty-four? |
| A. | Right. |

Transcript at 79 (parenthetical added).

Mr. Sharpe could not support his opinion on cross examination. He testified:

| | |
|---|---|
| Q. | Let's talk a little bit about you testified about the value of your home on Avenue "H." I believe you testified that you assigned the value of sixty-five thousand dollars as what you believe the value of the property was. Was that the value in 2004? |
| A. | As far as I can remember, it was. |
| Q. | Okay. And I believe you testified that you based that on an appraisal? |
| A. | Right. |
| Q. | Have you produced that appraisal? |
| A. | No, I haven't. |
| Q. | Do you have that appraisal? |
| A. | Somewhere. |
| Q. | Okay. But you haven't produced it in this case? |
| A. | No, I haven't. |
| Q. | You didn't bring it here to court? |
| A. | No. |
| Q. | We have not seen an appraisal that says that this property is worth sixty-five thousand dollars? |
| A. | No. |
| Q. | Now did you ever put the property up for sale? |
| A. | I don't remember ever putting it up for sale. |
| Q. | You don't remember if you had any attempts to try and sell the property? |
| A. | Once. Once. |
| Q. | Do you recall when that was? |
| A. | No, I don't. 2000, '99. |

Q.      So some years prior to the foreclosure?
A.      Yeah.
Q.      You considered the possibility of selling the property?
A.      Right.
Q.      This value of sixty-five thousand dollars that you assigned to the property, is that based on any other homes in the area?
A.      I don't know.
Q.      Are you aware of what other homes on the street and in your neighborhood, what those homes sell for?
A.      No, I am not.
Q.      You wouldn't know what a comparable home would also sell for?
A.      Not in the neighborhood.

Transcript at 94-96.

## (2) Ms. Jamie Walls' Testimony

The plaintiffs also called Jamie Walls to support their position. Ms. Walls was a foreclosure litigation specialist for the defendant.[13]

Plaintiffs' counsel asked Ms. Walls about Defendant's Exhibit 18, which is a "Drive-By Property Evaluation" of the plaintiffs' home dated August 6, 2002.

In her testimony, Ms. Walls explained that this process was a routine procedure for the defendant. The examination included:

Q.      Right. And why would it have been generated? Is this routine? Tell me a little bit about why this drive-by on the Sharpes' property would've been generated by Wells Fargo?
A.      Anytime a property is in bankruptcy or beginning the foreclosure process, it is a requirement to do the drive-by evaluations to determine the value of the property.
Q.      Very well. Based on this evaluation, what would Wells Fargo interpret to be the fair market value of the property as of at least 8-6-2002?
A.      It looks like the "as is" price is fifty-three thousand.

Transcript at 225.

In followup, Ms. Walls testified that the defendant would have adopted that amount as the fair market value of the property at that time. Transcript at 226.

---

[13] The defendant would later call Ms. Walls as its own witness on direct examination.

12

Plaintiffs' counsel also asked Ms. Walls about the defendant's purchase of insurance on the property. Referring to Defendant's Exhibit 11, "Notice of Temporary Insurance," that examination included:

> Q. And on what occasion would you guys be required to issue insurance on a piece of property?
> A. If we received notice from the insurance company that the policy has lapsed or there is no longer any insurance coverage on the property.
> Q. And is that why you understand that this temporary insurance would've been put in place on Mr. and Mrs. Sharpe's property?
> A. Yes, it states that we did not receive a new or renewal insurance policy.

Transcript at 228.

On followup, Ms. Walls testified, based on Defendant's Exhibit 11, "Notice of Temporary Insurance," that the value of the property on June 25, 2003, the time the insurance was placed, was $55,000. Transcript at 228-29; Defendant's Exhibit 11.

Plaintiffs' counsel also asked Ms. Walls about Defendant's Exhibit 19. That document was another "drive-by evaluation." This one was completed on June 29, 2004, thirty-one days before the August 30, 2004, foreclosure. The examination included:

> Q. Let's see. Turn to Defendant's Exhibit 19 and tell the judge exactly what Defendant's Exhibit 19 is.
> A. This is a drive-by property evaluation.
> Q. All right. And based on this drive-by evaluation, what – let me ask you first do you know if Wells Fargo adopted this drive-by evaluation as what it considered to be the fair market value of the property as of June 29, 2004?
> A. Yes.
> Q. And which price did it adopt as the fair market value of the property?
> A. Thirty-three thousand, five hundred.
> Q. All right. And that is the estimated sales price?

Transcript at 229.

Plaintiffs' counsel also asked Ms. Walls about the defendant's position on the county tax appraiser's valuation of the property, introduced as Plaintiffs' Exhibit 85. The defendant had paid the tax on the property on November 26, 2004, some three months after the foreclosure. The amount of the tax was based on an appraised tax value of $53,600. Ms. Walls testified that while the defendant may not have agreed with that value, it would have paid the taxes without contest. Transcript at 235-36.

Plaintiffs' counsel's final line of questioning included:

13

Q.      Do you believe that Wells Fargo punished the Sharpes for filing lawful, multiple bankruptcies –

A.      No, sir.

Q.      – by selling their property for less than its value and by accelerating their balance without sending them a cure letter?

A.      I can state that we were not punishing them.  I can't speak on the fact of whether or not we sent the cure letter.  I am not here to testify on that behalf.  We were not punishing them, by filing multiple bankruptcies, for putting their home in foreclosure.

Transcript at 244.

### b.  The Defendant's Evidence of the Market Value of the Property

The defendant called two witnesses to support its position.  They were Linda Saunders, a local real estate broker, and Ms. Walls.

### (1) Ms. Linda Saunders' Testimony

Ms. Saunders was a real estate broker with a local real estate agency. She had been working in the Birmingham, Alabama real estate market for about 24 years.  She was familiar with the subject property because she participated in an evaluation of the property and later was the listing agent for a sale.

Ms. Saunders defined a "broker price opinion" (BPO) for the Court and then explained her relationship to this particular property.  She testified:

It is a broker price opinion and it is very similar to an appraisal.  With a broker price opinion – with an appraisal, you have three houses that are sold that are comparable to the subject property.  With a broker price opinion, you use six houses.  You use three houses that are actually on the market saying what they are on the market for sale at that time, and you use three other houses that are sold, that have sold within the last six months that's comparable to the subject property.

Transcript at 263-64.

She explained further on direct examination:

Q.      And then based on those comparables, do you come up with a value of this particular property?

A.      You do.  In all of the foreclosures, two values are set.  The listing agent will always do what we call a broker price opinion.  A second person will be going out because most of the time asset companies, they don't

14

actually see the property. The only thing they can rely on is us. So we send them the pictures. We send them our opinion, and then they send an independent person to do the exact same thing. Based on them looking at both values, they determine how much the list price will be.

Q.     Okay. So there is actually two individuals who would go out and do a drive-by property inspection of the property?

A.     Right, and they are not allowed to talk to each other because the values have to be independent of each other.

Q.     Okay. Do you know who the other person is who did drive-by property inspections of 2617 Avenue "H?"

A.     No.

THE COURT: But you were one of the people that did a drive-by of this particular property?

THE WITNESS: The listing agent does the broker price opinion, which is me, and then a second person will go out around the same time, within the same week because they have to be during the same period.

THE COURT: Okay.

THE WITNESS: So two different people go and do a separate opinion. Most of the time it is either an agent from another company. It can't be an agent from my office. It has to be an agent from another company or it has to be a licensed appraiser, the second person.

Transcript at 263-65.

She explained further:

Q.     Okay. And I believe you mentioned earlier that you were the listing agent on this home; is that correct?

A.     That's correct.

Q.     Did you ever list this house for sale?

A      I did.

Q.     Okay. Can you tell us how much you listed this house for sale?

A.     For thirty-two five, and that's the price – I don't actually set the price. What happens is the sellers set the price based on my BPO and the second opinion and they send me the price to list it.

Transcript at 271.

Ms. Saunders' "Drive-By Property Evaluation" was introduced as Defendant's Exhibit 29. That document listed the value of the property at $33,500. Based on her research and participation in this evaluation process, Ms. Saunders agreed that the

value of the property at the time it was sold on August 30, 2004, was $33,500. Transcript at 271.

### (2) Ms. Jamie Walls' Testimony

The defendant called Ms. Jamie Walls as its own witness on direct examination. In addition to her prior testimony, Ms. Walls explained the basis of the defendant's foreclosure price. She testified that the defendant almost always bids the broker price opinion amount at its foreclosures. In this case, the defendant's bid was based on the June 29, 2004, BPO that set the property value at $33,500. Transcript at 286; Defendant's Ex. 19. Ms. Walls agreed with Ms. Saunders regarding the strict requirements under which a BPO is made. Transcript at 302-04. And she agreed with Ms. Saunders' that the fair market value of the property was $33,500, the price the defendant paid for the property at the foreclosure sale.

### 2. Conclusions of Law to The First Issue

As stated above, the issue is: Is the defendant liable under the limited theory that the price paid by the mortgagee for the property so shocked the conscience that it could be considered wrongful foreclosure or a breach of fiduciary duty? As discussed generally in several Alabama cases, that issue relates directly to the trust relationship that arises between a mortgagee and a mortgagor.

In its May 29, 2008, opinion this Court relied on First Nat. Bank v. Wise, 177 So. 636 (Ala. 1937), one of those earlier cases. Writing for the Supreme Court of Alabama in Wise, Justice Joel B. Brown explained:

> The general rule in respect to the sale of real property under the power of sale in a mortgage is that:
>
> " 'Where the price realized at the sale is so inadequate as to shock the conscience, it may itself raise a presumption of fraud, trickery, unfairness, or culpable mismanagement, and therefore be sufficient ground for setting the sale aside.' 27 Cyc. 1508.
>
> "And, although mere inadequacy of price is not sufficient to that end, it is 'always a circumstance to be considered in connection with other grounds of objection to the sale, and will be sufficient to justify setting the sale aside, when coupled with any other circumstances showing unfairness, misconduct, fraud, or even stupid management, resulting in the sacrifice of the property.' *** The remedial action of courts in such cases is grounded upon the duty of the mortgagee, as stated by Shaw, C.J., in Howard v. Ames, 3 Metc. (Mass.) [308] 311: 'In executing such power, he becomes the trustee of the debtor, and is bound to act bona fide, and to adopt all reasonable modes of proceeding, in order to render the sale

16

most beneficial to the debtor.' " <u>Hayden v. Smith</u>, 216 Ala. 428, 113 So. 293, 295; <u>HunterBenn & Co. Company v. Bassett Lumber Co.</u>, 224 Ala. 215, 139 So. 348. See, also, <u>Dewberry v. Bank of Standing Rock</u>, 227 Ala. 484, 150 So. 463; Note, 69 A.L.R. 1194.

<u>Id</u>. at 638.

A more recent, and possibly the leading case on the issue, <u>Brabham v. American Nat. Bank of Union Springs</u>, 689 So.2d 82 (Ala.Civ.App. 1996), agrees. After looking at <u>Howard v. Ames, 3 Metc.</u> cited above, Judge Sharon G. Yates wrote in <u>Brabham</u>:

> <u>Ames</u>, supra, is part of a line of cases that discuss the application of the good faith standard to the mortgagee's power of sale. In particular, those cases address whether the purchase price at the foreclosure sale is so inadequate as to constitute bad faith and whether the manner in which the mortgagee sold the property was appropriate (e. g., whether the property was sold en masse or by parcel or tract). See <u>Dozier v. Farrior</u>, 187 Ala. 181, 65 So. 364 (1914); <u>Bank of New Brockton v. Dunnavant</u>, 204 Ala. 636, 87 So. 105 (1920); <u>Hayden v. Smith</u>, 216 Ala. 428, 113 So. 293 (1927); <u>Kelly v. Carmichael</u>, 217 Ala. 534, 117 So. 67 (1928); <u>First National Bank v. Wise</u>, 235 Ala. 124, 177 So. 636 (1937); <u>J.H. Morris, Inc. v. Indian Hills, Inc.</u>, 282 Ala. 443, 212 So.2d 831 (1968). A review of these cases leads us to conclude that the duty a mortgagee owes a mortgagor in a foreclosure proceeding is one of good faith and fairness, not a general fiduciary duty. The description of a mortgagee as, "in a sense, a trustee," <u>J.H. Morris, Inc.</u>, supra, or as a "quasi-trustee," <u>Ames</u>, supra, should not be taken to mean that a mortgagee owes a mortgagor all the same duties that a trustee owes a trust beneficiary. We also note that <u>Wood River</u>, supra, deals with a judicial sale, not a foreclosure sale.

<u>Id</u>. at 88.

The factual question for this Court then is: Was the price the defendant bid at the foreclosure sale so inadequate as to shock the conscience?[14] The answer is – No.

---

[14] Presumably based on these cases, the plaintiffs argued that they had two causes of action regarding the price paid for the property. Plaintiffs' counsel argued:

> So we're going to take both positions. We think the sale price itself shocks the conscience and it, alone, is sufficient; but we also think that, even if the court doesn't think that it shocks the conscience to a point, that the sales price alone should defeat the sale, we think, in addition to the failure to send a notice and that other aspect of the case, that when you combine the two, that they also form a sufficient basis for a breach of fiduciary duty and wrongful foreclosure.

17

The evidence is uncontested and is overwhelming that the value of the property at the time of the foreclosure was the same as the price paid at the foreclosure sale, that is $33,500. Ms. Walls and Ms. Saunders both testified that the value of the property was $33,500. Their testimonies were based on their experiences with this property and broker price opinions taken both shortly before and shortly after the foreclosure. One BPO was taken in June 2004, the month before the foreclosure. The other was taken in September 2004, the month after the foreclosure. Both BPOs set the fair market value at $33,500.[15]

The only direct evidence that did not agree that the fair market value of the property was $33,500 was Mr. Sharpe's testimony. As the owner of the property he is allowed to give his opinion of the value of the property.[16] There are limitations however. As the Court of Appeals for the Eleventh Circuit recognized, any testimony by an owner, while it may be, "'self-serving and unsupported by other evidence', J & H Auto Trim, 677 F.2d at 1369, it is 'subject to attack through cross-examination or independent evidence refuting the owner's estimate.' Kestenbaum, 514 F.2d at 699." Neff v. Kehoe, 708 F.2d 639, 644 (11th Cir. 1983). Similarly, "When the owner of property is unable to provide a detailed explanation of how he or she arrived at a value for the property, the testimony may be insufficient to establish in the court's mind an 'actual belief... derived from the evidence' as to the validity of the owner's opinion. Russell, Bankruptcy Evidence Manual § 701.2 at page 1218 (West 2006 edition), quoting In re Brown, 244 B.R. 603, 612 (Bankr. W.D. Va. 2000)." In re Meeks, 349 B.R. 19, 22 (Bankr. E.D. Cal. 2006).

Mr. Sharpe testified that the fair market value was $65,000. But as the above demonstrates, while a property owner may give an opinion about the value of his or her property, the owner must be able to support that opinion with fact. Mr. Sharpe based his opinion on an appraisal and the local tax assessor's yearly valuation of the property.

_____

Transcript at 24.

The Court's May 29, 2009, memorandum and order were clear. In this final phase the Court would consider this issue only in the context of wrongful foreclosure and breach of fiduciary duty. That was the Court's opinion and its order, neither of which were appealed.

[15] The other evidence of value, that is the insurance value, the plaintiffs deduced cannot overcome this direct appraisal evidence of value.

[16] The general rule in this Circuit has for a long time been that an owner is competent to give an opinion as to the value of the property owned. Dietz v. Consolidated Oil & Gas, Inc., 643 F.2d 1088, 1094 (5th Cir. 1981); Neff v. Kehoe, 708 F.2d 639, 644 (11th Cir. 1983) (recognizing the binding effect of the Fifth Circuit case on the Eleventh Circuit.) This general rule applies to both personal and real property. An owner may give such an opinion without other qualifications. McElroy's Alabama Evidence §128.11 at 625 (5th ed. 1996).
The rational for allowing an owner to testify is that the opinion is, under Rule 7001, "based on the perception of the witness." McElroy's Alabama Evidence §128.11 at 625 (5th ed. 1996).

On cross examination he could not support his testimony. Mr. Sharpe did not produce the appraisal he mentioned, and certainly did not produce the appraiser, the <u>only</u> one who could have testified about the appraisal.

Similarly, Mr. Sharpe's reliance on the tax assessor's valuation does not support his testimony. Commentary about this situation from McElroy's Alabama Evidence explains that the prohibition on the use of tax assessments as evidence to prove market value goes far beyond eminent domain proceedings. It reads, "Alabama courts have long embraced the principle that generally the tax assessing authority's evaluation is not relevant when offered to prove market value. The rationale underlying this general exclusionary rule is that 'it is notorious that properties are not assessed at anything like true value or market value.'" McElroy's Alabama Evidence §267.04 at 1310 (5th ed. 1996) (notes omitted). See also <u>Alabama v. Griffith</u>, 292 Ala. 123, 290 So.2d 162, 164 (Ala.1974).

While the Court considered Mr. Sharpe's opinion, that opinion neither caries the weight of the other witnesses' opinions on the fair market value of the property nor does it carry the burden of establishing that the defendant's bid was inadequate.

Therefore, based on the legal standard applicable under Alabama law, the Court holds, as a conclusion of law, that the price the defendant bid at the foreclosure sale was not so inadequate as to shock the conscience and that the defendant's bid was not inadequate in any respect. The defendant bid the value of the property. Consequently, the defendant does not have any liability under either wrongful foreclosure or breach of fiduciary duty. As such, the plaintiffs are not entitled to damages under those theories. The remaining issue of damages therefore relates only to the breach of contract action.

## B. Issue Two

### What damages, if any, should be awarded to the plaintiffs?

As stated above, breach of contract is the only remaining cause of action under which the plaintiffs could receive damages. Therefore, the Court's consideration of whatever damages might be awarded to the plaintiffs is restricted to whatever damages are allowable for breach of contract as such a breach relates to the damages the plaintiffs allege they suffered.

The general rule in Alabama regarding what damages are available for breach of contract is clear. Writing for the Supreme Court of Alabama in <u>West v. Friday, Inc.</u>, 403 So.2d 213 (Ala. 1981), Justice James H. Faulkner explained:

> Damages recoverable for breach of contract are those that naturally and proximately result from the breach. <u>Alabama Water Service Co. v. Wakefield</u>, 231 Ala. 113, 163 So. 626 (1935). That is, damages for breach of warranty or contract are awarded to put the party in the same position

19

he would have occupied had the breach not occurred. <u>Geohagan v.</u>
<u>General Motors Corp.</u>, 291 Ala. 167, 279 So.2d 436 (1973).

<u>Id</u>. at 214.

Before applying these standards, it will be helpful to review the plaintiffs' specific
requests for damages.  In each count in their original complaint the plaintiffs' request
was:

> WHEREFORE, the Plaintiffs pray that this Court will enter an Order
> declaring that the Plaintiffs are entitled to relief, ordering defendant to pay
> the Plaintiffs' costs and attorney's fees, entering a finding, order or
> declaration that the Plaintiffs have good title in and to the property,
> awarding plaintiffs punitive and compensatory damages and ordering
> such other relief that the Plaintiffs are entitled to.

<u>Adversarial Complaint for Wrongful Foreclosure, Breach of Contract, Conversion,</u>
<u>Trespass & Violation of Automatic Stay</u>, Docket No. 1, pg. 3.

In each count in their amended complaint the plaintiffs' request was:

> WHEREFORE, the Plaintiffs pray that the Court will enter an Order
> declaring that the Plaintiffs are entitled to relief, ordering defendant to pay
> the Plaintiffs' costs and attorney's fees, entering a finding, order or
> declaration that the Plaintiffs have good title in and to the property,
> awarding plaintiffs punitive and compensatory damages in the amount of
> One Million Dollars ($1,000,000.00) and ordering such other relief that the
> Plaintiffs are entitled to.

<u>First Amended Adversarial Complaint for Wrongful Foreclosure, Breach of Contract,</u>
<u>Conversion, Trespass & Violation of Automatic Stay, Estoppel, Fraud, Unjust</u>
<u>Enrichment & Breach of Fiduciary Duty</u>, Docket No. 59, pgs. 3-4.

In their post-trial briefs, the plaintiffs divided their damage requests into four
categories.  Those are: (1) punitive damages; (2) injunctive or equitable relief in the
form of specific performance; (3) compensatory damages; and (4) attorney fees.  Each
category is discussed below.

## 1.  Punitive Damages

The Court's first consideration of the plaintiffs' requested damages is the
plaintiffs' request for punitive damages under their wrongful foreclosure and breach of
fiduciary theories.  They argued:

The foreclosure sale price was inadequate enough to raise a presumption of wrongful conduct in the sale of the Sharpes' property. Punitive damages are recoverable in wrongful foreclosure/breach of fiduciary duty claims and the Sharpes presented clear and convincing evidence of conduct warranting punitive damages of One Million And 00/100 Dollars ($1,000,000.00) for Mrs. Frazier and One Million And 00/100 Dollars ($1,000,000.00) for Mr. Frazier.

Post-Damages Trial Memorandum Brief at 3, Docket No. 201.[17]

As explained above, there were only two issues before the Court. The first was whether the price paid by the defendant shocks the conscience. The second was what damages may be awarded to the plaintiffs because of the defendant's breach of the contract. As explained below, the plaintiffs are not entitled to punitive damages under either.

As to the first, as stated above, this Court finds that the price paid by the mortgagee for the property did not shock the conscience. If it did, the plaintiffs may be entitled to punitive damages, but that issue is not before the Court. Because it did not, they cannot recover punitive damages under that theory.

As to the second, it is not clear whether the plaintiffs seek punitive damages under a breach of contract cause of action; however, to the extent that they do, Alabama law is clear. Punitive damages are not recoverable in Alabama for breach of contract. See, Boyd v. Homes of Legend, Inc., 188 F.3d 1294, 1299 (11th Cir. 1999); Geohagan v. General Motors Corp., 279 So.2d 436, 438 (Ala. 1973) (citing Wood v. Citronelle-Mobile Gathering System, 409 F.2d 367, 369 (5th Cir. 1968) which cites Western Union Telegraph Co. v. Rowell, 45 So. 73 (Ala. 1907); Western Union Telegraph Company v. Benson, 48 So. 712 (Ala. 1909); and Treadwell Ford, Inc. v. Leek, 133 So.2d 24 (Ala. 1961).

Therefore, based on above, the Court finds that the plaintiffs are not entitled to punitive damages under any theory.

## 2. "Specific Performance"

The Court's second consideration of the plaintiffs' requested damages is the plaintiffs' request for what this Court considers "specific performance" of the contract. They have asked to be placed in the same position they were in before the defendant's failed notice. They have asked that the mortgage be reinstated. They have asked that the mortgage be reformed. They have asked the Court to hold the foreclosure void. Whatever it is called, this Court recognizes that the plaintiffs simply want the

---

[17] References to Mrs. Frazier and Mr. Frazier must be word processing errors.

opportunity to cure the default, the opportunity they did not get because of the breach of contract. And as discussed below, the Court finds that they are entitled to that opportunity.

Writing for Alabama Court of Civil Appeals in <u>Conner v. Auburn Partners, L.L.C.</u>, 852 So.2d 755 (Ala. Civ. App. 2002), Judge Craig Sorrell Pittman explained:

> "Specific performance is an equitable remedy that rests largely in the discretion of the trial court, based on a consideration of the particular circumstances of each case." <u>Hicks v. Dunn</u>, 622 So.2d 914, 916 (Ala.1993). The trial court's ruling may not be overturned unless it is shown to be palpably wrong. Id. Appellate courts throughout the years have deferred to the trial court's discretion in determining whether to allow specific performance in real property transactions. See, e.g., <u>Webster v. Aust</u>, 628 So.2d 846 (Ala.Civ.App.1993); <u>Allen v. Storie</u>, 579 So.2d 1316 (Ala.1991); <u>Brett v. Wall</u>, 530 So.2d 797 (Ala.1988); and <u>Stringfellow Materials, Inc. v. Lee</u>, 438 So.2d 1387 (Ala.1983).

<u>Id</u>. at 759.

In the <u>Stringfellow</u> case cited above, Alabama Supreme Court Justice James H. Faulkner wrote:

> It is settled that the remedy of specific performance may be ordered where the contract is just, fair, and reasonable, and reasonably certain in respect to the subject matter and terms, and is founded on a valuable consideration. See <u>Montgomery v. Peddy</u>, 355 So.2d 698 (Ala.1978); <u>Alabama Central Railroad Co. v. Long</u>, 158 Ala. 301, 48 So. 363 (1909); <u>Carlisle v. Carlisle</u>, 77 Ala. 339 (1884). The decision to grant specific performance rests largely in the discretion of the trial judge, see <u>Edwards v. Thornburgh</u>, 396 So.2d 678 (Ala.1981); <u>Wray v. Harris</u>, 350 So.2d 409 (Ala.1977), appeal after remand, 370 So.2d 974 (Ala.1979), and whether relief shall be granted depends upon an equitable consideration of the particular circumstances of each case. See <u>Dendy v. Anchor Construction Co., Inc.</u>, 294 Ala. 120, 313 So.2d 164 (1975); <u>Carlisle v. Carlisle</u>, supra.
>
> Furthermore, the decision of the trial judge will be overturned, on appeal, only if shown to be palpably erroneous. <u>Edwards v. Thornburgh</u>, supra ; <u>Wray v. Harris</u>, supra. It should also be noted that the findings of a trial court hearing a case without a jury and on evidence presented ore tenus, as in the present case, will not be overturned on appeal unless they are unsupported by the evidence or are plainly and palpably erroneous. <u>Smith v. McNaughton</u>, 378 So.2d 703 (Ala.1979).

In the present case, the evidence presented by Mrs. Lee sufficiently establishes the existence and terms of a reasonable contract founded on valuable consideration. The evidence further shows that appellants breached said contract, and that Mrs. Lee has no adequate remedy at law to redress the breach. When tested by the criteria set out above, we cannot find that the trial court abused its discretion in ordering specific performance in this case.

Stringfellow Materials, Inc. v. Lee, 438 So.2d 1387, 1390 (Ala. 1983).  See also General Aviation, Inc. v. Aerial Services, Inc., 700 So.2d 1385, 1388 (Ala.Civ.App. 1997).

In its May 29, 2008, memorandum, the Court considered whether the defendant had provided the plaintiffs with all of the notices required by state law and the parties' mortgage contract.  In that memorandum, the Court found that the plaintiffs: (1) had actual notice of the statutory requirements of section 35-10-13, Code of Ala. 1975; (2) had actual notice of the requirements paragraph 14 of the parties' mortgage contract; and (3) had constructive notice of their default.  In contrast, the Court found that the defendant had not given, and the plaintiffs did not have, actual or constructive notice of the paragraph 21 provisions of their contract relating to acceleration.

In summary, paragraph 21 required the defendant to give the plaintiffs sufficient notice that would:

(1)     specify the default;
(2)     specify the action required to cure the default;
(3)     specify a date, not less than 30 days from the date the notice is given by which the default must be cured;
(4)     advise that the failure to cure the default on or before the date specified in the notice may result in acceleration of the debt and sale of the property; and
(5)     inform of the right to reinstate after acceleration and sale.

In simple terms, these provisions required the defendant to give the plaintiffs: (1) notice of the default; (2) a specific time to cure that default; and (3) its intent to accelerate its mortgage if the default was not cured.[18]

_____

[18] Paragraph 21 of the parties' mortgage reads:

21.  Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument.... The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) the failure to cure the default on or before the date specified in the notice may result

23

In its May 29, 2008, memorandum, the Court held that the defendant had violated those provisions of the contract. The defendant did not do what it was required to do under the contract. It did not give the proper notice and provide the plaintiffs with the opportunity to cure the default.

As noted in its earlier opinion, this Court could not find an Alabama case on point but quoted from one from the Court of Appeals for the Fifth Circuit discussing Texas law. It remains instructive. Writing for the Court, District Judge Frank A. Kaufman, sitting by designation, explained:

> Texas law requires that a maker of a promissory note be afforded notice of intent to accelerate and an opportunity to cure the default. Any notice of acceleration is ineffective unless preceded by a proper notice of intent to accelerate. Ogden v. Gibraltar Sav. Ass'n, 640 S.W.2d 232, 234 (Tex.1982). The two types of notice constitute separate rights of the borrower, and each is obligatory.
>
> Notice of intent to accelerate is necessary in order to provide the debtor an opportunity to cure his default prior to harsh consequences of acceleration and foreclosure. Proper notice that the debt has been accelerated, in the absence of a contrary agreement or waiver, cuts off the debtor's right to cure his default and gives notice that the entire debt is due and payable.

_____

in acceleration of the sums secured by the Security Instrument and sale of the property. The notice shall further inform Borrower of the right to reinstate after acceleration and sale. If the default is not cured, on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by the Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorney's fees and cost of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of notice to Borrower in the manner provided in paragraph 14. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in Shelby County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

Mortgage at 4. Pla. Ex. 42, Hearing On October 11, 2007.

Id. Appellant never received a notice of intent and was not given the opportunity to cure his default prior to the letter of May 23, 1985. A "demand for payment of the overdue installment [must] be made prior to exercising the option to accelerate." Allen Sales & Servicenter, Inc. v. Ryan, 525 S.W.2d 863, 866 (Tex.1975).

F.D.I.C. v. Massingill, 24 F.3d 768, 775 (5th Cir. 1994).

Because the defendant here failed to give the plaintiffs proper notice of the acceleration, its acceleration failed. Because the acceleration failed, the foreclosure is void.

The question then is, what is the remedy. The United States Supreme Court recognized in Butner v. United States, 440 U.S. 48, 55 (1979), that, "Property interests are created and defined by state law." Therefore, state foreclosure law determines when a mortgagor's interest is terminated. See In re Sims, 185 B.R. 853, 858 (Bankr. N.D. Ala.1995) and In re McKinney, 174 B.R. 330, 333 (Bankr.S.D.Ala.1994).

This Court finds that because the foreclosure was void, if Alabama law allows, the Court should set aside the foreclosure. As reported in Chrysler First Fin. Serv. Corp. v. Bolling, 608 So.2d 734, 737 (Ala.1992), Alabama law does so provide.

In Bolling the Supreme Court of Alabama recognized the power of a court of equity to set aside a foreclosure sale. This Court exercised that authority in In re Nail, 195 B.R. 922 (Bankr. N.D. Ala. 1996) where it found that it could set aside a foreclosure under Alabama law for equitable reasons. See also In re Parks, 193 B.R. 361, 365 (Bankr. N.D. Ala.1995) where this Court set aside a foreclosure where a mortgagee recognized an ongoing mortgage relationship by accepting monthly mortgage payments after the foreclosure.

Based on the above, the Court finds that because the defendant's foreclosure was void for failure to give proper notice, this Court may, and will, through its equitable powers, set aside the foreclosure and place the parties in the position they were in before the defendant's failed notice.

Consequently, the foreclosure will be set aside because it is void. The parties will be placed in the positions they held prior to the defendant's attempted foreclosure.

Because those same positions included relief from the automatic stay for the defendant, the defendant may, if it chooses, institute new foreclosure proceedings. If it does, the Court finds, based on Ms. Jamie Walls testimony, that the amount the defendant must represent to the plaintiffs as the cure amount and the amount the

plaintiffs must pay in order to reinstate the mortgage is $18,271.97. Transcript at 289-90.[19]

In addition, because the parties' same positions could not have, at the time, included the later foreclosure, this Court will require the defendant to notify all major credit reporting agencies that the August 30, 2004, foreclosure is void and has been set aside by this Court.

And finally, because the parties will be placed in the positions they were in before the foreclosure, the plaintiffs are entitled to reside in the property until removed in a lawful manner. As such, the parties should make arrangements as soon as possible to have the property turned over to the plaintiffs, if the plaintiffs choose. But if they do choose, being in the same position they held prior to the foreclosure, the plaintiffs will again be responsible for making the regular mortgage payments.

### 3. Compensatory Damages

The Court's third consideration of the plaintiffs' requested damages is the plaintiffs' request for "additional damages" under three general theories.[20] Those are: (i) mental anguish and emotional distress; (ii) aggravation of preexisting physical conditions; and (iii) property loss and associated expenses.

Each of these theories is discussed below; however, before addressing those, this Court must recognize two black letter principles of law in Alabama that govern compensatory damages. Those are: (a) proximity; and (b) dual recovery.

### a. Proximity

Supreme Court of Alabama Justice James H. Faulkner defined this proximity in West v. Friday, Inc., 403 So.2d 213 (Ala. 1981). He wrote, "Damages recoverable for breach of contract are those that naturally and proximately result from the breach. Alabama Water Service Co. v. Wakefield, 231 Ala. 113, 163 So. 626 (1935)." Id. at 214.

### b. Dual Recovery for Breach of Contract

The general rule in Alabama is that a plaintiff is not entitled to both specific performance and monetary damages under the same breach of contract action.

---

[19] The plaintiffs will be entitled to a set off of their damage award against this arrearage amount.

[20] The plaintiffs seek "compensatory" damages. As discussed above, the Court believes that if the plaintiffs are entitled to any damages in addition to "specific performance," they are entitled to "incidental damages," technically not "compensatory damages."

26

Supreme Court of Alabama Justice Richard L. Jones explained that law in <u>Grayson v. Boyette</u>, 451 So.2d 798 (Ala. 1984). He wrote:

> The sole issue remaining, then, is whether, under the instant facts, both an award of damages and a decree of specific performance will lie for the breach of the same contract. **Ordinarily, one cannot have a decree for specific performance and damages for breach of the same contract.** <u>Gulf Oil Corporation v. Spriggs Enterprises, Inc.</u>, 388 So.2d 518 (Ala.1980). This Court has, however, on occasion, allowed both the recovery of damages and ordered specific performance of the same contract. <u>Suter v. Arrowhead Investment Co., Ltd.</u>, 387 So.2d 815 (Ala.1980).
>
> The situation in the instant case is one which falls within the exception as explained in <u>Suter</u>. There, an investment company entered into an agreement with the Suters for the sale of a townhouse and lot. The Suters later refused to purchase the home and the investment company sued for specific performance. This Court affirmed the trial court's order awarding incidental damages and also decreeing specific performance. The Court reasoned that <u>damages and specific performance were appropriate where the damages, supported by credible evidence, were **incidental** to the breach</u>, and where the on-going nature of the contract required its faithful performance. In the instant case, the evidence amply supports an award of damages in the amount of $12,035, if the jury believed the Boyettes' testimony; but these damages are merely incidental to the breach and do not compensate for the breach of its central purpose - the racing of the greyhounds.
>
> Because the circumstances of this case fall outside the general rule proscribing both recovery of damages for breach of a contract and its specific performance, and because we find no abuse of the trial court's discretion, we affirm that portion of the judgment ordering Grayson to specifically perform the contract.

<u>Id</u>. at 800-01 (emphasis added).[21]

---

[21] See also <u>Stringfellow Materials, Inc. v. Lee</u>, 438 So.2d 1387, 1390 (Ala. 1983):

Appellants also contend that the trial court erred in granting damages for fraud for concealment of the outstanding mortgage and, at the same time, granting specific performance of the contractual agreement. Appellants, in their brief, rely on <u>Gulf Oil Corp. v. Spriggs Enterprises</u>, 388 So.2d 518 (Ala.1980), for the proposition that the court may not award damages for the tort of fraud and misrepresentation, and, in addition, grant specific performance of the agreement.

The issue then is: Are the plaintiffs entitled to compensatory damages in addition to specific performance damages? The answer is a qualified yes. Based on these parameters and the facts of the current proceeding, the Court finds that if the plaintiffs are entitled to any damages, those damages are incidental damages that may be awarded in addition to "specific performance."

### c. Specific Contentions for Compensatory Damages

As stated above, the plaintiffs seek additional damages under three theories. Those are: (i) mental anguish and emotional distress; (ii) aggravation of preexisting physical conditions; and (iii) property loss and associated expenses. Each is discussed below.[22]

### (1) Mental Anguish and Emotional Distress

### (a) Findings of Fact

The plaintiffs' first general request for compensatory damages is for alleged mental anguish and emotional distress. They argue:

> Mental & Emotional Distress are a natural & proximate consequence of a breach of contract involving a person's home. The Sharpes submitted substantial evidence that they suffered mental and emotional distress supporting Mr. Sharpes' claim for Eight Hundred Fifty Thousand Four Hundred Eighteen And 83/100 Dollars ($850,418.83) and Mrs. Sharpe's claim for Eight Hundred Sixty-Three Thousand Six Hundred Eighteen And 83/100 Dollars ($863,618.83).

Post-Damages Trial Memorandum Brief at 4-5, Docket No. 201.[23]

There was extensive testimony from both plaintiffs and their medical doctor about the mental anguish the plaintiffs allege they suffered because of the defendant's foreclosure. But, as is evident from the discussion below, it is not necessary for the Court to make extensive findings of fact in this regard. The quote below from the

---

While, ordinarily, this is a correct statement of the law, (see, however, Midstate Homes, Inc. v. Johnson, 294 Ala. 59, 311 So.2d 312 (1975)), it is inapplicable to the present case."

[22] The plaintiffs also seek additional damages for attorney fees. That issue is discussed separately below.

[23] The burden of proof for emotional distress and mental anguish may be different. See Carraway Methodist Health Systems v. Wise, 986 So.2d 387, 405 (Ala. 2007). The plaintiffs did not differentiate and therefore neither has the Court.

28

opinion of the Alabama Court of Civil Appeals in <u>Baldwin v. Panetta</u>, 4 So.3d 555 (Ala.Civ.App. 2008), a case involving a homestead, explains why.

In summary, even if compensatory damages are available for mental anguish in a breach of contract action, unless the plaintiffs satisfy three elements under Alabama law that are essential to recover mental anguish damages for a breach of contract, damages are not available. As the findings of fact from the Court's prior opinions demonstrate, the plaintiffs did not satisfy those three elements here; therefore, the plaintiffs are not entitled to damages for mental anguish or emotional distress. The discussion below explains.

### (b) Conclusions of Law

As a general rule, in Alabama damages for mental anguish and emotional distress <u>are not</u> recoverable for a breach of contract. <u>Hardesty v. CPRM Corp.</u>, 391 F.Supp.2d 1067, 1072 (M.D. Ala. 2005).[24] They are, however, available in limited circumstances.

Writing for the Court in <u>Baldwin v. Panetta</u>, 4 So.3d 555 (Ala.Civ.App. 2008), Judge Terri Willingham Thomas explained:

> In <u>Ruiz de Molina v. Merritt & Furman Insurance Agency, Inc.,</u> 207 F.3d 1351 (11th Cir.2000), the United States Court of Appeals for the Eleventh Circuit accurately summarized Alabama law concerning the recovery of mental-anguish damages for breach of a contract to build a residence:
>
> > "Under Alabama law, '[d]amages for mental anguish can be recovered ... where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with

---

[24] The court in <u>Hardesty</u> explained:

The general rule is that plaintiffs may not recover for mental anguish on breach of contract claims. See <u>Liberty Homes, Inc. v. Epperson</u>, 581 So.2d 449, 454 (Ala.1991). However, an exception to this rule exists "where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering." <u>Id.</u> (quotation and citation omitted). It is well established, however, that the exception is just that, an exception. <u>Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.</u> 207 F.3d 1351, 1359 (11th Cir.2000). The Alabama Supreme Court has indicated that it is not eager to "widen the breach in the general rule [prohibiting such damages]." <u>Volkswagen of America, Inc. v. Dillard</u>, 579 So.2d 1301, 1304 (Ala.1991).

<u>Id.</u> at 1074.

29

the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering.' Liberty Homes, Inc. v. Epperson, 581 So.2d 449, 454 (Ala.1991) (quoting F. Becker Asphaltum Roofing Co. v. Murphy, 224 Ala. 655, 141 So. 630, 631 (1932)). ...

"....The majority of the cases in which a plaintiff has been allowed to recover damages for mental anguish involved actions on 'contracts for the repair or construction of a house or dwelling or the delivery of utilities thereto, where the breach affected habitability.' See, e.g., Epperson, 581 So.2d at 454; Orkin Exterminating Co. v. Donavan, 519 So.2d 1330 (Ala.1988); Lawler Mobile Homes, Inc. v. Tarver, 492 So.2d 297 (Ala.1986); Alabama Power Co. v. Harmon, 483 So.2d 386 (Ala.1986). Because a person's home is said to be his 'castle' and the 'largest single individual investment the average American family will make,' these contracts are 'so coupled with matters of mental concern or solicitude or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering.' B & M Homes, Inc. v. Hogan, 376 So.2d 667, 671-72 (Ala.1979). Where such a contractual duty [is] breached, the Alabama Supreme Court has said that 'it is just that damages therefor be taken into consideration and awarded.' Id. at 671.

"....

"The Alabama Supreme Court has made very clear, however, that all these cases represent an exception to the general rule prohibiting mental anguish damages for breach of contract. These cases deserve special treatment because it is highly foreseeable that **egregious** breaches of certain contracts--involving one's home ..., for example--will result in significant emotional distress. See Sexton v. St. Clair Federal Sav. Bank, 653 So.2d 959, 962 (Ala.1995)."

Ruiz de Molina, 207 F.3d at 1359-60. See also Hardesty v. CPRM Corp., 391 F.Supp.2d 1067, 1074 (M.D. Ala. 2005) (citing Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301, 1304 (Ala.1991), for the proposition that "[t]he Alabama Supreme Court has indicated that it is not eager to 'widen the breach in the general rule [prohibiting such damages]'"). We find it unnecessary to decide the question the circuit court put to the parties in this case--whether compensatory damages for

30

mental anguish are available in a breach-of-contract action for building a house that is not a party's primary residence--because we hold that, even if the lake house had been the owners' primary residence, they would not have established their right to mental-anguish damages.

The Eleventh Circuit Court of Appeals' summary of Alabama law indicates that our decisions have set out three elements that are essential to the right to recover mental-anguish damages for the breach of a home-construction contract, namely: (1) **that the breach be egregious**, i.e., that it result in severe construction defects; (2) that those defects render the home virtually uninhabitable; and (3) that the breach necessarily or reasonably result in mental anguish or suffering. See, e.g., Liberty Homes, Inc. v. Epperson, 581 So.2d 449, 454 (Ala.1991)(wiring defects that presented an imminent fire hazard); B & M Homes, Inc. v. Hogan, 376 So.2d 667 (Ala.1979) (crack in the concrete slab extending from the front porch through the den that widened and extended throughout the house, causing severe damage); Hill v. Sereneck, 355 So.2d 1129, 1132 (Ala.Civ.App.1978) (crack in the concrete slab that warped the doors and made them unable to be closed and locked, causing the owner's stay-at-home wife to be "afraid and apprehensive" about her safety); F. Becker Asphaltum Roofing Co. v. Murphy, 224 Ala. 655, 141 So. 630 (1932) (roof that, each time it rained, leaked into every room of the house, including the bedroom where the plaintiff slept).

Baldwin v. Panetta at 567-68.

This defendant's breach was not egregious. This foreclosure occurred because the plaintiffs did not pay their mortgage. As this Court wrote in its earlier opinion:

[T]he plaintiffs are not unsophisticated debtors. Between them they have had three bankruptcy cases before this Court. They were in default in their mortgage payments before each case was filed. They continued to default on their mortgage during each case. The defendant filed a motion for relief from stay in each of those cases. In each case, the defendant was granted relief from the stay with limited conditions. The plaintiffs agreed to future relief orders in two cases and agreed to unqualified relief in one case.

When the current case was filed, the plaintiffs were in default for $9,500. This Court's November 19 order allowed them to add $1,251.30 to that amount to be paid as postpetition arrears. That order also instructed them to make regular payments to the defendant beginning with the October 2003 payment. At best, the plaintiffs' situation was critical. Any hint of the slightest problem should have prompted them to take action. And as the evidence demonstrates, there was much more than a hint.

31

Memorandum Opinion at 30, Docket No. 160; Sharpe v. Wells Fargo et al. (In re Sharpe), 391 B.R. 117, 145-46 (Bankr. N.D. Ala. 2008).

This Court's opinion analyzed in detail the plaintiffs' failures to pay their mortgage and the consequences that resulted. It also discussed this Court's recognition of the situations where the Court's rulings allowed the plaintiffs not one, not two, but three opportunities to make their payments to prevent a foreclosure. Even then, the plaintiffs failed to make the payments. When the plaintiffs did not, the defendant started a foreclosure action. But because the defendant did not give the proper notice, and only because it did not give proper notice, that action failed.

Consequently, because the defendant did not give the proper notice, and only because it did not give proper notice, it breached the parties' contract. As such, this Court must find that the defendant's breach was not egregious. Because it was not egregious, the plaintiffs do not satisfy their burden of proving that they were entitled to compensatory damages for mental anguish.

Therefore, based on its findings of fact from its prior opinions in this matter, and the additional findings of fact above, the Court finds that the plaintiffs did not satisfy the three elements required under Alabama law; therefore, the plaintiffs are not entitled to damages for mental anguish or emotional distress.

## (2) Aggravation of Preexisting Conditions

The plaintiffs' second general request for compensatory damages is for aggravation of alleged preexisting medical conditions. They argue:

> The stress from the foreclosure and its physical manifestation as an aggravation of the Sharpe's physical conditions were natural and proximate consequences of a breach of contract involving a person's home. The Sharpes have demonstrated an aggravation of their physical conditions warranting recovery of One Hundred Thousand And 00/100 Dollars ($100, 000.00) for Mrs. Sharpe and One Hundred Thousand And 00/100 Dollars ($100, 000.00) for Mr. Sharpe.

Post-Damages Trial Memorandum Brief at 7, Docket No. 201.

### (a) Findings of Fact

Both plaintiffs and their physician testified about the alleged aggravation of the plaintiffs' preexisting medical conditions. Each reached the same conclusion and had the same opinion, that is, the foreclosure caused those conditions to worsen.

32

### i) Mr. Sharpe's Opinion about His Medical Conditions

Mr. Sharpe testified:

> Q.     Did it affect you physically at all?
> A.     It made me sick. Whatever little problems I had, it just elevated it from being agitated and angry and upset all the time, you know.
> Q.     How did you differentiate the foreclosure from other things that might have been going on? I want you to try to help the judge understand specifically when they called all the money due and it became apparent that you weren't going to be able to save your house, try to explain the difference between how that affected you and maybe other things that affected you?
> A.     Well, the biggest thing that was going on in our lives at that time was the foreclosure of the house. And the effect that it had on my family totally, me, myself, I tried to be upbeat about it, to keep everybody together and keep it from seeming like I was such a failure, you know, but after a while I tried to just deal with it.
> Q.     Did you lose any sleep at all as a result of this, the foreclosure specifically?
> A.     All the time, and I still can't sleep.
> Q.     Would you represent to the judge that prior to the foreclosure you slept okay?
> A.     Prior to it I slept pretty good.

Transcript at 68-69.

> Q.     Then also, Mr. Sharpe, do you believe that the stress related to your foreclosure has resulted in you physically being ill; do you believe that over this period of time?
> A.     Yeah, I believe it contributed to it.
> Q.     And are you also as a part of the award that you ask the judge to make, are you asking the judge to include compensation for that physical effect?
> A.     Yes, I am.

Transcript at 152-53.

### ii) Mrs. Sharpe's Opinion about Her Medical Conditions

Mrs. Sharpe testified:

> Q.     Do you feel like – and there has been some medical testimony, but I want to know, in your opinion, do you feel like your physical condition from your surgery, your blood pressure and your physical conditions have been worse since the foreclosure? Do you believe that?
> A.     I know that they have, sir.

33

Q.   And are you asking the judge to compensate you also for the aggravation of those conditions?
A.   Yes, sir, I am.

Transcript at 188.

### iii)  The Plaintiffs' Medical Doctor's Opinions about the Sharpes' Medical Conditions

The plaintiffs' medical doctor, Dr. Ernest A. Claybon, MD, concluded the same as to both plaintiffs.[25]  He offered his opinions about the impact of the plaintiffs' financial situation on their health.  He testified generally about both plaintiffs:

Q.   Did you form an opinion as to whether Mr. and Mrs. Sharpe's social history, their oral history of complaints about the foreclosure, whether or not that resulted in an aggravation of the condition that you were treating them for?
A.   Yes, they were very upset.  They kept talking about paying somebody money who wouldn't accept it and had to find a house.

---

[25] The defendant placed Dr. Claybon's credibility at issue.  The defendant's contest of Dr. Claybon's credibility is based on the fact that Dr. Claybon's license to practice medicine in Alabama had at one time been suspended, terminated, or restricted.  See Plaintiffs' Exhibits 73-83.

In making determinations of this sort, this Court applies the following standards.  Writing for the Court of Appeals for the Eleventh Circuit in U.S. v. Peters, 403 F.3d 1263 (11th Cir. 2005), Circuit Judge Stanley Marcus explains:

Assessing witness credibility is uniquely the function of the trier of fact, and it is one that a court of appeals may not and should not endeavor to replicate based on the cold paper record before it. As we have observed previously, "the jury, hearing [the defendant's] words and seeing his demeanor, was entitled to disbelieve [his] testimony and, in fact, to believe the opposite of what [he] said." United States v. Rudisill, 187 F.3d 1260, 1268 (11th Cir.1999) (quoting United States v. Brown, 53 F.3d 312, 314 (11th Cir.1995)) (emphasis removed). It is "the jury's prerogative to disbelieve" a defendant's testimony, United States v. Sharif, 893 F.2d 1212, 1214 (11th Cir.1990)....

Id. at 1270.

This Court was the trier of fact on the pending matters and as such has the same latitude as a jury.  See the unpublished opinion in Es-Tee Realty Co., LLC v. Soumekhian, Case No. 06-5221-CV, 2008 WL 2476712 (2nd Cir. June 19, 2008).  As the trier of fact, the Court finds that the evidence, taken as a whole, does not reflect negatively on Dr. Claybon's truthfulness. Consequently, the Court finds that Dr. Claybon's testimony was credible.

34

Transcript at 125.

His specific testimony about Mr. Sharpe included:

Q. Describe for the judge in what manner the complaints that you listed and the oral history of the complaints about the foreclosure, in what manner you believe that for Mr. Sharpe could have contributed to or aggravated or probably contributed to or aggravated his sleeping problems, his diabetes, and his hypertension. Would you explain that to the judge?

A. Well, stress is a very important component in diabetes, hypertension and anxiety. The more stress you add to a situation, the worse it gets.

Q. Did you observe his condition flare up or be worsened after being made aware that their home had been foreclosed on?

A. All I can recall is that they were both consumed with the situation.

.................

Q. Is it your opinion as it relates to Mr. Roderick Sharpe that his social history and complaints relating to the foreclosure and loss of his home contributed to or exacerbated his hypertension, his diabetes, and his anxiety? Is that your opinion?

A. Yes.

Transcript at 126-28.

His specific testimony about Mrs. Sharpe included:

Q. All right. And as it relates to – let's talk about Mrs. Sharpe for a second. What were you treating – what conditions were you treating Mrs. Sharpe, Linda Sharpe, for?

A. Mrs. Sharpe has multiple problems. She has had surgery on her neck. She has hypertension and she has stress.

Q. And you testified earlier that Mrs. Sharpe also was, I believe, consumed is what you said with the issue relating to the foreclosure and the loss of her home?

A. Yes.

Q. And you have a recollection of making an oral – them giving you an oral history of that condition – I mean, of that situation?

A. Yes.

Q. Okay. And is it your medical opinion today that the oral history relating to Mrs. Sharpe's loss of her home contributed to and/or exacerbated her hypertension, her stress condition and her back condition?

A. Yes.

Transcript at 128.

**(b) Additional Findings of Fact**

These three witnesses' testimonies were conclusory. None of them provided facts to support those conclusions. As such, the Court cannot find that there is sufficient evidence to conclude that the foreclosure caused the plaintiffs any additional physical injury or aggravated any existing conditions.

In contrast, assuming that the plaintiffs and their physician are correct that the plaintiffs' medical conditions were affected <u>by the plaintiffs' financial situation</u>, could this Court, based on the evidence, find that those medical conditions were caused by, or aggravated by, either the plaintiffs' <u>general</u> financial conditions or something unrelated? For example, Mr. Sharpe filed his first bankruptcy case on June 22, 2001. At that time, the plaintiffs were severely in default on their mortgage. What were their medical conditions then? Did their financial conditions aggravate any existing medical conditions?

Mr. and Mrs. Sharpe filed a second case on October 2, 2002. According to the Statement of Financial Affairs they filed on October 9, 2002, <u>a foreclosure sale was scheduled by GE for October 2, 2002</u>. According to the proposed Chapter 13 plan they filed on October 11, 2002, the plaintiffs were $8,600 in arrears on their mortgage to GE. What were their medical conditions then? Did these additional financial problems aggravate any existing medical conditions?

Mr. Sharpe filed the current case on May 28, 2003. At that time, the plaintiffs were again severely in default on their mortgage. According to the proposed Chapter 13 plan filed with the petition, the plaintiffs were in arrears for $9,500. What were their medical conditions then? Did these additional financial problems aggravate any existing medical conditions? Have there been any cumulative effects from all of these events?

On cross examination, Dr. Claybon admitted that at no time did he document any specific complaint from the plaintiffs regarding the foreclosure. Transcript at 145. In addition, he admitted that the foreclosure was not the sole cause of the plaintiffs' aggravated, if at all, medical conditions. He admitted another cause could have been diet. He testified:

> Q.   So you would agree with me that Mr. Sharpe was suffering from diabetes prior to the foreclosure in this case?
> A.   Yes.
> Q.   You mentioned earlier that stress is one of the components that can contribute to diabetes and hypertension?
> A.   Yes.
> Q.   So there are other things that also contribute to stress? Excuse me. There are other elements that would contribute to a patient having diabetes or hypertension?

36

A.    Yes.
Q.    Things such as his diet?
A.    Yes.

Transcript at 142-43.

Dr. Claybon also testified about written statements he provided to plaintiffs' counsel in preparation for trial.  Transcript at 143-44; Plaintiffs' Exhibits 62A and 63A.  Those statements, like his testimony, were conclusory.  He did not connect those conclusions to any specific facts.[26]

Based on the evidence, how can the Court establish even a baseline of the plaintiffs' pre-foreclosure medical conditions, let alone differentiate those conditions from their post-foreclosure conditions? As discussed above, the plaintiffs' financial problems have existed at least since 2001.  What were the Sharpes' medical conditions at that time?  Have their financial problems impacted those conditions?  What were they doing for those conditions?  How were they treating those conditions?  When did their conditions worsen?  What did the Sharpes do to maintain their health in the pre-foreclosure and post-foreclosure periods?  What else did they do that could have caused their problems to worsen?

### (c) Conclusions of Law

In Alabama, "Although they need not be proved to a mathematical certainty, "damages [for breach of contract] may not be awarded where they are remote or speculative. A jury must have some reasonable basis for the amount of its award." Parsons, 849 So.2d at 949. See also Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126, 1132 (Ala.1992)." Systrends, Inc. v. Group 8760, LLC, 959 So.2d 1052,1076 (Ala. 2006).

Writing for the Court in Systrends, Alabama Supreme Court Justice Robert Bernard Harwood Jr. explained:

"It is true that damages may be awarded only where they are reasonably certain. Damages may not be based upon speculation. Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812 (Ala.1988); see also Alabama Power Co. v. Alabama Public Service Commission, 267 Ala. 474, 103 So.2d 14 (1958).... [The plaintiff] 'must produce evidence tending to show the extent of damages as a matter of just and reasonable inference.' C. Gamble, Alabama Law of Damages § 7-1 (2d ed.1988), as cited in Industrial Chemical, supra, at 820. The rule that one cannot

_____

[26] Plaintiffs' Exhibits 62A and 63A (Tabs K and L) contained copies of some of Dr. Claybon's medical records for Mr. and Mrs. Sharpe.

37

recover uncertain damages relates to the nature of the damages, and not to their extent. If the damage or loss or harm suffered is certain, the fact that the extent is uncertain does not prevent a recovery. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); see also Shook v. Vertagreen Credit Union, 460 So.2d 1343 (Ala.Civ.App.1984)."

Id. at 1075-76 (citing Jamison, Money, Farmer & Co. v. Standeffer, 678 So.2d 1061, 1067 (Ala.1996)).

This Court cannot find that the plaintiffs' alleged damages are certain, either as to the nature of them or their extent. Based on the above, the Court finds that the plaintiffs are not entitled to damages for aggravation of preexisting conditions.

### (3) Property Loss and Related Expenses

The plaintiffs' third general request for compensatory damages is for alleged property loss and related expenses. In their Post-Damages Trial Memorandum Brief, Docket No. 201, the plaintiffs describe their property loss, associated expenses, and the damages they seek. The plaintiffs allege six categories of damages. Those are: (1) additional living expenses; (2) moving expenses; (3) storage; (4) loan expenses; (5) damage to credit; (6) additional work travel expenses; (7) losses in Mr. Sharpe's antique car business; and (8) vehicle rental expenses. Each is discussed below.

### (a) Additional Living Expenses

The plaintiffs' first of eight requests for property loss damages is for post-foreclosure living arrangements. They argue:

> Wells Fargo demanded possession of the home and required the Sharpes to moves. As a result of the acceleration of the balance, the foreclosure and eviction, the Sharpes had to find somewhere to live and they had to pay to live somewhere else. The rent and down payment they paid was over and above the balance due on their mortgage and therefore it was an extra expense. As such, their rent and down payment in the amount of Sixteen Thousand Three Hundred Thirty And 00/100 Dollars ($16,330.00) was a natural consequence of the breach. The eviction also required the Sharpes to need storage since their new spaces were smaller than their home (Attic Plus). The additional storage costs totaled One Thousand Thirty-Two And 00/100 Dollars ($1,032.00) according to the Sharpes' testimony.

Post-Damages Trial Memorandum Brief at 7- 8, Docket No. 201.

38

There was extensive testimony about the different places the plaintiffs lived after the foreclosure; however, factually that evidence was not sufficient for the Court <u>to determine the difference in the plaintiffs' pre-foreclosure and post-foreclosure living expenses</u>.  The evidence was conflicting as to where the plaintiffs were living, who was responsible for their living expenses, and what part of those expenses the plaintiffs paid.  It is simply not possible for the Court to make the calculations necessary to award damages.[27]  The evidence recited below explains.

### i)  Findings of Fact

### a)  8400 9th Avenue South

The plaintiffs lived at 8400 9th Avenue South for about 40 months after the foreclosure.  Transcript at 157.[28]  In addition to claiming that they made a down payment of $2,600 on a lease-purchase agreement for the house, Transcript at 161, (which the court will address later), the plaintiffs claim they paid some part of the monthly rental.

To begin, the plaintiffs' children, not the plaintiffs, leased the property.  Plaintiffs' Exhibit 17 demonstrates that the plaintiffs' children Roshee Sharpe and Cynquencia Sharpe, not the plaintiffs, leased the property.  Plaintiffs' Exhibit 17.[29]

Mrs. Sharpe testified:

Q.     And how many people were living at 8400 9th Avenue South?
A.     At one point, there were four and then there were three when my son had to go overseas.  My son was overseas.
Q.     And throughout that entire time did you guys share the rent?
A.     Yes, sir.
Q.     And what portion of it did you and Mr. Sharpe pay, how much of that?
A.     At one point half and at one point two-thirds.
Q.     All right.  Okay.  Now tell the judge how many months out of the forty-two months that you paid one-half the rent and how many months did you pay two-thirds?

---

[27] If there were such damages, this Court believes that they would be "incidental damages."

[28] The rent was $695.  Before the foreclosure, the plaintiffs' mortgage payment to the defendant was $531.95.

[29] See the discussion below regarding Plaintiffs' Exhibit 49.  The issue was the same.

A.    We paid the – some months we paid the full six ninety-five.  There were some months that we did but –

Q.    Well, you are going to either have to go through each one of them or, if you have a recollection, I mean, we are going to have to – on average, let's say on average how much did you pay?  Would you say it is one-half or two-thirds?

A.    I would say one-half.

Q.    On average throughout the entire period of time you paid one-half?

A.    Yes, sir.

Q.    Some months you paid the total amount, some months you paid one-half and some months you paid two-thirds?

A.    Yes, sir.

Q.    All right.  And so that is three hundred and forty-seven dollars and fifty cents at a minimum that you paid throughout the time from September of 2004 until March 2008?

A.    Yes, sir.

Q.    All right.  So that would be –

THE COURT: You paid some of this rent, Mrs. Sharpe, even though you weren't living here?

THE WITNESS: We were living there.  Well, there were –

THE COURT: I mean, I go back to my point.  I didn't understand it.  Someone needs to ask, someone needs to explain –

MR. LODER: I will.  I will ask her that question now.

THE COURT: Why don't you do it now so I can understand where they lived and when.

MR. LODER: Sure.

BY MR. LODER:

Q.    I asked you do you know if you actually paid the rent for every month even during the months that you weren't living there?

A.    There were, in the total time from '04 to '08, approximately maybe four months total that we didn't pay the full six ninety-five for that house.

Q.    You did not pay anything, so nothing would have been paid during those months?

A.    That's correct.

Q.    So the remaining number of months, which I believe would be about thirty-eight months, you and your husband paid one-half, three hundred and forty-seven dollars and fifty cents?

40

Transcript at 158-61.

The plaintiffs did not provide the Court with an accounting, and even if the plaintiffs did pay the full amount in some months, there is no definitive evidence of those payments. Because the plaintiffs' monthly mortgage payment to the defendant would have been $531.95 but for the foreclosure, in the months where they paid one-half of the $695 monthly rental, they would have been paying something considerably less than the mortgage. In any event, even if the plaintiffs have a legal obligation to pay the rent, they did not give the Court the information it needed to make these calculations.

### b) Sunrise Point Apartments

The plaintiffs lived at the Sunrise Pointe Apartments for about four months. Transcript at 168. Mrs Sharpe explained:

Q. So throughout that time you moved there for four months. Explain to the judge why you moved to those places temporarily; why you believed you needed to move?
A. We were having a hard time with the six ninety-five at one point. My son had his own place, which was at Sunrise. We moved in with my son; stayed with him, I am thinking, at least four months.
Q. Okay. And when you were with your son, that was at Sunrise?
A. Yes, sir.
Q. All right. Let's go back to tab "C," Plaintiff's Exhibit 49, and tell the judge what this is a copy of.

THE COURT: Which one?

MR. LODER: Plaintiff's Exhibit 49. I believe it is tab "C." I believe this has already been admitted. Tab "C," Plaintiff's Exhibit 49, just for the purpose of showing that they were living there.

Q. Is that correct, 49?
A. Yes.
Q. It has been admitted. That is just for that limited purpose. All right. Was the rent five hundred and fifty dollars per month at Sunrise Lane?
A. Yes, sir.
Q. All right. How much of that during the four months that you stayed at Sunrise Lane did you and your husband pay?
A. Half.
Q. Half. Half of the five fifty?
A. Yes, sir.
Q. So that would have been two hundred and seventy-five dollars for each of those four months?

41

A.     Yes, sir.

Transcript at 168-69.

As noted above, the plaintiffs' monthly mortgage payments to the defendant would have been $531.95.  Even if they paid one-half of the Sunrise monthly rental, they would have paid $275, considerably less than their monthly mortgage payment. Therefore they would not have had additional rental expenses at Sunrise.[30]

In addition, it does not appear that the plaintiffs were legally obligated to make the apartment rental payments.  Plaintiffs' Exhibit 49 demonstrates that the apartment was leased in the name of Roshee Sharpe, the plaintiffs' son.

And finally, at trial the Court recognized the following when admitting the lease identified as Plaintiffs' Exhibit 49 into evidence:

THE COURT: Well, I am going to admit it to show an address that Mr. Sharpe testified that he was living at and there was a lease; but I'm not going to admit it to show the amount of money that Mr. Sharpe had to pay. Now certainly he can testify to whatever portion of this he had to pay.

MR. LODER: Fair enough.  That is fair enough.

THE COURT: And I suspect that will be my ruling on Exhibit 17 once we get to Mrs. Sharpe testifying, or I can rule that now and save us the trouble of it coming up again.

Transcript at 57.[31]

### c)  Current Lease - 1636 18th Place North

The plaintiffs entered into their current lease in April 2008.[32]  The monthly rent under that lease is $400, considerably less than the 531.95 they would have paid as a

---

[30] Plaintiffs' Exhibit 52 is a copy of a check to Sunrise Point Apartments from Linda Sharpe for $550.00.

[31] As noted above, Plaintiffs' Exhibit 17 is the lease referred to above in the names of Roshee Sharpe and Cynquenca Sharpe.

[32] The plaintiffs also entered into a lease for 7202 Division Avenue in April 2008.  Mrs. Sharpe testified that they lived there about one month.  Plaintiffs' Exhibit 51; Transcript at 50.

42

monthly mortgage payment.[33]

## ii) Conclusions of Law to Additional Living Expenses

The Court agrees with the defendant's citation of <u>Aldridge v. Dolbeer</u>, 567 So.2d 1267 (Ala. 1990) for the proposition that, "The plaintiff has the burden of producing sufficient evidence of his loss to allow the factfinder to calculate the damages without operating from guesswork. <u>Johnson v. Harrison</u>, 404 So.2d 337 (Ala.1981)." <u>Id</u>. at 1270. At the conclusion of the trial, the Court commented:

> I need a list from you of what damages you contend. Now I have got the list that you gave me yesterday that is a general list – well, it is not general. I mean, it is fairly specific but it is not specific enough. I need to get from you what you think the evidence has demonstrated. Rather than rent, seventeen thousand dollars, I want to know from you what you think the evidence showed, "x" number of months at 8400 9th Avenue South at one-half or at two-thirds equals "x" amount, so many months at "x" amount. If you all read – and I know you did – the last order that I entered, the only way I know how to do it is the detail and that is what I am looking for.

Transcript at 322-23.

While the defendant provided some of the information the Court was seeking, that is not evidence to support the plaintiffs' claim of damages. In addition, the plaintiffs did not provide the Court with sufficient information to calculate the living expenses in the situations described above where the plaintiffs incurred damages which were the proximate result of the foreclosure. Similarly, they did not prove that their cost of living was more than the mortgage payments and other expenses they would have had to have paid if they had had an opportunity to cure the arrears.[34]

Based on the above, the Court cannot find that the plaintiffs are entitled to any damages under a breach of contract action for living expenses in excess of those they would have had if the foreclosure had not occurred.

---

[33] There was no evidence, and the Court has not attempted to calculate, the differences between the places the plaintiffs lived after the foreclosure and the foreclosed property. Are they comparable in size? Are the utilities the same? Are they equal in value? These are question that could affect damages, but they cannot be answered from the current evidence.

[34] The Court recognizes that the plaintiffs' hardships and difficulties with moving and their uncertainty about the outcome of these matters have been difficult; however, that concern is not evidence on which a decision may be based.

43

### iii)  Down Payment

As noted above, in regard to the plaintiffs living expenses, there is the remaining issue of how to treat a "down payment" they made.

The lease at 8400 9th Avenue South has been characterized as a "lease-to-own" or "lease purchase." Plaintiffs Exhibit 17.  The lease recited a payment of $2,595 as "nonrefundable option considerations." Id.  Mrs. Sharpe testified that she made those payments, Transcript at 194-95, but the question of the relevance of this issue was discussed at trial.  The transcript reads in part:

> MS. BEARDSLEY: If I may, I mean, I questioned Mrs. Sharpe previously about whether or not she exercised the option, and I don't believe that she did and I don't know if Mr. Loder is planning to put on any testimony about that, but it is my understanding that she never actually exercised the option to purchase.  I mean, I think the down-payment may – under this contract, it appears the down-payment was required because it's a lease-to-own, but it gives you the option to later purchase.  And it is my understanding they did not exercise that option unless testimony is otherwise.
>
> MR. LODER: And that is really a legal issue because this could be interpreted to be – I mean –
>
> THE COURT: My question is do I need to figure that issue out?  I mean, I don't know what relevance it would have to this but the fact that it is on there, I wanted to ask now.  I didn't want to wait until everyone was gone.
>
> MR. LODER: Right now our understanding is that, because the original owner was foreclosed upon, I don't believe, and I will confirm this before we leave, that they are making a claim that they will be obligated to buy the house or this is like a mortgage or anything like that.  So the answer to your question right now would be no.  Right now they are offering this to show that they lived there, they were obligated to pay an amount and they told you exactly what portion they pay.

Transcript at 164.

As stated above, "Damages recoverable for breach of contract are those that naturally and proximately result from the breach." West v. Friday, Inc., 403 So.2d 213, 214 (Ala. 1981).  The Court cannot find that a down-payment on property under a lease-purchase agreement is the natural and proximate result of the defendant's breach of contract.  That seems to be something the plaintiffs took upon themselves.

Based on the above, the Court finds that the plaintiffs are not entitled to damages for the "down payment" they made.

### (b)  Moving Expenses

The plaintiffs' second of eight requests for property loss damages is for post-foreclosure moving expenses.  They argue:

> Also they testified that they needed assistance moving since they could not move all the items alone (Labor), they needed something to move the items in (U-Haul) and they needed some mode of transportation to move large items such as the antique vehicles (Towing Costs). These added expenses totaled Nine Hundred Sixty-Seven And 72/100 Dollars ($967.72).

Post-Damages Trial Memorandum Brief at 8, Docket No. 201.

While the Court acknowledges the defendant's argument that regardless of the defendant's failure to give proper notice for acceleration of its debt, the foreclosure would have occurred anyway, the fact is – it occurred before it was legally allowed.  In that sense, the plaintiffs were required to move from their home before they would have otherwise.  While they should have been prepared to do so based on their dire financial situations, if proper notice had been given, they would have had more time to make those preparations.  In that sense, they are entitled to damages for moving.  Are they entitled to damages for all of the moves they made?  Probably not.  After a certain time whatever moving expense they had could not have been the proximate result of the breach of contract.  But simply put, if the plaintiffs had not had to move, they would not have incurred moving expenses.

The plaintiffs seek $967.72 in damages for moving.  There is evidence of expenses of $39.24 for a moving truck (Plaintiffs' Exhibit 53) and testimony that a similar truck was rented three times (Transcript at 60); however, the Court cannot find other specific evidence to support any additional expenses.

The Court recognizes, "If the damage or loss or harm suffered is certain, the fact that the extent is uncertain does not prevent a recovery. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931)." Jamison, Money, Farmer & Co. v. Standeffer, 678 So.2d 1061, 1067 (Ala.1996).  But, the Court also recognizes:

> Although mathematical certainty is not required, a jury cannot be left to speculate as to the amount of damages, but ' "[t]his does not mean that the plaintiff must prove damages to a mathematical certainty or measure them by a money standard. Rather, he must produce evidence tending to show the extent of damages as a matter of just and reasonable inference." C. Gamble, Alabama Law of Damages § 7-1 (2d ed.1988).' " IMAC Energy, Inc. v. Tittle, 590 So.2d 163, 168 (Ala.1991) (quoting Industrial Chem. & Fiberglass Corp. v. Chandler, 547 So.2d 812, 820 (Ala.1988)) (emphasis omitted).

45

<u>Birmingham Coal & Coke Co., Inc. v. Johnson</u>, 10 So.3d 993, 998 (Ala. 2008).

The Court finds that the breach of contract was the natural and proximate cause of the plaintiffs having to move.  The testimony evidence is that the plaintiffs rented a moving truck three times at a rate of $39.24, the rate shown on Plaintiffs Exhibit 53.  Therefore, the Court finds that the plaintiffs are entitled to $117.72 for moving expenses.[35]

The Court cannot find any specific evidence of the amount of the plaintiffs' expenses for "labor" or "towing" as the argument quoted above requested.

### (c)  Storage

The plaintiffs' third of eight requests for property loss damages is for post-foreclosure storage.  They argue:

> They tried to mitigate their damages by storing clothes in the basement. However, they testified that the basement was damp and Six Hundred And 00/100 Dollars ($600.00) worth of their clothes were destroyed due to mold.

<u>Post-Damages Trial Memorandum Brief</u> at 8, Docket No. 201.

As the testimony below demonstrates, the plaintiffs also contend they are entitled to damages for the rental of a storage unit and the delivery and pickup fees for transporting that unit.

Mr. Sharpe testified:

Q. Turn to Exhibit (j) – I mean Exhibit 61 under tab (j),  Plaintiff's Exhibit 61 under tab (j).  Tell the judge what this is.
A. Well, we had to rent a pod to store some of our belongings in when we moved from 8400 to 1636.
Q. And why did you need to store stuff?
A. Well, we had too much to store in the apartment, so we either had to store it in a building or store it in a pod.  So we decided to get the pod.
Q. Okay.  The pod?
A. Right.
Q. And how many months have you used the pod – is this material that was also in your house, your original house?

---

[35] The Court recognizes that some of the plaintiffs' moves were years after the foreclosure.

Case 04-00250-BGC    Doc 219    Filed 01/26/10    Entered 01/26/10 15:09:40    Desc Main
Document    Page 46 of 62

A.     Yes, it is.
Q.     How many months did you have to use Attic Plus or use storage?
A.     We had it since June, I believe.
Q.     June of what year?
A.     Of '08.
Q.     So that's about six months?
A.     About six months.
Q.     And are you obligated to pay – how much did you pay for this storage?
A.     We pay a hundred and twenty-nine dollars a month on it.
Q.     All right.  For roughly six months as of now?
A.     Right.
Q.     All right.  And did you pay also for the delivery?  I see it is fifty-nine dollars per trip.  Did you have to –
A.     Yes, we did.
Q.     Okay.  So the total amount would be six months times the hundred and twenty-nine monthly rental rate, plus the trip?
A.     Yes, it was.
Q.     Is it each trip each way, two ways or one way?
A.     That's one way.
Q.     So when they pick it up, is there another trip?
A.     That's another trip.
Q.     All right.  So that's ultimately two when you return the pod and a hundred and twenty-nine dollars per month?
A.     Right.
Q.     And had you had your house would you have needed to rent a pod?
A.     No, I would not have.

Transcript at 61-62.  Mr. Sharpe also testified that they had made the payments on the storage unit. Transcript at 54.

Storage of personal items during a move is common.  If the plaintiffs had not had to move, they would not have incurred those expenses.  The Court finds that these damages are incidental to, and the natural and proximate result of, the defendant's breach of contract.

The plaintiffs proved that they had storage expenses of $129.00 for six months plus delivery and pickup expenses of the storage unit of $59.00 each way.  The total is $892.00. The plaintiffs are entitled to damages for this amount.

As quoted above from the plaintiffs' post-trial memorandum, the plaintiffs also claim losses from damaged items that were stored at one of their rental residences. Mrs. Sharpe testified:

A.     We had to – I have got – I guess if you go to Dollar General, they have got these big square plastic buckets that looks like trunks but they are actually

47

plastic. I have got those stacked on top of each other. I have got rolling garbage cans. I have got plastic bags. And because I had to store some things under the house of 8400, there was a lot of damage that was done to some things. I had to leave those behind.

Q.    And roughly how much would you value the loss of those clothes, the ones that resulted in having to be stored in the basement at 8400?

A.    About at least three or four hundred dollars just for the clothes alone.

Transcript at 187.

In contrast to the above, the Court cannot find that damage to some of the plaintiffs' clothes is the natural and proximate result of the defendant's breach.

Based on the above, the Court finds that the plaintiffs are entitled to damages of $892.00 for storage that was the natural and proximate result of the breach of contract.

### (d)  Loan Expenses

The plaintiffs' fourth of eight requests for property loss damages is for post-foreclosure cost of borrowing money to pay their alleged additional expenses. They argue:

All of the above re-location expenses resulted in the need for more money. The Sharpes testified that they supplemented their income with pay day and loans to cover the additional expenses and had to pay One Thousand One Hundred Fifty-Six And 25/100 Dollars ($1, 146.25) to cover the cost of borrowing money for these expenses.

Post-Damages Trial Memorandum Brief at 8, Docket No. 201.

The evidence established that the plaintiffs had cash advance transactions before the foreclosure. The transcript reads:

Furthermore, if I could make an offer of proof, I have already deposed both of the Sharpes in this case and they have told me that they were taking cash advances before they were ever foreclosed and specifically to help pay bills.

Transcript at 178. And again, as this Court's May 29, 2008, opinion establishes, the plaintiffs' financial situation was critical before the foreclosure. Again, that opinion reads:

[T]he plaintiffs are not unsophisticated debtors. Between them they have had three bankruptcy cases before this Court. They were in default in their mortgage payments before each case was filed. They continued to

48

default on their mortgage during each case. The defendant filed a motion
for relief from stay in each of those cases. In each case, the defendant
was granted relief from the stay with limited conditions. The plaintiffs
agreed to future relief orders in two cases and agreed to unqualified relief
in one case.

When the current case was filed, the plaintiffs were in default for $9,500.
This Court's November 19 order allowed them to add $1,251.30 to that
amount to be paid as postpetition arrears. That order also instructed
them to make regular payments to the defendant beginning with the
October 2003 payment. At best, the plaintiffs' situation was critical. Any
hint of the slightest problem should have prompted them to take action.
And as the evidence demonstrates, there was much more than a hint.

Memorandum Opinion at 30, Docket No. 160; In re Sharpe, 391 B.R. 117, 145-46
(Bankr. N.D. Ala. 2008).

In Alabama, "Damages for breach of a contract (or breach of warranty) are
awarded to put a party in the same position he would have occupied if the contract had
not been violated. Coastal States Life Ins. Co. v. Gass, 278 Ala. 656, 180 So.2d 255."
Geohagan v. General Motors Corp., 291 Ala. 167, 171, 279 So.2d 436, 438 (Ala. 1973).

Based on the evidence, the Court finds that the expenses the plaintiffs claim for
"cash advances" are not the natural and proximate result of the defendant's breach. In
addition, the Court finds that to award the plaintiffs damages for expenses relating to
"cash advances" would put them in a better position than they were before the breach.

Based on the above, the Court finds that the plaintiffs are not entitled to
damages for expenses related to "cash advances."

### (e) Damage to Credit

The plaintiffs' fifth of eight requests for property loss damages is for post-
foreclosure damage to their credit because the foreclosure was reported to major credit
reporting agencies. The discussions above relating to the Sharpe's request for
damages for aggravation of preexisting medical conditions and for loan expenses are
relevant here. There is simply no way for this Court to differentiate between the
Sharpe's credit worthiness before the foreclosure and after it. The plaintiffs had filed
three bankruptcy cases before the foreclosure. They were in default of their mortgage
for at least $9,500. This Court had granted the defendant relief from the stay to begin
foreclosure proceedings. Then the foreclosure occurred. Did that event cause
additional damage to the plaintiffs' credit? There is no evidence for the Court to make
that determination.

49

In addition, as quoted above, recovery on a breach of contract action is limited to putting the injured party in the same position that party would have occupied if there had not been a breach. As stated above, the plaintiffs are being afforded "specific performance" relief. Because the foreclosure is void and is being set aside by this Court, the defendant will be required to transmit that information to the major credit reporting agencies.

Based on the above, the Court finds that the plaintiffs are not entitled to damages for any impact the foreclosure had on their credit.

### (f) Additional Work Travel Expenses

The plaintiffs' sixth of eight requests for property loss damages is for Mr. Sharpe's post-foreclosure expenses in traveling to and from work after the plaintiffs moved to a location that was farther from his place of employment. They argue:

> Mr. Sharpe was required to move farther away from work and testified that he had to travel an additional 36 miles per day, that he worked twenty days per week and that he had to travel this additional distance for thirty months between the period of 9/04 and 3/08. His testimony results in an additional six hundred miles (600) at the IRS government rates attached and incorporated herein for the various years in question. This expense totaled Thirteen Thousand Seven Hundred Five And 20/100 Dollars ($13,705.20).

Post-Damages Trial Memorandum Brief at 8-9, Docket No. 201.

As stated above, the plaintiffs were required to move from their home before they would have and could not return until the matters before this Court were resolved. The plaintiffs seek damages for expenses that they incurred because they were, during that time, living farther away from Mr. Sharpe's place of employment. They contend that these distances resulted in additional costs to them.

The Court agrees because these damages were incidental to the breach; however, the Court agrees with the defendant that the evidence supports only a part of the damages claimed. The issue then is how to calculate those damages.

### i) Additional Travel from September 2004 through October 2007

The parties agree that for the period from September 2004 through at least October 2007 the plaintiffs lived at 8400 9th Avenue South.[36]  Transcript at 148-50,

---

[36] Apparently the plaintiffs would have remained at 8400 9th Avenue South if an ensuing foreclosure against the owner/lessor had not occurred.  See Transcript at 166 and Plaintiffs' Exhibits 54-56.

58-59; Defendant's <u>Post-Trial Brief</u> at 23-241, Docket No.202.

      They disagree about the number of additional miles Mr. Sharpe was required to travel to work during this time. The plaintiffs contend, based on Mr. Sharpe's testimony, that the round-trip distance Mr. Sharpe traveled to work from his home before the foreclosure was 6 miles. They contend that the round-trip distance after the plaintiffs moved to 8400 9th Avenue South was 36 miles.

      Mr. Sharpe testified:

Q.    All right. When you were at the home in Ensley, which is the subject of this lawsuit, approximately how far did you have to travel to get to Birmingham Southern?

A.    Before I moved to East Lake, it was about three miles.

Q.    All right. And when you moved to East Lake, how far did you have to travel one-way to get to work?

A.    About eighteen miles.

Q.    So that was thirty-six miles two ways, both ways?

A.    Right.

Q.    And I believe you lived at 8400 according to your testimony – when did you stop living at 8400, the East Lake address, roughly what year and what month?

A.    Roughly March of '08.

Q.    March of '08. All right. So that was sometime from September 2004 until March of '08?

A.    Right.

Q.    All right. And are you – and you worked roughly how many days a week?

A.    Roughly five days a week.

Q.    Five days a week. So from September '04 until March 2008 you traveled back-and-forth to work five days a week and you traveled approximately thirty-six miles per day?

A.    Right.

Q.    Are you asking this court to compensate you additionally for the increased level of mileage that resulted from you having to travel a further distance?

A.    Yes, I am.

Q.    All right. And what rate do you feel is an adequate rate to use per mile to satisfy your mileage requirement, what rate?

A.    Whatever the rate that's going for these days.

Q.    Is the IRS government rate the rate that you would suggest to the judge is a fair rate if the judge determines that your increased mileage was a result of this foreclosure incident?

A.    That's correct.

Transcript at 148-50.

Based on that testimony, the plaintiffs argue for a round-trip, per day mileage amount of 36.[37]

In its post-trial brief, the defendant argued that a review of an applicable map demonstrates that the actual round-trip distance before the foreclosure was 4.94 miles and the round-trip distance after the move to 8400 9th Avenue South was 31.46 was 15.73 miles, not 18.  Therefore the defendant argues for a round trip, per day mileage amount of 26.52.

The map relied on by the defendant is not in evidence.  Neither the defendant nor the Court can know what route Mr. Sharpe took to and from work or why.  The evidence is that the round-trip distance before the foreclosure was 6 miles.  The round-trip distance after the foreclosure from 8400 9th Avenue South was 36 miles.  The Court finds that the round-trip, per day mileage amount for calculating damages is therefore 30, the difference in 36 and 6.

Both parties calculated the damages by multiplying the number of days Mr. Sharpe worked, times the number of miles he traveled on those days, times a per mile amount (for the appropriate time periods) from the Internal Revenue Service standard mileage rates for calculating costs of operating an automobile.  The Court takes judicial notice of those rates.[38]

Using these figures, the Court calculates the plaintiffs' incidental damages in this manner:

```
Sept. 2004 - Dec. 2004 (80 work days x 30 miles per day x .375 cents per mile)   =$  900
Jan. 2005 - Dec. 2005 (240 work days x 30 miles per day x .405 cents per mile    =$2,916
Jan. 2006 - Dec. 2006 (240 work days x 30 miles per day x .445 cents per mile    =$3,204
Jan. 2007 - Oct.  2007 (180 work days x 30 miles per day x .485 cents per mile   =$2,619
Total                                                                             $9,639
```

Therefore, based on the above, the Court finds that the plaintiffs are entitled to incidental damages of $9,639.00 for expenses incurred because they were, from

---

[37] The plaintiffs actual calculation of these damages used 36 miles rather than 30.  Post-Damages Trial Memorandum, Docket No. 201.  They failed to reduce the 36 total miles (18 one way times two) by the six total miles Mr. Sharpe traveled before the foreclosure.  In calculating damages the Court has considered only the additional miles traveled.  As explained in this memorandum many times, the plaintiffs may not be placed in a position that is better than the one they had before the breach.

[38] Rule 201 of the Federal Rules of Evidence authorizes a court, whether requested or not and at any stage in a proceeding, to take judicial notice of a fact that is not subject to reasonable dispute in that it is either generally known within the territorial jurisdiction of the trial court or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

September 2004 through October 2007, living further away from Mr. Sharpe's place of employment than they were before the foreclosure.

### ii) Additional Travel from October 2007 to the Present

The important point to remember here is that there is no evidence about the distances Mr. Sharpe traveled from home to work and from work back to home, other than those relating to 8400 9th Avenue South. Therefore, the Court cannot calculate what additional expenses he would have had if that evidence had been provided.[39]

If this is correct, which the Court finds that it is, there is no evidence about the distances between Mr. Sharpe's work place and these other two residences. In that regard, the defendant asks the Court to ignore any additional mileage for any months after October 2007. The Court agrees. If the plaintiffs lived at the Sunrise Point Apartments for four months and 7202 Division Avenue for one month, and then moved to their current location in April 2008, the five months from October 2007 to March 2008 were months away from 8400 9th Avenue South, the only location for which mileage is provided.

Based on the above, the Court cannot calculate what incidental damages the plaintiffs may have had for any time after October 2007.

### (g) Losses in Mr. Sharpe's Antique Car Business

The plaintiffs' seventh of eight requests for property loss damages is for Mr. Sharpe's post-foreclosure losses in an antique car business. They argue:

> Finally Mr. Sharpe had to close his antique repair business resulting in the loss of three vehicles (74 Nova, 94 Seville, 86 Cavalier).
>
> ******************************
>
> He testified that they were lost because he had to store them at locations other than his home. The real estate agent, Linda Saunders, corroborated his testimony that he repaired vehicles at his home as she documented repair equipment, motors, etc. in the Sharpes' garage. He testified that the

---

[39] The Court cannot calculate mileage for any time after October 2007 even if the plaintiffs contend that they provided mileage for the time after October 2007. The evidence is conflicting. Mr. Sharpe testified, as quoted above, that they lived at 8400 9th Avenue South from September 2004 through March 2008. This cannot be correct. Mrs. Sharpe testified, and all other evidence agrees with her, that they lived at the Sunrise Point Apartments for four months and at 7202 Division Avenue for one month. Transcript 167-68; 196-197. See also Transcript at 171-72.

Case 04-00250-BGC   Doc 219   Filed 01/26/10   Entered 01/26/10 15:09:40   Desc Main
Document      Page 53 of 62

cumulative value of these vehicles was Thirteen Thousand Eight Hundred And 00/100 Dollars ($13, 800.00).

Post-Damages Trial Memorandum Brief at 9 -10, Docket No. 201.

The plaintiffs seek damages for loss profits from having to close what they contended was Mr. Sharpe's antique car repair business and seek damages for the storage, repairs to, expenses related to, or the loss of three vehicles.  Those vehicles are a 1974 Chevrolet Nova, a 1986 Chevrolet Cavalier, and a 1994 Cadillac Seville.

The first issue is what was the nature of Mr. Sharpe's "business."  He testified:

Q.      Why did you work on cars?
A.      Hobby.

Transcript at 39.

The Court agrees with the defendant's general conclusion that the plaintiffs are not entitled to any losses associated with an "antique car business," because Mr. Sharpe testified that the "business" was a hobby.  Defendant's Post Trial Brief at 9-20, Docket No. 202.  As the defendant correctly points out, not only did Mr. Sharpe testify that his interest was a "hobby," the plaintiffs did not include any information on their Chapter 13 schedules about a car business.

With that finding however, if the plaintiffs suffered any losses to this personal property that were the proximate result of the breach, they are entitled to incidental damages for those losses as they would be for damages to other personal property. The question then is what do the plaintiffs claim they lost and were those losses the natural and proximate result of the breach of contract.

Mr. Sharpe testified that he worked on these cars in his yard and in his garage. His general contention is that when he had to move he did not have anywhere to store or to work on these cars.[40]

_____

[40] The Court recognizes the severe imposition that the move must have had on Mr. Sharpe in regard to these vehicles.  Before the move he had space to store them and work on them.  After the move he did not.  It must have been very difficult for the plaintiffs to find not only somewhere to live, but also some where to store three vehicles in various states of repair or restoration.  What is that worth to the plaintiffs?  If the plaintiffs had had the money, they could have easily rented space for Mr. Sharpe to store the vehicles and work on them.  But if they had those funds, they probably would not have been in the predicament they were after the move.  The Court cannot minimize the problems that the plaintiffs financial situation must have caused, and still cause, them.  But these "damages," if they are compensable at all, would be because of the mental anguish and emotional distress that the plaintiffs suffered because of the breach.  And as discussed above, the Court finds that they are not entitled to any reward for

54

### i)  1974 Chevrolet Nova

Mr. Sharpe testified that he owned a 1974 Chevrolet Nova.  Transcript at 39.  He had removed and was restoring its engine.  Transcript at 40.  Mr. Sharpe testified that after the foreclosure he moved the Nova to a parking lot in downtown Birmingham.  The Nova disappeared from that lot.  Mr. Sharpe believes it was stolen.  Transcript at 41-42.  While there is no official report that the Nova was reported stolen, Plaintiffs' Exhibit 18 is a February 4, 2005, letter from the City of Birmingham, Department of Police to Mr. Sharpe asking Mr. Sharpe to provide information about the status of the vehicle.

The plaintiffs ask for damages for the storage and loss of the Nova.[41]  If there were evidence of the plaintiffs' cost of renting space in the parking lot to store the Nova, the Court would award damages for those costs.  But there is not; therefore, no damages are due for storage.

In regard to the loss of the Nova, the Court cannot find that the "theft" of the Nova is a natural and proximate result of the defendant's breach of contract.

### ii)  1986 Chevrolet Cavalier

Mr. Sharpe also owned a 1986 Chevrolet Cavalier.  Transcript at 40.  After the foreclosure, Mr. Sharpe moved the Cavalier to 8400 9th Avenue South with them.  Transcript at 40-41.  The Cavalier was in operating condition at that time, but later had problems.  He took it to a repair shop.  Transcript at 41-42.  Mr. Sharpe testified that the Cavalier was also stolen.  Transcript at 42.

The plaintiffs ask for damages for the storage and loss of the Cavalier.  Again, if there were evidence of the plaintiffs' cost of paying for space to store the Cavalier, the Court would award damages for those costs.  But there is not; therefore, no damages are due for storage.

In regard to the loss of the Cavalier, again the Court cannot find that the "theft" of the Nova is a natural and proximate result of the defendant's breach of contract.

---

them.  That does not minimize the impact on the plaintiffs because of their situation, and the Court recognizes that impact, even if it does not find that a money award is available.

[41] There is conflicting testimony that there may have been some space to "store" the Nova when the plaintiffs moved.  Mr. Sharpe testified that he took the Cavalier to 8400 9th Avenue South.  The implication is that he had room to keep it but did not have room to work on it.  Transcript at 40.

### iii) 1994 Cadillac Seville

The situation with the Seville is the same as the Cavalier. Transcript at 41. Mr. Sharpe moved it to 8400 9th Avenue South after the foreclosure. When it quit running, he took it to the same repair shop. He believes it was stolen from that shop. The one difference is that the plaintiffs claim repair cost for the Seville. Plaintiffs' Exhibit 23 is a bill or a receipt for $1,500 for repair work on the Seville. The plaintiffs' theory is that if the defendant had not breached the contract the plaintiffs would not have had to have moved, and Mr. Sharpe would have had space to work on the vehicle and would not have had to have paid someone else $1,500 to repair the car.

Again, if there were evidence of the plaintiffs' cost of paying for space to store the Seville, the Court would award damages for those costs. But there is not; therefore, no damages are due for storage.

In regard to repairs made to the Seville, there is no evidence that if Mr. Sharpe had repaired the vehicle himself, he could have, or would have, repaired it for less, or even if he did, how much more it cost for someone else to make the repairs. Therefore, the Court cannot calculate, and the plaintiffs are not entitled to, damages for the repair expenses to the Seville.

In regard to the loss of the Seville, again the Court cannot find that the "theft" of the Seville is a natural and proximate result of the defendant's breach of contract.

### iv) Conclusion to Losses in Mr. Sharpe's Antique Business

Based on Mr. Sharpe's own testimony, the Court finds that his work with the vehicles in this matter was a hobby, not a business, and he is therefore not entitled to any damages for losses from such a business.

Based on the above, the Court finds that the plaintiffs are not entitled to damages for the storage of, repair of, or loss of any of the vehicles they contend were a part of Mr. Sharpe's antique repair business.

### (h) Vehicle Rental Expenses

The plaintiffs' eighth of eight requests for property loss damages is for post-foreclosure vehicle rental expenses. Plaintiffs' Exhibits 19, 22, 25, 26, 27, 28, 29, and 31 are receipts for rental expenses for vehicles in 2005 and 2006. The plaintiffs contend that because of the foreclosure, and presumably because of the loss of the vehicles discussed above, they are entitled to damages for the cost of renting vehicles after the foreclosure.

First, there is no evidence that supports a finding that renting these vehicles for personal use is a natural or proximate result of the breach. Second, the Court agrees

with the defendant that the time between the foreclosure and the rentals confirms that the breach was not the proximate cause.

Therefore, the Court finds that the Sharpes are not entitled to incidental damages because they rented vehicles after the foreclosure.

### 4. Attorney Fees

The Court's fourth consideration of the plaintiffs' requested damages is the plaintiffs' request for attorney fees. The plaintiffs argue:

> This Court has the authority to award the Sharpes attorney fees because Wells Fargo's conduct was intentional and vexatious. The Sharpes incurred attorneys fees and costs in the amount of Seventy Thousand Two Hundred Eighty Seven And 15/100 Dollars ($70, 287.15).

Post-Damages Trial Memorandum Brief at 3-4, Docket No. 201. This Court disagrees.

Writing for the Supreme Court of Alabama in Eagerton v. Williams, 433 So.2d 436 (Ala.1983), Justice Reneau P. Almon stated the general rule in Alabama. He wrote:

> In Alabama, attorney's fees are recoverable only where authorized by statute, when provided in a contract, or by special equity, such as in a proceeding where the efforts of an attorney create a fund out of which fees may be made. Shelby County Commission v. Smith, 372 So.2d 1092 (Ala.1979); State ex rel. Payne v. Empire Life Ins. Co., 351 So.2d 538 (Ala.1977). We affirm the trial court's finding that the decree creates a common fund from which counsel fees may be made.

Id. at 450.

Justice J. Gorman Houston Jr. explained in more detail in James v. James, 768 So.2d 356 (Ala. Jan 28, 2000). He wrote:

> The "American Rule" of awarding attorney fees has been that a party must pay his own attorney's fee, and in the vast majority of situations this is the proper rule. Reynolds v. First Alabama Bank of Montgomery, 471 So.2d 1238, 1240 (Ala.1985). However, Alabama law has made exceptions to the American Rule:
>
> "In Alabama, attorneys' fees are recoverable only where authorized by statute, when provided [for] in a contract, or by special equity, such as in a proceeding where the efforts of an attorney create a fund out of which fees may be made. Shelby County Commission v. Smith, 372 So.2d 1092

57

(Ala.1979); <u>State ex rel. Payne v. Empire Life Ins. Co.</u>, 351 So.2d 538 (Ala.1977)."  <u>Eagerton v. Williams</u>, 433 So.2d 436, 450 (Ala.1983), quoted in <u>Reynolds</u>, 471 So.2d at 1241.

<u>Id</u>. at 360-61.

None of the exceptions to the general rule are present here.  There is neither a statute nor a contract provision that excepts this situation from the general rule, and this matter is not one where a fund is created out of which fees may be paid.  Therefore, the Court finds that the plaintiffs are not entitled to damages for their attorney fees.

### C.  The Defendant's Motion to Dismiss GE and the Plaintiffs' Allegations against GE

Also pending before this Court are:

1.      The defendant's <u>Motion to Dismiss Defendant GE Mortgage Services</u> filed November 21, 2007, Docket No. 147.

2.      The plaintiffs' <u>Response in Opposition to Motion to Dismiss Defendant GE Mortgage Services: Motion for Scheduling Conference on Jury Trial of Defendant GE</u> filed November 23, 2007, Docket No. 148; and

3.      The defendant's <u>First Amendment to Motion to Dismiss Defendant GE Mortgage Services</u> filed December 18, 2007, Docket No. 152.

The Court addressed these matters briefly in its May 29, 2008, memorandum opinion and left them for decision in conjunction with the above matters.  They are now ripe for decision.

In its May 29, 2008, opinion the Court wrote:

All of the evidence offered at the trial against Wells Fargo applies to GE. And based on that evidence, this Court cannot imagine additional evidence that could be offered against GE that was not offered against Wells Fargo.  Each party offered all of its evidence regardless of whether it involved Wells Fargo or GE.  And as it turns out, all of that evidence applies equally to GE and Wells Fargo.  If ever necessary, this Court can determine whether GE has any liability separate from Wells Fargo.  But for now, all that matters is that it is not necessary to have another trial.

<u>Memorandum Opinion</u> at 70, Docket No. 160.

In the affidavits supporting its motion to dismiss, Wells Fargo assumed all liability for all of GE's actions and pledged to satisfy any judgment rendered against Wells Fargo or GE.

58

Based on this memorandum opinion and others entered by this Court in this proceeding, the Court finds that all of the matters relating to GE are resolved. The Court is confident that the defendant will satisfy all of the obligations imposed on it and GE by this Memorandum opinion and accompanying order. Therefore, the defendant's motion to dismiss GE is due to be granted.

## IV. CONCLUSIONS

As to Issue One, the Court concludes that the defendant is not liable under the limited theory that the price paid by the mortgagee for the property so shocked the conscience that it could be considered wrongful foreclosure or a breach of fiduciary duty. The price paid by the defendant at the foreclosure was equal to the fair market value of the property at that time. Consequently, the defendant does not have any liability under either wrongful foreclosure or breach of fiduciary duty. As such, the plaintiffs are not entitled to damages under those theories.

As to Issue Two, the Court concludes that the plaintiffs are, as listed below, entitled to certain damages but are not entitled to others.

### A. Punitive Damages

The plaintiffs are not entitled to punitive damages under any cause of action.

### B. Specific Performance

The plaintiffs are entitled to specific performance of the terms of their contract with the defendant. Because the defendant failed to give the plaintiffs proper notice of the acceleration, the acceleration failed. Because the acceleration failed, the foreclosure is void. Because the foreclosure was void, it is due to be set aside. Therefore, the parties will be placed in the positions they were in before the foreclosure.

Because the foreclosure is void and will be set aside, the plaintiffs are entitled to reside on the property until removed in a lawful manner. As such, the parties should make arrangements as soon as possible to have the property turned over to the plaintiffs, if the plaintiffs choose.

Because the parties will be placed in the positions they were in before the foreclosure, the defendant still has relief from the automatic stay. It may, if it chooses, institute new foreclosure proceedings. If it does, the Court finds, based on the evidence, that the amount the defendant must represent to the plaintiffs as the cure amount, and the amount the plaintiffs must pay in order to reinstate the mortgage, is

Case 04-00250-BGC    Doc 219    Filed 01/26/10    Entered 01/26/10 15:09:40    Desc Main
Document      Page 59 of 62

$18,271.97. Transcript at 289-90.[42]

Because the parties will be placed in the positions they were in before the foreclosure, if the plaintiffs choose to occupy the property, they will again be responsible for making the regular mortgage payments.

And finally, in regard to specific performance, because the parties will be placed in the positions they were in before the foreclosure, the Court will require the defendant to notify all major credit reporting agencies that the August 30, 2004, foreclosure is void and has been set aside by this Court.

### C.  Compensatory or Incidental Damages because of the Breach of Contract

### 1.  Mental Anguish or Emotional Distress

The plaintiffs are not entitled to damages for mental anguish or emotional distress.

### 2.  Aggravation of Preexisting Conditions

The plaintiffs are not entitled to damages for aggravation of preexisting conditions.

### 3.  Property Loss and Related Expenses

The plaintiffs are entitled to damages for certain property losses but not for others.

### a.  Additional Living Expenses

The plaintiffs are not entitled to damages for additional living expenses.

### b.  Down Payment on the Lease - Purchase of 8400 9th Avenue South

The plaintiffs are not entitled to damages for the down payment on the lease-purchase of 8400 9th Avenue South.

---

[42]  The plaintiffs will be entitled to a set off of their damage award against this arrearage amount.

60

### c.  Moving Expenses

The plaintiffs are entitled to damages of $117.72 for moving expenses.

### d.  Storage

The plaintiffs are entitled to damages of $892.00 for storage.

### e.  Loan Expenses

The plaintiffs are not entitled to damages for loan expenses.

### f.  Damage to Credit

The plaintiffs are not entitled to damages to their credit.

### g.  Additional Work Travel Expenses

#### (1) September 2004 through October 2007

The plaintiffs are entitled to damages of $9,639.00 for additional work travel expenses incurred from September 2004 through October 2007.

#### (2) After October 2007 to the Present

The plaintiffs are not entitled to damages for additional work travel expenses incurred after October 2007 to the present.

### h.  Losses in Mr. Sharpe's Antique Car Business

The plaintiffs are not entitled to damages for any losses associated with Mr. Sharpe's antique car business.

### i.  Vehicle Rental Expenses

The plaintiffs are not entitled to damages for any vehicle rentals, other than those associated with moving as discussed above.

### D.  Attorney Fees

The plaintiffs are not entitled to reimbursement for their attorney fees.

### V.  Status of the Current Bankruptcy Case
### and Adversary Proceeding

   The current case, Case Number 03-04644, was closed on January 13, 2006. With entry of this Memorandum Opinion and accompanying Order, the pending Adversary Proceeding Number 04-00250 is due to be closed in the normal course.

   Dated:  January 26, 2010    /s/Benjamin Cohen     
                    BENJAMIN COHEN
                    United States Bankruptcy Judge

BC:pb